UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————— x

JEREMIE COMEAU, Individually and on
Behalf of All Others Similarly Situated,

                            Plaintiff,

            vs.

VINFAST AUTO LTD., LE THI THU THUY,
PHAM NHAT VUONG, DAVID
MANSFIELD, NGAN WAN SING
WINSTON, LING CHUNG YEE ROY,
PHAM NGUYEN ANH THU, and NGUYEN
THI VAN TRINH,

                            Defendants.

———————————————— x

:  Civil Action No. 1:24-cv-02750-NGG-RML
:
:  <u>CLASS ACTION</u>
:
:
:
:
:  **AMENDED CLASS ACTION
:  COMPLAINT FOR VIOLATIONS OF
:  THE FEDERAL SECURITIES LAWS**
:
:
:
:
:
:  <u>DEMAND FOR JURY TRIAL</u>
:
:
:

Lead Plaintiffs Dr. Filippo Nannicini, Alessandra Nannucci, and Lorenzo Nannicini ("Lead Plaintiffs") make the following allegations based upon their counsel's investigation, which included, without limitation, review and analysis of: (a) certain U.S. Securities and Exchange Commission ("SEC") filings by VinFast Auto Ltd. ("VinFast" or the "Company"); (b) press releases issued and disseminated by VinFast; (c) analyst reports and media reports regarding the Company; and (d) other publicly available information concerning VinFast, including transcripts of VinFast's investor calls. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This amended complaint is alleged in two parts.  The first part alleges non-fraud claims under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of all persons or entities that purchased VinFast securities in a public offering conducted on or about August 15, 2023 (the "Offering").

2.      The second part of this amended complaint alleges fraud claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired VinFast securities between August 15, 2023 and April 21, 2024, inclusive (the "Class Period"), and who were damaged thereby.

3.      VinFast is a Vietnamese automotive manufacturer established in 2017.  In 2022, VinFast transitioned from manufacturing traditional internal combustion engine vehicles to electric vehicles ("EVs") exclusively.

### Securities Act Claims

4.      On May 12, 2023, VinFast and Black Spade Acquisition Co. ("Black Spade"), a special purpose acquisition company ("SPAC"), announced that they entered into a business

combination agreement (the "Business Combination") which, when completed, would result in VinFast shares being listed publicly in the United States.

5.    Prior to the Business Combination, VinFast had been financially dependent upon its parent company, Vingroup Joint Stock Company ("Vingroup"), one of the largest private enterprises in Vietnam, and Defendant Pham Nhat Vuong ("Vuong"), the founder of both Vingroup and VinFast and one of the richest persons in Vietnam with a net worth believed to be in the tens of billions of dollars.

6.    On June 15, 2023, VinFast filed with the SEC a Form F-4 registration statement (the "Registration Statement") in connection with the Business Combination. On July 28, 2023, VinFast filed with the SEC a prospectus and proxy statement (the "Proxy Statement," and together with the Registration Statement, the "Offering Documents") on Form 424B3 in connection with the Business Combination. Following approval by Black Spade's shareholders, the Business Combination between Black Spade and VinFast was completed. On August 15, 2023, VinFast began trading on the NASDAQ, with an initial market capitalization of approximately $23 billion.

7.    The Offering Documents set forth VinFast's plans for expansion outside of Vietnam, with target markets including the United States, Canada, France, Germany and the Netherlands. VinFast also discussed plans to create new manufacturing centers in North Carolina and elsewhere.

8.    At the time of the Offering, however, VinFast's EVs were experiencing significant, undisclosed operational defects that materially impaired their marketability. These defects, which ranged from inferior materials to mechanical malfunctions, resulted in major safety and drivability issues that caused the market for VinFast's EVs to be extremely limited.

9.    Defendants repeatedly ignored the concerns related to VinFast's cars. Beginning in February 2023, Hazar Denli, who led the engineering team that worked on the VinFast car's front

suspension and chassis prior to their production for consumer use, identified "improperly designed components in the car's chassis, including its suspension system." He reported that "[a]t low mileages, ***some of the[] [chassis] were snapping off***," which "created a risk that under stress, such as hitting a pothole at speed, the wheels could become misaligned, causing the car to veer to the left or right without prompting, and the driver could lose control[.]" He further explained that "***[i]n a crash scenario, it could be completely unsafe***."

10.     Denli conveyed his concerns to senior executives at VinFast, recommending they redesign the faulty components and manufacture safer, higher quality parts. Denli explained that the "serious faults data was basically buried under the carpet," and that VinFast "never really dealt with it." VinFast dismissed Denli's concerns and recommendations and "pushed ahead with production" as it was preparing to go public.

11.     When asked if Defendant Vuong knew that the cars were problematic, Denli responded, "***Yes he indeed knew of our concerns . . . or issues reported . . . we follow strict reporting guidelines etc. He basically didn't care***[.]"

12.     In May 2023, automotive journalists and car enthusiasts in the United States began reviewing the VinFast VF 8. The reviews of the vehicle were resoundingly negative, with complaints about the quality of the ride, the cheap choice of materials, and how the vehicle was not ready for deliveries to customers. Several reviewers reported feeling sick while driving.

13.     Defendants largely minimized the negative reviews of the EVs, with VinFast executives calling them "so much noise," "balanced," and "positive, or at least neutral." VinFast did, however, "reflect" on "some [] negative reviews" and acknowledged that they gathered feedback on potential improvements. Despite this, the issues with VinFast's EVs persist. On September 10, 2024, the National Highway Traffic Safety Administration ("NHTSA") announced

that it would be investigating certain VinFast EVs sold in the United States. That investigation remains ongoing.

14.     As a result of the safety and mechanical issues associated with VinFast's EVs, Defendants knew at the time of the Offering that the Company could not count on sales to non-related, retail customers. In fact, prior to the Offering, VinFast's sales to non-related customers amounted to only one-third of total sales in the first two quarters of 2023. The magnitude of sales to related parties was designed to, and did, mask the lack of demand VinFast was experiencing for its EVs in the marketplace.

15.     The market, however, only began to learn this after VinFast went public. For example, on September 7, 2023, *DW*, a German international news outlet, published an article titled "Is Vietnam's e-car maker VinFast hitting the brakes?," discussing how "***VinFast still does not have a significant market share even in Vietnam***[.]"

16.     Unable to sell its EVs, VinFast's parent company Vingroup simply created a taxi company shortly before VinFast went public to buy VinFast's EVs, thereby super-charging VinFast's sales and revenues and making the Company look better to investors than it really was.

17.     On September 12, 2023, Barron's reported that, in the first half of 2023, out of 11,300 EVs VinFast sold, over 7,000 were sold to Green and Smart Mobility Joint Stock Company ("GSM")—a related party founded by Vingroup ***just two months before VinFast announced its intention to go public***. Thus, ***nearly two-thirds of VinFast sales went to GSM in the first and second quarter of 2023***. The second quarter had closed over a month before VinFast went public, so these facts were available to Defendants. This material information, however, was not disclosed in the Offering Documents.

18.    On April 11, 2024, *Reuters* published an article titled "Vietnam EV maker VinFast's challenges escalate risk for parent Vingroup." The article highlighted Vingroup's financial risk from VinFast's sales to affiliated companies, and revealed that ***over 80%*** of VinFast's 2023 sales were to Vingroup-affiliated companies.

19.    On April 21, 2024, *Hunterbrook Media* published an article titled "What's Going On With VinFast?" The article discussed VinFast's sales to affiliated companies, revealing that "[m]ore than 70% of those deliveries were to other companies owned by VinFast's Chief Executive Pham Nhat Vuong[.] They ***accounted for more than 90% of Vinfast's total sales revenues***."

20.    Despite their awareness of the systemic issues with VinFast's EVs, coupled with the Company's overwhelming proportion of historical sales to related parties, Defendants failed to disclose in the Offering Documents VinFast's known trend, uncertainty, and/or unusual event or transaction of overwhelming sales to related parties in violation of Item 303, and the risk that the Company would be unable to sell its vehicles to customers other than related parties in violation of Item 105, rendering the Offering Documents materially false and misleading.

21.    Defendants further misled investors in the Offering Documents by making radical changes to the lock-up provision described in the Offering Documents. According to the Offering Documents, certain equityholders of VinFast had agreed to be subject to a 180-day lockup in respect of their VinFast ordinary shares. On August 30, 2023, ***just two weeks*** after the Company went public, VinFast filed a registration statement confidentially with the SEC (the "Confidential Registration Statement"), revealing that it was planning to release a certain number of "ordinary shares to be offered and sold by [Vingroup] from the lock-up restrictions."

- 5 -

22.     Accordingly, the statements discussing the lock-up provision were materially false and misleading because, at the time of the Offering, VinFast imminently planned to release a significant number of shares from the lock-up provision.

### Exchange Act Claims

23.     Following the Offering, Defendants continued to mislead investors in violation of Section 10(b).  On August 15, 2023, the first day of the Class Period, Defendants David Mansfield ("Mansfield"), the Company's then-Chief Financial Officer ("CFO"), and Le Thi Thu Thuy ("Thuy"), the Company's then-Chief Executive Officer ("CEO"), touted VinFast's capital position, claiming that the Company was "very comfortable" and "not in a rush" to obtain additional capital, and "[didn't] need more equity capital."  Contrary to their statements, however, VinFast had a present need to raise capital and was actively seeking to raise additional funding in various ways.

24.     At the same time Mansfield and Thuy denied the Company's need for more capital, VinFast was planning to raise capital by releasing shares from the lock-up provision, explaining in the Confidential Registration Statement that *it would will receive all of the proceeds from the sale of an undisclosed number of ordinary shares by a related party.*  Indeed, on September 21, 2023, VinFast stated that it released more than 46 million shares from the lock-up restriction.

25.     VinFast also raised capital shortly thereafter by accessing nearly $1 billion in loans from Vingroup.  VinFast announced on October 5, 2023, that, *as of September 30, 2023, Vingroup had disbursed approximately $955 million in loans to VinFast in accordance with a capital funding agreement*, and it expected to receive up to *$500 million in grants from Vingroup* in the next six months.

26.     Then, on October 15, 2023, *Bloomberg* interviewed Thuy and published an article titled "VinFast to Expand Into South-East Asia, Raise More Capital."  In the interview, Thuy stated

that VinFast will look to raise "*a lot of capital*."  In response, VinFast's ordinary share price fell $1.45 per share, or 18.17%, to close at $6.53 per share on October 16, 2023.

27.     On October 17, 2023, *The Wall Street Journal* published an article titled "VinFast Plumbs New Lows After CEO Says Company Needs Lots of Capital," attributing the decline in VinFast securities prices to Thuy's statements that "VinFast would need to raise a lot of capital to fund expansion plans into southeast Asia."

28.     Just a few days later, in a press release dated October 20, 2023, VinFast announced its entry into a Standby Equity Subscription Agreement with YA II PN, Ltd. ("Yorkville Advisors"). The press release stated that "***VinFast has the option, but not the obligation, to require Yorkville Advisors to subscribe for up to $1.0 billion of ordinary shares in VinFast at any time during the term of the Subscription Agreement***, subject to certain conditions and limitations."

29.     In addition, VinFast issued sales projections that lacked a reasonable basis.  On May 17, 2023, Vuong told investors at the Company's annual general meeting that VinFast projected EV sales for full-year 2023 to be between 40,000 and 50,000, up from EV sales of 7,400 in 2022. The low end of this projection was more than double VinFast's total sales of 18,700 since beginning EV production in 2021.

30.     Several analysts and news outlets were skeptical that VinFast would be able to meet its target goal.  As the truth about the baseless nature of the projections began to leak out, VinFast's ordinary shares declined on September 22, 2023 and October 27, 2023.  Nevertheless, these projections were repeatedly affirmed by Vuong, Mansfield, Thuy, and VinFast during the Class Period.

31.    Ultimately, on January 18, 2024, VinFast announced that "it delivered nearly 35,000 cars in 2023, below its target of at least 40,000 units." More than 70% of those deliveries were to Vuong's GSM.

32.    The truth of Defendants' fraud was not fully revealed until April 2024, when additional information came out about the extent of VinFast's reliance on related companies for sales and financing.

33.    As a result of these corrective disclosures, the price of VinFast ordinary shares dropped precipitously, ultimately falling to a low of $2.43 per share by the end of the Class Period, more than **97%** below its Class Period high.

34.    Through this action, Lead Plaintiffs seek to recover the damages that Lead Plaintiffs and other Class members have suffered as a result of Defendants' violations of the federal securities laws, and the resultant decline in the value of their investments in VinFast securities.

## II.    JURISDICTION AND VENUE

35.    Counts I and II arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

36.    Counts III and IV arise under §§10(b), 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

37.    This Court has jurisdiction over this action pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1331.

38.    This Court has personal jurisdiction over each of the defendants and venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b). VinFast securities trade on the NASDAQ. Accordingly, there are presumably hundreds, if not thousands, of investors in VinFast securities located across the United States, some of whom likely reside in this Judicial District.

39.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Plaintiffs

40.     Lead Plaintiff Dr. Filippo Nannicini, as set forth in the certification previously filed with the Court (ECF 23-2), and incorporated by reference herein, purchased or acquired VinFast securities pursuant or traceable to the Offering and/or during the Class Period, and was damaged thereby.

41.     Lead Plaintiff Alessandra Nannucci, as set forth in the certification previously filed with the Court (ECF 23-2), and incorporated by reference herein, purchased or acquired VinFast securities pursuant or traceable to the Offering and/or during the Class Period, and was damaged thereby.

42.     Lead Plaintiff Lorenzo Nannicini, as set forth in the certification previously filed with the Court (ECF 23-2), and incorporated by reference herein, purchased or acquired VinFast securities pursuant or traceable to the Offering and/or during the Class Period, and was damaged thereby.

### B.    Defendants

43.     Defendant VinFast, a subsidiary of Vingroup, is a global manufacturer of electric vehicles, with its operational headquarters in Vietnam and its legal and financial headquarters in Singapore.  VinFast manufactures and sells a portfolio of electric SUVs, sedans, scooters, and buses, and operates an automotive manufacturing complex in Hai Phong, Vietnam.  VinFast securities trade on the NASDAQ under the tickers "VFS" for its ordinary shares and "VFSWW" for its warrants.

44.     Defendant Thuy served as the Company's CEO from the completion of the Business Combination until January 2024, and currently serves as Chairwoman of the Company's Board of Directors.  Thuy signed or authorized the signing of the Registration Statement.

45.     Defendant Vuong founded VinFast and served as the Company's Chairman of the Board of Directors from the completion of the Business Combination until January 2024, and has served as the Company's Managing Director and CEO since January 2024.  Vuong effectively controls over 99% of VinFast's stock.  Vuong is the founder and Chairman of Vingroup, VinFast's parent company.  Vuong does not directly hold any stake in VinFast, but as of September 21, 2023, Vingroup owned 50.8% of VinFast, Vietnam Investment Group Joint Stock Company ("VIG") held 32.9% of VinFast, and Asian Star Trading & Investment had a 12.9% stake.  Each of these entities is majority-owned by Vuong.  Vuong signed or authorized the signing of the Registration Statement.

46.     Defendant Mansfield served as the Company's CFO from the completion of the Business Combination until January 2024.  Mansfield signed or authorized the signing of the Registration Statement.

47.     Defendant Ngan Wan Sing Winston ("Winston") served as a Director of the Company from the completion of the Business Combination until May 1, 2024.  Winston signed or authorized the signing of the Registration Statement.

48.     Defendant Ling Chung Yee Roy ("Roy") served as a Director of the Company at all relevant times.  Roy signed or authorized the signing of the Registration Statement.

49.     Defendant Pham Nguyen Anh Thu ("Thu") served as a Director of the Company from the completion of the Business Combination until June 2024.  Thu signed or authorized the signing of the Registration Statement.

- 10 -

50.     Defendant Nguyen Thi Van Trinh ("Trinh") served as a Director of the Company at all relevant times.  Trinh signed or authorized the signing of the Registration Statement.

51.     Defendants Thuy, Vuong, Mansfield, Winston, Roy, Thu, and Trinh are collectively referred to herein as the "Securities Act Defendants," and together with VinFast, as "Defendants."

52.     The Securities Act Defendants, because of their positions with the Company, possessed the power and authority to control the content of VinFast's reports to the SEC, press releases, documents posted by the Company on its official website, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Securities Act Defendants were provided with copies of the Company's Offering Documents alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information available to them, the Securities Act Defendants knew, or should have known, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public. The Securities Act Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Securities Act Defendants.

### C.     Non-Defendant Related Parties

53.     Vingroup, founded by Vuong, is one of the largest private enterprises in Vietnam. VinFast depends financially on support from Vuong and Vingroup in the form of capital, debt financing, and corporate loan guarantees.  For example, in April 2023, VinFast entered into a capital funding agreement which provided the Company access to more than $2.5 billion in capital from both Vuong and Vingroup (the "Capital Funding Agreement"):

> [I]n April 2023, we entered into a capital funding agreement with Mr. Pham Nhat Vuong and Vingroup that provides a framework for us to receive grants of up to VND24,000.0 billion  (approximately $1 billion) from Mr. Pham Nhat Vuong and up

to VND12,000.0 billion (approximately $508.5 million) from Vingroup by April 2024, in amounts to be mutually agreed, at such time as required by us and subject to Vingroup and Mr. Pham having sufficient financial resources, as well as a loan of up to VND24,000.0 billion (approximately $1 billion) from Vingroup, with disbursements of the grant and the loan to be subject to the parties agreeing to enter into a definitive loan agreement, the financial resources of Vingroup and necessary approvals from the relevant governing bodies of Vingroup.[1]

54.    GSM is an entity dedicated to using VinFast EVs for rental and taxi services.  On March 6, 2023—approximately two months before VinFast announced its intention to go public—Vuong announced the establishment of GSM.  When it was created, GSM had a charter capital of $125.7 million, with Vuong owning a 95% stake.  On April 14, 2023, GSM began operating the first pure electric taxi service in Vietnam, Green and Smart Mobility Taxi.  GSM's rental and taxi services exclusively use VinFast EVs.

55.    VIG is a business entity operating in Vietnam and is a major shareholder of Vingroup.  Vuong is a shareholder of VIG, holding more than 50% of its charter capital.

56.    Vinhomes, founded by Vuong as a subsidiary of Vingroup in 2008, is the largest commercial real estate developer in Vietnam.

## IV.    CLAIMS ASSERTED IN THIS COMPLAINT

57.    As discussed in detail below, Lead Plaintiffs assert two separate sets of claims.

58.    Counts I and II assert strict liability, non-fraud claims, under §§11 and 15 of the Securities Act.  The Securities Act claims arise out of duties to disclose pursuant to Items 303 and 105 of Regulation S-K and materially false and misleading statements and omissions in the Offering Documents issued in connection with the Company's Offering.  Lead Plaintiffs' Securities Act claims are not based on any allegation of deliberate or intentional misconduct, and Lead Plaintiffs expressly disclaim any reference or reliance upon fraud allegations for such claims.

---

[1]    As of the date of this Complaint, one Vietnamese Dong ("VND") was equal to $0.00004, and one U.S. Dollar was equal to VND 25,383.

59.     As set forth herein, each of the Defendants named under the Securities Act claims made materially false and misleading public statements and omissions in the Offering Documents that: (i) failed to disclose known trends, uncertainties, and/or unusual events or transactions including an overwhelming portion of sales to related parties, that had, and were expected to have, a material impact on sales and revenues in violation of Item 303; (ii) failed to disclose certain risks, including that the Company would be unable to sell its vehicles to customers other than related parties, in violation of Item 105; and (iii) misstated the truth about VinFast's lock-up provision.

60.     Counts III and IV assert securities fraud-based claims under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, 17 C.F.R. §240 10b-5, promulgated thereunder.  The Exchange Act claims arise out of a fraudulent course of conduct whereby, during the Class Period, Defendants knew or recklessly disregarded that the statements they made, as alleged herein, were materially false and misleading.

61.     Specifically, Defendants knowingly or recklessly made materially false and misleading public statements and omissions that concealed that: (i) VinFast had a then-present need to raise additional capital at the time of the Offering; (ii) VinFast was actively seeking to raise capital at the time of the Offering; and (iii) VinFast lacked a reasonable basis for its full-year 2023 projection of 40,000 to 50,000 EV sales.  Moreover, these projections were misleading in that most of the deliveries would be to an affiliated company.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Vingroup and Its Subsidiaries

62.     Vingroup was established in 1993 by Vuong.  Vingroup operates in various sectors, including real estate, retail, healthcare, education, and automotive.  Vuong is the richest person in Vietnam, with a net worth of as much as $55.9 billion during the Class Period.

- 13 -

63.     In 2017, VinFast was founded as Vingroup's automotive subsidiary in Hai Phong, Vietnam.  VinFast debuted on October 2, 2018 at the Paris Motor Show and launched its first three internal combustion engine cars in 2019.  In 2021, VinFast expanded its vehicle profiles by introducing e-scooters and e-buses.  VinFast describes itself as "an innovative, full-scale mobility platform focused primarily on designing and manufacturing premium EVs."

**B.      VinFast Begins Selling EVs**

64.     On September 23, 2022, VinFast began selling EVs exclusively.

65.     Also in 2022, VinFast launched its VF 8 and VF 9 models for the global market in Europe and North America.  The first 100 VF 8 models were delivered to customers in Vietnam in September 2022, and the first 45 VF 8 vehicles were delivered to customers in the United States in March 2023.

**C.      VinFast Prepares to Go Public**

66.     On May 12, 2023, VinFast and Black Spade announced that they entered an agreement in connection with the Business Combination.  At the time of the announcement, Black Spade was a Hong Kong-based SPAC that was listed on the New York Stock Exchange in 2021. Black Spade and VinFast further announced that after the transaction, VinFast would have an enterprise value of $27 billion and an equity value of $23 billion, and that the shares would be listed in the United States.

67.     On June 15, 2023, VinFast filed the Registration Statement with the SEC.  The SEC declared the Registration Statement effective on July 28, 2023 following several amendments.

68.     On July 28, 2023, VinFast filed the Proxy Statement with the SEC.  The Proxy Statement described the business agreement between VinFast and Black Spade as follows:

> The board of directors of Black Spade Acquisition Co, a Cayman Islands exempted company ("Black Spade" or "BSAQ"), has unanimously approved the business combination agreement, dated as of May 12, 2023, by and among Black Spade,

VinFast Auto Pte. Ltd., a Singapore private limited company (the "Company" or "VinFast") and Nuevo Tech Limited, a Cayman Islands exempted company and wholly owned subsidiary of the Company ("Merger Sub") (the "Original Business Combination Agreement") . . . Pursuant to the Business Combination Agreement, Merger Sub will merge with and into Black Spade, with Black Spade surviving the merger (the "Business Combination"). As a result of the Business Combination, and upon consummation of the Business Combination and the other transactions contemplated by the Business Combination Agreement (collectively, the "Transactions"), Black Spade will become a wholly owned subsidiary of VinFast, with the securityholders of Black Spade becoming securityholders of VinFast. Pursuant to the Business Combination Agreement, among other things, immediately prior to the effective time of the Merger (the "Effective Time"), (i) the amended and restated constitution of VinFast ("Constitution") will be adopted and become effective, and (ii) VinFast will effect a share consolidation or subdivision such that each ordinary share in the capital of VinFast, as of immediately prior to the Recapitalization (as defined below) (collectively, the "Pre-Recapitalization VinFast Shares") immediately prior to the Effective Time, will be consolidated or divided into a number of shares equal to the Adjustment Factor (as defined below) (items (i) through (ii), the "Recapitalization"). . . .

Pursuant to the Business Combination Agreement, at the Effective Time and as a result of the Business Combination, (i) each Class B ordinary share of Black Spade, par value $0.0001 per share ("BSAQ Class B Ordinary Share") that is issued and outstanding immediately prior to the Effective Time will be converted into one VinFast ordinary share; (ii) each Class A ordinary share of Black Spade, par value $0.0001 per share ("BSAQ Class A Ordinary Shares") that is issued and outstanding immediately prior to the Effective Time (other than such BSAQ Class A Ordinary Shares that are treasury shares, validly redeemed shares, or BSAQ Dissenting Shares (as defined below)) will be converted into one VinFast ordinary share, and (iii) each issued and outstanding BSAQ Class A Ordinary Share that is held by any person who has validly exercised and not effectively withdrawn or lost their right to dissent from the Merger in accordance with Section 238 of the Companies Act (As Revised) of the Cayman Islands ("BSAQ Dissenting Share") will be cancelled and carry no right other than the right to receive the payment of the fair value of such BSAQ Dissenting Share determined in accordance with Section 238 of the Companies Act (As Revised) of the Cayman Islands.

69.    The Proxy Statement covered VinFast's ordinary shares and warrants issuable to certain securityholders of Black Spade. VinFast registered up to an aggregate of 6,974,285 VinFast ordinary shares, 14,829,991 VinFast warrants, and 14,829,991 VinFast ordinary shares issuable upon the exercise of the VinFast warrants.

70.     The Proxy Statement also described a "VinFast Shareholders Support Agreement," whereby certain shareholders agreed not to transfer certain shares for a period of 180 days, stating, in pertinent part, as follows:

> ***VinFast Shareholders Support Agreement***
>
> Concurrently with the execution of the Business Combination Agreement, BSAQ, VinFast and all VinFast Shareholders entered into a shareholders support and lock-up agreement and deed (the "VinFast Shareholders Support Agreement")[.]
>
> In addition, pursuant to the VinFast Shareholders Support Agreement, ***each VinFast Shareholder also agreed not to transfer, during a period of 180 days from and after the Closing Date***, subject to customary exceptions, (i) any VinFast ordinary shares held by such VinFast Shareholder immediately after the Closing, excluding any VinFast ordinary shares acquired in open market transactions after the Closing, (ii) any VinFast ordinary shares received by such VinFast Shareholder upon the exercise, conversion or settlement of options or warrants held by such VinFast Shareholder immediately after Closing (along with such options or warrants themselves), and (iii) any VinFast equity securities issued or issuable with respect to any securities referenced in clauses (i) and (ii) by way of share dividend or share split or in connection with a recapitalization, merger, consolidation, spin-off, reorganization or similar transaction.

71.     On August 10, 2023, VinFast and Black Spade announced the approval of the Business Combination by Black Spade's shareholders at an extraordinary general meeting.  On August 14, 2023, the Business Combination between Black Spade and VinFast was completed.  The next day, VinFast began trading on the NASDAQ.

## VI.    SECURITIES ACT ALLEGATIONS

### A.    Prior to the Offering, Defendants Masked the Extremely Limited Demand for VinFast's EVs by Selling a Tremendous Portion of its Vehicles to Related Parties

72.     In the months leading up to the Offering, there were major problems with VinFast's EVs.  Beginning in February 2023, a mechanical engineer leading the testing on the EVs' front suspension and chassis recognized serious safety concerns with the cars and reported the problems to VinFast executives, who dismissed his warnings.  In May 2023, the VF 8 model received abysmal

reviews when test-driven in the United States, with complaints ranging from improperly working mechanics to issues with the suspension.  VinFast's EVs were so problematic that the Company faced the serious risk that they would not be able to sell them to retail customers.

73.     Defendants masked the lack of demand for VinFast's EVs by selling an extremely large percentage to related parties, ranging from 63% prior to the Offering to as much as 80% during the Class Period.

### 1. VinFast's EVs Were Plagued with Undisclosed Serious Safety Issues

74.     On December 18, 2024, the *BBC* published an article titled "Electric car whistleblower sacked by Jaguar Land Rover."  The *BBC* interviewed a whistleblower, Hazar Denli, who voiced concerns to senior VinFast executives, including Vuong, regarding the safety of VinFast EVs prior to the Offering.

75.     Denli is a specialist in chassis design, and was appointed to lead the engineering team working on the VinFast car's front suspension and chassis beginning in September 2022.

76.     Denli first raised concerns internally while working at global engineering consultancy Tata Technologies, as follows:

> He told the BBC that in test-driving prototypes, designed by Tata Technologies for Vietnamese car maker Vinfast, *he identified improperly designed components in the car's chassis, including its suspension system*.
>
> At low mileages, *some of them were snapping off*, he said.
>
> *That created a risk that under stress, such as hitting a pothole at speed, the wheels could become misaligned, causing the car to veer to the left or right without prompting, and the driver could lose control*, Mr Denli added.
>
> "We saw, for example, the front strut-to-knuckle connection was loosening, *which could be extremely dangerous*," he said. "It could cause a loosening of the entire structure that could cause wheels to come off."
>
> "*In a crash scenario, it could be completely unsafe.  It could cause the vehicle to lose control*."

- 17 -

77.    Under a heading titled "Alarm Bells," the *BBC* included Denli's account of the safety concerns he discovered with VinFast's EVs, stating, in pertinent part:

> [Denli] soon became concerned VinFast was ***cutting corners with safety, keeping costs down by employing a small team of inexperienced engineers***.
>
> His concerns grew when he heard ***three of his predecessors had quit*** after short spells on the project.
>
> He says in February and March 2023, while running vigorous testing on VinFast cars at the Mira Technology Park near Nuneaton, ***two components snapped off and another two failed***.
>
> He reported the "***extremely concerning***" incidents to colleagues at Tata Technologies Limited (TTL), the consultancy's UK division, based in Leamington Spa, Warwickshire.
>
> In subsequent testing, he alleges ***further components failed***.
>
> Mr Denli said they were failing after fewer than 25,000 km (15,534 miles), when normally they would be expected to last for at least 150,000 km (93,205 miles).
>
> "In the drive units, ***some of the brackets were completely failing and falling out on to the road***," he said. "We're talking one or two kilograms worth of aluminium."
>
> "These [incidents] started causing ***alarm bells to go off*** just a short time before we we went into production."
>
> ***He escalated his concerns to senior executives at TTL and VinFast and said he had recommended they redesign the faulty components and manufacture safer, higher quality parts***.

78.    Denli's recommendations to fix the issues "would have sharply boosted costs and required VinFast Group to postpone production of the car."  But at that time, VinFast, which was "preparing to sell shares in itself and raise funds by floating on the New York Stock Exchange, instead pushed ahead with production."

79.    Denli subsequently resigned from his position and joined Jaguar Land Rover ("JLR"), also owned by Tata Group.  He continued seeing reports related to serious safety defects in the same VinFast cars he had previously worked on, including a VinFast car catching fire at a showroom in

Germany, and a VinFast car losing control, veering off the road, hitting a pole, and catching fire, causing fatalities in California.

80.     According to the *BBC*, the reports of the crash in California prompted Denli to publish on a *Reddit* account under the username "howardkitty94,"[2] "saying he had worked on the design of the car and it was a vehicle ***he believed endangered lives***."

81.     Denli's *Reddit* post titled "I designed major sections of Vinfast, ask me anything?" described his work and his opinion on the vehicles, stating, in pertinent part:

> So Vinfast for 3 years employed TATA technologies to design its VF6 and 7 models…those services were disengaged by Vinfast a few months ago…
>
> I led several teams into the design of several of the major systems on the…ask me anything and I will let you know without giving information that could identify me…
>
> I'm a mechanical engineer, I've worked in automotive engineering my whole life and companies much better and bigger than VF…
>
> ***I think it's a trash vehicle that endangers lives but go ahead ask me anything…like how long does the subframe last? How easily does the battery explode? How is the body torsional stiffness? How long does the rear suspension last? How is the life expectancy?***

82.     Denli's post garnered attention and he elaborated in the comments certain safety issues he recognized and how they were ignored by VinFast executives:

> We did the real world testing and whatever small [sic] we could fix we fixed…***but all of that serious faults data was basically buried under the carpet***…
>
> Vinfast basically said give us the data and we will deal with it but they never really dealt with it[.]
>
>          *        *        *
>
> ***The car has the potential to kill someone*** when driving on the motorway for no reason…like your [sic] just driving in a straight line and no other cars about and it would steer one way losing control killing people or injuring them…
>
>          *        *        *

---

[2]     The *BBC* identified Denli's *Reddit* account.

I've worked for many companies and never ever shared anything, and I work on some very secret stuff right now too…and I will never break my NDA for any one under any circumstances…

But VINFAST…oh man they are worth the risk…

I always encounter situations in my career that I do not like, I get told to do things I disagree with, sometimes immoral…and I never share…*but NEVER has anyone in any other company I worked for endangered lives knowingly to meet shareholder requirements or make money…NEVER…*

*We cut corners on quality, we cut corners on cost, timescales but never ever ever ever when that endangers lives…*

F[***] Vinfast and my NDA with them…they are communists and don't care about killing people[.]

83.    In response to one comment on Denli's *Reddit* post asking additional questions about

VinFast EVs, Denli went into detail about the many issues with VinFast's cars, stating:

1.) *We had a very big problem with the vehicle dynamics and NVH[3] of the Vinfast vehicles*. So basically you have isolation (compliant mounting) in vehicles…These are rubber components that isolate noise, vibration and harshness that comes in through various ways…the two most common is the road input and the second one being the drivetrain (EDU)…At Vinfast we did not work with a reputable isolation supplier like Vibracoustic, Hutchinson or Boge etc.…*We had to use a supplier that the chairman said we have to use, which was he's mates company in China*…So the bushes were quite bad…*They had durability issues as mentioned below*…So to avoid some durability issues we decided to increase the shore hardness…At shore hardness above 67-69 you take a bush from its linear region into its dynamic region and it starts snubbing…(also has other factors but in this case I have simplified it)…This improves the durability of the bushes, but stiffer also means more load is transferred to the vehicle itself.  Isolation is reduced…

Also, in a typical vehicle of its size…the Vinfast VF6/7 is heavier than it should be…that increases the reaction loads from the wheels into the body…

84.    Denli criticized the suspension in VinFast's cars, saying: "[t]he Rear suspension of

VF6/7 breaks more often then any vehicle I have seen."

---

[3]    NVH stands for noise, vibration, and harshness, a crucial part of vehicle design that affects the performance and user experience.

85.    Denli also described his overall feeling towards the leadership of VinFast, describing it as "modern day slavery," stating:

> We went from the uk to Vietnam, Hanoi to oversee the prototype build and **he locked us into the building and locked down the site till everything was completed**…he cancelled all buses and considering the site is outside the city within 2 hour walk of the near village so even if you escaped there was no way to go back…
>
> **Nobody went home till it happened…which is modern day slavery…**
>
> **He would fire someone first then ask questions later…**

86.    When asked if Defendant Vuong knew that the cars were problematic, Denli responded, "**Yes he indeed knew of our concerns…or issues reported…we follow strict reporting guidelines etc.  He basically didn't care**[.]"

87.    Upset with Denli's criticism, VinFast acted quickly to have him fired from JLR. Internal documents revealed that a senior executive at Tata Technologies had been in touch with JLR executives to seek Denli's dismissal.  Patrick Flood, Tata Technologies HR director, discussed his company's wish to have Denli's JLR employment terminated with JLR's HR director, Dave Williams.  Flood told Williams that VinFast had conducted an investigation and identified Denli as the author of the *Reddit* posts.

88.    The same day, Denli was sacked from JLR and blacklisted on Magnit, a workforce management website, meaning that any applications he filed on the website would automatically be declined.

89.    Prior to going public with the information regarding the safety of VinFast's EVs, Denli filed whistleblower reports with the SEC Whistleblower Program and the NHTSA Whistleblower Program.

90.    On December 23, 2024, *The Times*, a UK news outlet, published an article titled "Exposed: Engineers 'locked in factory' to finish 'unsafe' electric car," which provided additional

information about VinFast's rushed process to get its cars to market, resulting in poorly built vehicles. The article quoted Denli, who described a "'rushed' development process" and staff that was "under so much pressure to produce the car that engineers in Vietnam were locked in the factory overnight to force them to keep working." Denli alleged that the "lockdown was due to pressure from VinFast for staff to keep working to get the car to market."

91.    *The Times* cited a second whistleblower who confirmed that he had been locked in the factory over a weekend "as part of VinFast's push for productivity," and stated that "the production process was so rushed that lockdowns were a frequent occurrence":

> There's lots of incidents where people were locked in the factory. There were also lots of instances where people on their way to the airport and were told to turn around, not get on the flight and get back to the factory. That was the nature and the culture.

92.    According to Denli, the pressure to get the car to market resulted in testing being "completely rushed."

### 2.    VinFast's EVs Received Scathing Reviews in the United States

93.    Before the Offering, VinFast's VF 8 models sent to the United States were sharply criticized, with numerous reviewers stating that the models were not ready to be sold to customers. In May 2023, VinFast held a "first drive" event near San Diego, California, where the Company invited, and paid, several automotive journalists to test drive and review the VF 8. Consistent with Denli's allegations, reviewers were in agreement: the VF 8 was really bad.

94.    On May 12, 2023, automotive journalist Steven Ewing reviewed the 2023 VinFast VF 8 for *InsideEVs*. Ewing expressed concern that the VF 8 was not ready to take on other EVs currently on the market. He could not "believe this is a vehicle you can go out and buy right now."

95.    During his drive, Ewing complained of car sickness that caused him to stop driving. He stated the following regarding the ride:

The road wasn't super curvy and we'd been cruising along at a moderate pace, but ***the sheer amount of bouncy body motions*** coming through the VF8's suspension made being in this electric crossover – and I say this without hyperbole – ***unbearable***.

96.     Ewing also described the materials used in the VF 8 as "cheap," stating as follows:

But then you get inside ***and things fall apart***.  Not literally, though I did almost break one of the seat adjustment toggles, and the center console lid on one of the display cars was halfway popped off.  The entire door panel flexes when you pull the handle from inside, and the seats are as stiff as they are flat. Headroom and legroom are decent overall, ***but there are hella cheap materials and inconsistent panel gaps everywhere***.  It's like early 2000s General Motors in here.

97.     Also on May 12, 2023, *Jalopnik* published an article titled "Critics Agree: The VinFast VF8 Is Very, Very Bad[.]"  The article included Ewing's review of the VF 8 as well as a review from Mack Hogan of *Road & Track*, who stated:

The VinFast VF8 ***has the worst body control of any modern car I've ever driven***. Over a 90-minute drive, the 5600-lb SUV never stopped bobbing, swaying, and bucking, producing near-constant head-tossing motions.  ***Riding in the passenger seat, I became car sick for the first time in years.***  When I switched seats with the driver, he felt queasy, too, even though he says he's never been the type to get car sick.  Despite the firmness you feel over impacts, though, the VF8 is also sloppy and prone to excessive roll in corners.  It is unclear if this is the result of poor tuning or fundamental issues with the vehicle's suspension geometry (control blades at the rear, "smart axles" at the front), ***but the ride quality alone is enough to disqualify the VF8 from serious consideration***.

98.     Another article published by *MotorTrend* on May 12, 2023, titled "2023 VinFast VF8 First Drive: Return to Sender," further stressed that the VF 8 was "***nowhere near ready for the customer deliveries that [were] already happening.***"  Echoing similar reviews, the article explained that the VF 8's basic functions including the turn signal, climate control, and navigation system were not working properly.  The author experienced the VF 8 shuddering violently when backing up.  The article also shared that the features that did work needed adjustments, including the radio, fan, and steering wheel.

- 23 -

99.    On May 18, 2023, *Jalopnik* published an article titled "VinFast Is Going For It Anyway."  *Jalopnik* reported that Anh Nguyen, VinFast's North American CEO, dismissed the overwhelmingly poor reviews from the VF 8's launch event as just "noise."  The article stated, in pertinent part:

> "When you're committed to your plan and have the means to execute your plan, then you ***just do it instead of listening to so much noise***," Nguyen said. "The North American market has a lot of conditions for us to launch the brand here and make it the most important market for us."

100.    A May 19, 2023 article published by *The Carolina Journal*, titled "'Just don't.' Brutal reviews of VinFast car come amid merger to save NC plant plans," stated that "[r]eviews on VinFast's latest model, VF8 City Edition, have sparked words like ***abysmal, 'very, very bad,' 'yikes,' 'simply unacceptable,' and 'return to sender.'***  A vehicle definitely 'not ready for primetime.'"  The article further expressed that the VF 8 was "nowhere near ready for customer deliveries that are already taking place."  Concerns with the vehicle included: (i) basic functions not working reliably; (ii) the car "shudders violently"; (iii) issues with the parking break; (iv) "bobbing, swaying, and bucking, producing near-constant head-tossing motions"; and (v) issues with steering response.

101.    On May 25, 2023, during a Q&A session with *The Detroit Bureau*, Anh Nguyen was asked about the poor reviews the VF 8 received.  Nguyen characterized "most of them" as "balanced," stating:

> We have received ***quite a few reviews for the VF 8 recently and most of them are balanced***, noting that the vehicle has a stylish exterior, modern interior, solid performance and a wide range of advanced technology features.  In addition to that, we gathered feedback on potential improvements from some of the journalists in attendance at the drive program.  We have acknowledged them and will work on their improvements as VinFast is constantly striving to improve itself to bring customers quality products and outstanding services.

- 24 -

102.     On June 13, 2023, *Road & Track* published an article titled "VinFast Knows It Has a Problem, and Is Working to Fix It."  The article explained that VinFast's engineers acknowledged problems that affected production and that they promised to address them.  The article also questioned why issues were not addressed during development, stating in pertinent part:

> And the long list of complaints begs a question: ***Why weren't these issues spotlighted and addressed during development and testing, instead of waiting for them to be pounced on by journalists?  Or worse, potentially called out by paying customers***?

103.     On August 15, 2023, the day VinFast went public, Defendant Thuy gave an interview and discussed the reviews on VinFast's EVs, also characterizing "most" of the reviews as "positive, or at least neutral," stating as follows:

> Actually, ***if you look at the reviews, the publicity about us most of them are positive, or at least neutral, let's wait and see there have been some, like, negative reviews, we take them very close to our heart, we reflect on the feedback, of, from those reviews, and we make our vehicles better, we update the software, when we make the vehicles better***.  We actually really appreciate the feedback from the public, from the consumer, because it's a way for us to, to become better.

104.     Despite concerns brought to the Company's attention as early as May 2023, problems with VinFast's EVs persist and they continue to receive negative reviews.  For example, on November 11, 2024, *Jalopnik* published an article titled "Consumer Reports Trashes VinFast VF8 In First Review," recalling the negative reviews from 2023 and stating the "VinFast VF8 is ***still half-baked***."  The article continued that "the list of complaints, on the other hand, ***is much longer***, though, including the power delivery, brakes, regenerative braking programming, ride, steering and suspension tuning.  And while it may look like it can run with the electric crossovers offered by the competition, Consumer Reports isn't confident the interior materials will hold up."

105.     On September 10, 2024, NHTSA announced that it was investigating the VinFast VF 8 and looking into 3,118 VinFast vehicles sold in the United States in 2023 and 2024, which were reported by multiple drivers to have flawed Lane Keep Assist systems.

106.    Defendants did not disclose the aforementioned safety defects and drivability problems in the Offering Documents.  To mask these marketability issues, and the true extent to which its EVs were being rejected by consumers, VinFast resorted to sales to related parties.

### 3.    VinFast Overwhelmingly Relied on Sales to Related Parties Prior to the Offering

107.    On September 7, 2023, *DW*, a German international news outlet, published an article titled "Is Vietnam's e-car maker VinFast hitting the brakes?"  The article discussed VinFast's insignificant market share even in its home market of Vietnam, stating as follows:

> The company's executives blamed European regulations [for the VF 8 and VF 9's failure to meet approval requirements in Europe]. ***But experts say that VinFast leapt too early, having not already established itself even in Vietnam***, and made some poor choices in how to expand its operations in Europe.
>
> ***VinFast still does not have a significant market share even in Vietnam***, said Nguyen Huy Vu, a Norway-based economist.

108.    On this news, VinFast's ordinary share price fell $6.51 per share, or 26.57%, to close at $17.99 per share on September 7, 2023, and $0.84 per share, or 4.67%, to close at $17.15 per share on September 8, 2023, for a total decline of 30% over two days.

109.    On September 12, 2023, *Barron's* reported that out of 11,300 VinFast EVs sold, over 7,000 were sold to GSM in the first half of 2023.  Thus, ***nearly two-thirds*** of VinFast sales went to a related party in the first and second quarter of 2023.

110.    On a conference call held on September 21, 2023, in response to a question about VinFast sales to GSM, Defendant Mansfield confirmed that "in terms of the GSM deliveries, the numbers that we have disclosed are of the 11,300 vehicle deliveries towards the first half, about 7,100 have been delivered to GSM."

111.    In an analyst report dated September 22, 2023, Lightstream Research expressed skepticism that VinFast would be able to meet its target to sell 50,000 EVs in 2023 because the

majority of its past sales had been to related parties.  The report stated: "***More than 50% of EV volume during 1H2023 were to a related company*** while US volume was less than 200 units ***raising serious concerns over demand for VinFast's EVs***."  The report continued: "according to several news media outlets, more than half of the EVs sold during 1H2023 were to a domestic taxi company (Green and Smart Mobility) which is controlled by the parent Vingroup.  ***This raises the question of how small the demand is for the company's EV models***."

112.    On this news, VinFast's ordinary share price fell $1.63 per share, or 10.43%, to close at $14.00 per share on September 25, 2023.

113.    On September 29, 2023, *Jalopnik* published an article titled "Aw, VinFast Thinks It's A Real Car Company," reporting that it did not seem possible that VinFast would meet its goal of selling 50,000 EVs in 2023.  The article stated, in pertinent part, as follows:

> So it should be no surprise that VinFast is far, far off-target.  ***The company sold 11,315 vehicles in the first two quarters of 2023, and the vast majority of those were sold to its parent company's taxi wing.  Based on CNBC's numbers, a mere 4,215 cars were sold to real, human buyers***.  At this rate, the company could be beaten out for volume by Rolls-Royce.  ***The story gets even worse in the U.S., according to CNBC. VinFast has apparently sold just 137 cars so far in the States*** — fewer than Toyota sold Grand Highlanders in the first half of the year.

114.    On October 5, 2023, the Company held its Q3 2023 earnings call.  Several analysts asked questions related to the volume of VinFast's sales to GSM.  At the end of the call, Thuy addressed the flood of questions related to GSM, defending the volume of sales to GSM and the benefit of continuing VinFast's relationship with the related entity:

> Please can I just have 1 minute. I mean there have been a lot of questions about GSM, so if possible, can I just say a few things about GSM.  We think that GSM is a positively good business and it has probably about 70% is the taxi business and the other 30% is our vehicle leasing business to the advertising company, to corporate. . . . ***So from VinFast perspective, we think that GSM is a very good business partner and it's going to compliment very well as VinFast grows in the future.***  So I just wanted to say a few words about GSM because there has been an overwhelming number of questions about GSM.

- 27 -

115.    On October 19, 2023, *Reuters* published an article titled "VinFast expects sales to founder's taxi venture to extend into 2024," which highlighted VinFast's high number of sales to GSM and the related entity's continuing demand for VinFast's cars.  The article explained that "the large share of sales to Vuong's venture prompted questions from analysts and investors on the company's most recent earnings call."   In an interview included in the article, Thuy disclosed VinFast's expectation that the pace of sales to GSM would continue into the first and second quarter of 2024, stating as follows:

> "*For the next two quarters we still see GSM having demand for our vehicles, both EVs and e-scooters*," Thuy said.   "*That is going to continue into end of first quarter, even maybe the second quarter next year*."

116.    On this news, VinFast's ordinary share price fell $0.28 per share, or 4.69%, to close at $5.69 per share on October 19, 2023.

117.    In an analyst report dated October 26, 2023, Lightstream Research discussed its "serious concerns over the company's ability to establish a market presence" in light of the volume of sales to related parties, stating, in pertinent part, as follows:

> According to news media outlets, *more than half of the EVs sold during 9M2023 were to either a related party or an affiliate of the founder.  This raises serious concerns over the company's ability to sell its EVs to external customers as a majority is sold to related parties*.

> At the same time, Vinfast has an ambitious target of selling 40-50k EVs in 2023 and as at the end of 3Q2023, the company had sold a total of 21,342 EVs and the company should sell another 18.6-28.6k units during the current quarter to meet its EV target for 2023.  *In our view, it seems unlikely for the company to meet its target for 2023 unless they keep selling EVs to related parties or affiliates of the group as the company has not yet been able to establish its presence in the market*.

118.    On this news, VinFast's ordinary share price fell $0.19 per share, or 3.44%, to close at $5.32 per share on October 27, 2023.

- 28 -

119. On January 27, 2024, *The Motley Fool* published an article titled "Is There a Silver Lining in VinFast Auto's Disappointing Q4 Deliveries?"  The article attributed VinFast's "impressive amount" of vehicle sales globally to GSM, stating, in pertinent part, as follows:

> More to VinFast's story?
>
> As previously alluded to, there's a little more to the story.  To first add a little context, VinFast has a parent company, VinGroup Joint Stock Co. It's the largest conglomerate in Vietnam, with holdings in tech, industrial, real estate, retail, and services ranging from healthcare to hospitality.  The conglomerate recently established an EV rental and taxi company called Green and Smart Mobility (GSM).
>
> You might see where this is going: ***During the second and third quarters, roughly two-thirds of VinFast's sales were to GSM.***  So while the silver lining of handing over an impressive amount of vehicles globally last year is tempting to grab onto, ***the truth is that much of the company's progress could be attributed to GSM's buying***. (VinFast, as of this writing, hasn't yet released details of how many fourth-quarter sales were to GSM.)  It's certainly a nice boost for VinFast to have GSM taking its production, ***but it's also fair to say that this pipeline can't and won't last forever***.

120. On April 11, 2024, *Reuters* published an article titled "Vietnam EV maker VinFast's challenges escalate risk for parent Vingroup."  The article highlighted Vingroup's financial risk from VinFast's sales to affiliated companies.  The article stated, in pertinent part, as follows:

> As Vietnam's biggest conglomerate Vingroup (VIC.HM), doubles down on its electric vehicle business with ambitious global expansion plans, ***it faces growing financial risks stemming from loss-making unit VinFast Auto***.
>
> ***VinFast's rapid growth has hinged on sales to affiliated companies that are set to continue this year***, according to Reuters' analysis of a recent securities filing and information provided by the firm, ***as it struggles to attract retail buyers and faces weakening global EV demand***.

121. The article disclosed that ***over 80%*** of VinFast's 2023 sales were to Vingroup-affiliated companies, and stressed that "the extent of VinFast's reliance on Vingroup companies for sales and financing have not been previously reported":

> ***But struggling to penetrate even its home market, VinFast last year generated 82% of its $1.1 billion of vehicle sales from companies that are part of Vingroup or owned by Vuong***, who is also VinFast's CEO and effectively controls nearly 98% of the Nasdaq-listed EV maker.

- 29 -

> *Nearly all of VinFast's retail sales in Vietnam were also aided by hefty discounts offered through a joint marketing campaign with Vinhomes, Reuters has found.*
>
> *The extent of VinFast's reliance on Vingroup companies for sales and financing have not been previously reported.*
>
> *The company had so far said about 70% of its vehicle deliveries last year went to Green SM (GSM)*, a taxi operator and leasing provider 95% owned by Vuong.

122.    The article revealed that a significant percentage of VinFast revenue came from sales to related party Vinhomes, stating, in pertinent part:

> Apart from $839 million sales of EVs and e-scooters to GSM, *VinFast also had a $57 million EV sales deal with Vinhomes, a $1 million EV sales contract with Vingroup and $7 million of electric bus sales to VinBus last year*.
>
> *VinFast also offered vouchers worth up to 350 million dong ($14,000) each to new home buyers of Vinhomes last year. EV sales from the discount programme generated around 14% of its EV revenues, the filing showed, which could amount to nearly all of its retail sales in Vietnam*.

123.    On this news, VinFast's ordinary share price fell $0.43 per share, or 10.67%, to close at $3.60 per share on April 12, 2024.

124.    On April 17, 2024, *Reuters* published an article titled "Vietnam's VinFast's jump in EV deliveries drives Q1 revenues higher." *Reuters* pointed to VinFast's continued overwhelming reliance on sales to related parties, stating: "VinFast chairwoman Thuy Le told Reuters over half of that number went to its affiliate Green SM, a taxi operator and leasing provider backed by VinFast founder and other 4% to its sibling company, Vinhomes."

125.    On this news, VinFast's ordinary share price fell $0.35 per share, or 11.4%, to close at $2.72 per share on April 17, 2024.

126.    On April 21, 2024, *Hunterbrook Media* published an article titled "What's Going On With VinFast?" The article discussed VinFast's sales to affiliated companies, stating, "[m]ore than 70% of those deliveries were to other companies owned by VinFast's Chief Executive Pham Nhat Vuong, according to SEC filings that were reported on by Reuters earlier this month. They

*accounted for more than 90% of Vinfast's total sales revenues*." The article continued, in pertinent part:

> *Two of VinFast's largest customers are owned by Vuong or Vingroup: electric taxi company Green and Smart Mobility (GSM) and real estate company Vinhomes*.

> GSM, which is 95% owned by Vuong, was responsible for the majority of VinFast's sales last year, an arrangement that has received scrutiny. Until the recent investigation by Reuters, however, *VinFast's relationship with Vinhomes had received almost no attention — despite EV sales to VinHome customers accounting for approximately 14% of 2023 EV revenue*, according to a March SEC filing.

> *Vinhomes said on its website that it had given away 1,000 VinFast cars for free to new homeowners.* Vinhomes also offered its customers five years of free taxi service through GSM.

127.    *Hunterbrook*'s investigation revealed VinFast cars sitting in lots, unused for months:

> VinFast's struggles have come as its vehicles have received abysmal reviews from international press. A VinFast critic in Vietnam, meanwhile, has been arrested — and negative posts about the company seem to have disappeared from the internet entirely, *including a YouTube video featuring a field full of vehicles gathering dirt that VinFast had sold to a related party*.

> *Hunterbrook Media's review of satellite imagery showed that many of these vehicles had been stored in the field for months*.

*     *     *

> That same month, a Vietnamese blogger posted a video on YouTube of a giant field in Thái Nguyên, a small city near Hanoi, *filled with hundreds of blue VinFast vehicles that appeared to belong to GSM. Weeds lined the wheels, as the cars collected dust*.

128.    On this news, VinFast's ordinary share price fell $0.09 per share, or 3.57%, to close at $2.43 per share on April 22, 2024.

129.    Accordingly, as a result of the myriad issues with VinFast's EVs, the Company was largely unable to sell their cars to retail consumers and, instead, relied on sales to related parties to mask the marketplace's rejection of its vehicles.

B. **The Offering Documents Omitted Material Information Required to Be Disclosed Therein**

1. **Section 11 Disclosure Requirements**

130.    Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC.  *See* 15 U.S.C. §77k.  Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k(a).  Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration statement as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security."  15 U.S.C. §77k(a)(1)-(5).

2. **Defendants Violated Their Disclosure Obligations Under Items 303 and 105 of Regulation S-K**

a. **Item 303**

131.    Item 303 of Regulation S-K imposes an affirmative duty on issuers to:

Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or

materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

17 C.F.R. §229.303.

132.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See* Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id*. at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

133.    Here, the overwhelming volume of sales to GSM and other related parties as a percentage of total sales was a known trend, uncertainty, and/or unusual event or transaction likely to have a material impact on VinFast's business, sales, and revenues.

134.    Indeed, at the time of the August 15, 2023 Offering, VinFast had ***already sold*** nearly two-thirds of its EVs to related parties through June 30, 2023.  While the Offering Documents discussed relationships with related parties, including GSM, as well as sales to them, they did not disclose that related-party sales accounted for nearly two-thirds of total sales over the first two quarters of 2023.  Instead, the Offering Documents cited a sales figure of 18,700, but this represented VinFast's total sales since beginning production in 2021, not sales for the first two

- 33 -

quarters of 2023.[4]  Indeed, the 18,700 sales figure misled investors to believe that sales to GSM represented a much smaller percentage of total sales than they actually were.

135.    Only after the Offering was completed did *Barron's* report, on September 12, 2023, that those sales accounted for 7,100 out of ***11,300*** of VinFast's vehicle deliveries for the first and second quarters of 2023, the latter of which had ended more than a month before VinFast shares began trading publicly.

136.    Thus, VinFast knew that as of June 30, 2023, nearly two-thirds of sales for the previous two quarters were to related party GSM and, therefore, there was a known trend that the majority of VinFast's EV sales had been to related parties and would likely have a material adverse impact on its business.  And, due to the safety issues and poor quality of its EVs, there was a known uncertainty whether VinFast would be able to sell its EVs to non-related customers.  Additionally, the related-party sales to GSM represented an unusual event or transaction.  As such, VinFast was required to include specific disclosures regarding the known trend, uncertainty, and/or unusual event or transaction of a major proportion of historical sales to related parties in its Offering Documents. It did not.

### b.    Item 105

137.    Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. §229.105(a).  Item 105 further requires the offering documents to "[c]oncisely explain how each risk affects the registrant or the securities being offered."  17 C.F.R. §229.105(b).  The discussion of risk factors:

---

[4]    Peter Cohan, *Why VinFast Stock May Be 98% Too High*, FORBES (Aug. 22, 2023, 3:03 PM), https://www.forbes.com/sites/petercohan/2023/08/17/why-vinfast-stock-may-be-98-too-high/.

> [M]ust be specific to the particular company and its operations, and should explain
> how the risk affects the company and/or the securities being offered. Generic or
> boilerplate discussions do not tell investors how the risk may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Cos.,

Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

138.    Here, VinFast failed to adequately disclose, and in fact, did not disclose at all, in the

"Risk Factors" section of the Offering Documents, the risks to VinFast's sales and revenue,

particularly that there was a very small market for VinFast's EVs outside of sales to related parties

due to the EVs' marketability issues, and that a large majority of VinFast cars had already been sold

to, and would continue to be sold to, those related parties. These risks were some of the most

significant factors that made an investment in VinFast securities speculative or risky, and VinFast

was aware of these risks because: (i) VinFast was aware of, and ignored, serious complaints about

the safety of its EVs identified and reported by the lead engineer of the team working on VinFast

cars' front suspension and chassis; (ii) VinFast received extremely negative reviews surrounding its

EVs in the United States before the Offering; (iii) the reviews discussed major issues with the EVs,

which VinFast acknowledged it was aware of, and in fact downplayed; and (iv) related party GSM,

which exclusively uses VinFast EVs for its business, was created *just two months* prior to VinFast's

announcement that it was going to go public, ostensibly for the purpose of increasing the sales of

VinFast's EVs.

### 3.    The Offering Documents Contained Materially False and Misleading Statements Related to VinFast's Lock-Up Provision

139.    A lock-up provision is a clause often included in offering documents that restricts

insiders, including company executives, directors, and employees, from selling their shares in a

company for a specified period. A lock-up provision helps to prevent a sudden drop in a company's

shares due to a large number of those shares being sold on the market at once.

140.    The Proxy Statement included a lock-up provision whereby "Certain equityholders of VinFast have agreed to be subject to a one-hundred and eighty (180) day lockup in respect of their VinFast ordinary shares."

141.    Similarly, the Proxy Statement included information related to the 180-day lock-up provision in the VinFast Shareholders Support Agreement.  *See* ¶70.

142.    On August 30, 2023, just one month after the Offering Documents were declared effective by the SEC, and only two weeks after the Offering was completed, VinFast confidentially filed the Confidential Registration Statement with the SEC for comments and guidance.

143.    The Confidential Registration Statement discussed another offering and radical changes to the lock-up provision described in the Offering Documents that would release shares held by the related party VIG from the lock-up restrictions, stating, in pertinent part, as follows:

> Although certain of our shareholders are subject to restrictions regarding the transfer of their securities, these shares may be sold after the expiration of the applicable lock up periods or the release from such lock up periods. ***We have released the [_____][5] ordinary shares to be offered and sold by Vietnam Investment Group Joint Stock Company ("VIG") from the lock-up restrictions under the VinFast Shareholders Support Agreement (as defined herein) and [_____] ordinary shares to be offered and sold by certain Selling Securityholders named in this prospectus from the lock-up restrictions under the Sponsor Support Agreement*** (as defined herein) and the letter agreement dated as of July 15, 2021, by and among Black Spade, certain initial shareholders, directors and officers of Black Spade (the "Letter Agreement").

144.    The Confidential Registration Statement further discussed changes to the lock-up provision contained in the Offering Documents, stating, in pertinent part:

> Lock-up restrictions
>
> Certain of the Selling Securityholders are subject to certain restrictions on transfer until the termination of applicable lock-up periods.  *See* "Securities Eligible for Future Sale" for more information.

---

[5]    The Confidential Registration Statement left blank the number of shares to be offered and sold.  In a final draft of the Confidential Registration Statement dated September 21, 2023 (the "September Registration Statement"), VinFast stated that it released 46,293,461 ordinary shares.

*We have released the [_____] ordinary shares to be offered and sold by VIG from the lock-up restrictions under the VinFast Shareholders Support Agreement and ordinary shares to be offered and sold by certain Selling Securityholders named in this prospectus from the lock-up restrictions under the Sponsor Support Agreement and the Letter Agreement. Our affiliates, Vingroup and Asian Star, have each waived their right to equivalent amendments to their lock-up.*

*We have also reduced the lock up period applicable to the warrants issued in connection with the Business Combination for the cancellation of all outstanding private placement warrants of Black Spade* and ordinary shares issuable upon exercise of warrants pursuant to the terms of the Sponsor Support Agreement and the ordinary shares to be offered and sold by the Backstop Subscriber pursuant to the terms of the Backstop Subscription Agreement from 12 months to six months.

145.    The Confidential Registration Statement stated that VinFast would receive the proceeds from the sale of VIG's shares, stating, in pertinent part, as follows:

*We will receive all of the proceeds from the sale of up to [_____] ordinary shares by VIG, net of any sales commissions, fees, brokerages or taxes, which VIG has committed to provide to us as a grant.* We will not receive any proceeds from the sale of any securities by any of the other Selling Securityholders. We expect to receive up to an aggregate of $ million [*sic*] from the exercise of the warrants, assuming the exercise in full of all of the warrants for cash at an exercise price of $11.50 per ordinary share.  See "Use of Proceeds."  We will pay certain expenses associated with the registration of the securities covered by this prospectus, as described in the section entitled "Plan of Distribution."

146.    The statements in ¶¶140-141 concerning the 180-day lock-up period were materially false and misleading because at the time of the Offering, Defendants were already planning the Confidential Registration Statement, which was filed confidentially with the SEC just two weeks after VinFast's Offering.  This also triggered a duty to update the Offering Documents prior to VinFast's Offering on August 15, 2023.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

147.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained in ¶¶1-22, 35-146 above as if fully alleged in this Count, only to the extent, however, that the

- 37 -

allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiffs or other members of the Class.

148.    This claim is brought under Section 11 of the Securities Act (15 U.S.C. §77k), on behalf of the Class, against all Defendants. Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in fraud. Lead Plaintiffs do not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a Section 11 claim. All allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

149.    The Offering Documents contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

150.    As part of the Offering, VinFast registered and sold approximately 13.3 million ordinary shares in the closing of the Offering. VinFast is the registrant for the Offering. Defendants were responsible for the contents and dissemination of the Offering Documents. The Securities Act Defendants signed or authorized the signing of the Registration Statement on their behalves.

151.    As the issuer of the securities, VinFast is strictly liable to Lead Plaintiffs and the Class for the Offering Document's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to Lead Plaintiffs and the Class for such material misstatements and omissions. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Offering Documents were complete, accurate or non-misleading.

152.    Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. Each had a duty

to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Offering Documents inaccurate. Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents, the Offering Documents contained misrepresentations and/or omissions of material fact. As such, Defendants are liable to Lead Plaintiffs and the Class.

153.    By reason of the conduct alleged herein, Defendants violated Section 11 of the Securities Act. Lead Plaintiffs and members of the Class purchased VinFast securities pursuant and/or traceable to the Offering and have sustained damages as a result. The value of the securities have declined substantially subsequent and due to Defendants' violations. At the time of their purchases, Lead Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

154.    Because of the foregoing, Lead Plaintiffs and the members of the Class are entitled to damages under Section 11 of the Securities Act.

## COUNT II

### Violations of Section 15 of the Securities Act
### Against the Securities Act Defendants

155.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained in ¶¶1-22, 35-154 above as fully alleged in this Count, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiffs or the other members of the Class.

156.    This claim is brought under Section 15 of the Securities Act (15 U.S.C. §77o) against the Securities Act Defendants. Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in

fraud. Lead Plaintiffs do not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a Section 15 claim. All allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

157. As detailed herein, each of the Securities Act Defendants committed primary violations of the Securities Act by committing conduct in contravention of Section 11 of the Securities Act.

158. By reason of the conduct alleged herein, the Securities Act Defendants violated Section 15 of the Securities Act, and Lead Plaintiffs and the Class have suffered harm as a result.

159. At all relevant times, the Securities Act Defendants were "controlling persons" of VinFast within the meaning of Section 15 of the Securities Act.

160. By reason of the conduct alleged herein, the Securities Act Defendants violated Section 15 of the Securities Act, and Lead Plaintiffs and the Class have suffered harm as a result.

161. The Securities Act Defendants, due to their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of VinFast within the meaning of Section 15 of the Securities Act. The Securities Act Defendants had the power, influence, and knowledge—and exercised the same—to cause VinFast to engage in the acts described herein.

162. The Securities Act Defendants, at all relevant times, participated in the operation and management of VinFast, and conducted and participated, directly and indirectly, in the conduct of VinFast's business affairs. The Securities Act Defendants were under a duty to disseminate accurate and truthful information with respect to VinFast's financial condition and prospects. Because of their positions of control and authority as officers and directors of VinFast, the Securities Act Defendants were able to, and did, control the contents of the Offering Documents, which contained

materially false and/or misleading statements and/or omitted to state material facts required to be stated therein.

163.    Because of their conduct, the Securities Act Defendants are liable under Section 15 of the Securities Act to Lead Plaintiffs and the members of the Class who purchased or acquired VinFast securities pursuant to the Offering Documents.  As a direct and proximate result of the Securities Act Defendants' wrongdoing, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase and acquisition of VinFast securities pursuant to the Offering Documents.

## VII.    EXCHANGE ACT ALLEGATIONS

164.    Lead Plaintiffs assert securities fraud-based claims under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, against Vuong, Mansfield, Thuy, and VinFast.

165.    During the Class Period, Mansfield, Thuy, and VinFast knowingly or recklessly made materially false and misleading public statements and omissions about VinFast's capital position and needs.  Further, during the Class Period, Vuong, Mansfield, Thuy, and VinFast affirmed earlier sales projections made by Vuong in May 2023 that were not based on reasonable facts or investigation.

166.    The Class Period commences on August 15, 2023, the date of VinFast's Offering.  In connection with the Offering, Mansfield and Thuy discussed VinFast's capital position, describing it as "very comfortable" and assuring investors that the Company was "not in a rush" to raise additional capital, and "[didn't] need more equity capital."  While Mansfield and Thuy were misleadingly telling investors there was no urgency to raise additional capital, VinFast was then actively engaged in capital-raising activities.

167.    Additionally, on May 17, 2023, Vuong projected sales of 40,000 to 50,000 EVs in 2023 during an annual shareholder meeting.  During the Class Period, Vuong, Mansfield, Thuy, and

VinFast affirmed this guidance despite that: (i) VinFast's EVs were plagued with marketability problems; (ii) the vast majority of its prior sales were to related parties; and (iii) the Company would need to sell nearly triple its combined Q1 and Q2 2023 sales in the second half of 2023 to meet its target.

### A.    Vuong, Mansfield, Thuy, and VinFast Made Materially False and Misleading Statements During the Class Period

#### 1.    VinFast Needed to Raise Capital Despite Telling the Market Otherwise

168.    In an interview dated August 15, 2023, Mansfield stated that VinFast was "very comfortable with our capital position at the moment" and was "not in a rush" to raise capital, stating, in pertinent part, as follows:

> So we actually *are very comfortable with our capital position at the moment*, although we will obviously take our opportunities as they present themselves now we have the listing vehicle and we can participate with investors. *We are not in a rush to do so*, and we will obviously be working hard to educate investors about the stock as we have continued to do so for the last two years or so.  And you know, when that opportunity presents itself, we will look into getting back into the capital market.

169.    On the same day, Mansfield stated: "We have a number of strategic investors and institutional investors lined up.  We expect to formulate some kind of capital raising over the next 18 months for sure.  *We don't need more equity capital* but if an opportunity is presented, we'll obviously take advantage of that while we can."

170.    In another interview on the same day, Thuy was asked about VinFast's capital position, stating, in pertinent part, as follows:

> Interviewer:  Your founder committed about two billion dollars of his own personal capital to VinFast, will the founder have to put more money in?  I just want to go back to this idea of sovereign wealth funds as well.  You know, in terms of a capital need, where are your priorities to raise?
>
> Lê Thị Thu Thủy:  We, we have the commitment from our shareholder, VinGroup, and our chairman, up to $2.45 billion dollars, so that will help us continue on our path, we have been talking as part of a traditional IPO we were talking a lot to the

investors after becoming public today, we will continue the dialogue a lot to the investors, sovereign wealth funds, so many other institutional investors as well. ***When the time is right for another transaction, for the transaction to bring in significant funding for VinFast, we will do so.*** Meanwhile, we had very regular conversations with our, with potential investors.

171.     The statements in ¶¶168-170 were materially false and misleading because at the time they were made, Mansfield and Thuy misrepresented or failed to disclose the following facts, which were known to Mansfield, Thuy and VinFast or recklessly disregarded by them: (i) VinFast had a present need to raise capital; (ii) VinFast planned to release 46.2 million ordinary shares from the lock-up provision described in the Offering Documents, with the proceeds going back to the Company as described in the Confidential Registration Statement; (iii) VinFast was planning on accessing additional funding from Vuong and/or Vingroup in September 2023; and (iv) VinFast was in the process of raising funds through a standby equity subscription agreement with a hedge fund.

### a.     The Truth Begins to Emerge

172.     The truth about VinFast's true need for capital emerged over the course of a series of disclosures, causing material declines in the price of VinFast securities as a result of the revelation of the relevant truth and/or the materialization of the risks that had been concealed by Mansfield, Thuy, and VinFast's fraud.

173.     On September 21, 2023, VinFast filed with the SEC the September Registration Statement[6] that stated that it "released the 46,293,461 ordinary shares in aggregate . . . from the lock-up restrictions under the VinFast Shareholders Support Agreement." The September Registration Statement also stated that the Company "will receive all of the proceeds from the sale of up to 46,293,461 Released Shares to be sold by the Company Selling Securityholders, net of any sales commissions, fees, brokerages, taxes and other related expenses."

---

[6]     The September Registration Statement was the final version of the Confidential Registration Statement.

174.    On this news, VinFast's ordinary share price fell $1.44 per share, or 8.37%, to close at $15.75 per share on September 21, 2023.

175.    On September 22, 2023, *The Wall Street Journal* published an article titled "VinFast's SPAC Backers Are Backing Out," which commented on the shares VinFast stated it released from the lock-up restrictions the day before.  The article stated, in pertinent part:

> The company reported results on Thursday.  More interesting than the second-quarter numbers was an update on the capital structure.  ***The company last week filed documentation with the Securities and Exchange Commission to release lockup restrictions on 3.1% of its shares, worth about $1.25 billion at the current price. The shares declined 8.4% on Thursday***.

> The sponsors of the special-purpose acquisition company that took VinFast public will be able to sell at what might be a very healthy profit.  ***So, too, will entities belonging to billionaire chairman Pham Nhat Vuong, Vietnam's richest man, but he has pledged to plow any proceeds back into the company, which burned through $890 million of cash in the first six months of 2023***.

176.    On October 5, 2023, VinFast held its Q3 2023 earnings call.  During the Q3 2023 earnings call, Thuy explained how the proceeds from the September Registration Statement would go to VinFast and aid in its growth, stating:

> Maybe another point, another very important point is this 46 million were filtered by VinFast.  ***So VinFast didn't sell the shares, 100% of the net proceeds from selling this share will go into VinFast for free to continue growing VinFast***.

177.    Also on October 5, 2023, VinFast issued a press release reporting its unaudited Q3 2023 financial results.  The results included a section listing "Chairman and Vingroup support commitment," which included additional information regarding the Capital Funding Agreement, stating, in pertinent part:

**Chairman and Vingroup support commitment**

- In April 2023, VinFast entered into a capital funding agreement (as amended from time to time, the "Capital Funding Agreement") that provides a framework for VinFast to receive up to VND60,000 billion (US$2.5 billion), consisting of VND24,000 billion (US$1 billion) in grants from its Chairman, Mr. Pham Nhat Vuong, and VND24,000 billion (US$1 billion) in loans and VND12,000 billion

(US$0.5 billion) in grants from Vingroup to facilitate VinFast's ongoing growth. The Chairman's commitment could be provided as a grant from two of VinFast's key shareholders that are controlled by the Chairman. Disbursements were and are subject to the parties agreeing to enter into a definitive loan agreement, the financial resources of the Chairman, the relevant VinFast shareholders and Vingroup and necessary approvals from the relevant governing bodies of Vingroup.

- *As of September 30, 2023, Vingroup had disbursed approximately VND23,000 billion (US$955 million) in loans to VinFast in accordance with the Capital Funding Agreement. VinFast expects to receive up to VND12,000 billion (US$0.5 billion) in grants from Vingroup in the next six months.*

- *In September 2023, Chairman Pham Nhat Vuong disbursed a total amount of VND7,000 billion (US$291 million) to VinFast as a free grant in accordance with the Capital Funding Agreement.*

- *The Company will receive all of the proceeds from the sale from time to time of up to approximately 46 million ordinary shares by two of VinFast's key shareholders that are controlled by the Chairman, net of any sales commissions, fees and expenses, brokerages, taxes and legal costs. If the sum of such proceeds and the aforementioned VND7,000 billion (US$291 million) contribution by the Chairman is more than VND24,000 billion (US$1 billion), VinFast will receive the surplus amount from the two key shareholders as a further grant on behalf of the Chairman.*

- *Overall, VinFast expects to receive up to VND29,000 billion (US$1.2 billion) or more in grants from Vingroup, the Chairman and two key shareholders in the next six months.*

178.    On this news, VinFast's ordinary share price fell $0.47 per share, or 5.53%, to close at $8.03 per share the next day on October 6, 2023.

179.    On October 15, 2023, *Bloomberg* interviewed Thuy and published an article titled "VinFast to Expand Into South-East Asia, Raise More Capital." Thuy said VinFast would need to raise "a lot of capital." The following exchange occurred during Thuy's interview with *Bloomberg*:[7]

Question: You're talking about some serious investments taking place here as well. You know, do you think you're going to need to raise more money given your debt profile?

---

[7]    Thuy's interview with *Bloomberg* can be accessed at: https://www.youtube.com/watch?v=5_oIvAs3wvQ.

Thuy: As a company like us, ***of course we will continue raising a lot of capital.*** And that was the reason why we listed on Nasdaq. However, we also have support from our Chairman and Vingroup. So for the next 18 months or so at least, we still have the support from them.

180.    On this news, VinFast's ordinary share price fell $1.45 per share, or 18.17%, to close at $6.53 per share on October 16, 2023.

181.    On October 17, 2023, *The Wall Street Journal* published an article titled "VinFast Plumbs New Lows After CEO Says Company Needs Lots of Capital." The article attributed the previous day's drop in VinFast's share price to its need for capital. The article stated, in pertinent part, as follows:

> Shares of VinFast retreated Tuesday, a day after the once-hot Vietnamese electric-car startup ***slid 18% and hit new lows***.
>
> The stock was recently down about 3%. ***The declines came after the company's CEO said in a Bloomberg TV interview that VinFast would need to raise a lot of capital to fund expansion plans into southeast Asia***.

182.    Just a few days later, in a press release dated October 20, 2023, VinFast announced it entered into a Standby Equity Subscription Agreement with Yorkville Advisors, a Cayman Islands exempt limited partnership. The press release stated that "VinFast has the option, but not the obligation***, to require Yorkville to subscribe for up to $1.0 billion of ordinary shares in VinFast at any time during the term of the Subscription Agreement***, subject to certain conditions and limitations."

183.    Commenting on the news related to the Yorkville Advisors Standby Equity Subscription Agreement, Mansfield stated:

> ***This new source of equity funding provides us with valuable optionality and access to capital to continue to expand our business on a global scale.*** While we are under no obligation to draw on the full amount, the transaction aligns with our goals of opportunistic capital raising while adding liquidity to our shares over time. In addition to existing funding commitments, it provides financial flexibility to fund our growth. We will continue to evaluate other capital markets transactions and sources of fundraising as VinFast continues to grow.

- 46 -

184. Several news outlets commented on the announcement related to the Yorkville Advisors offering. For example, *The Motley Fool* published an article on October 20, 2023, titled "Why VinFast Auto Stock Plunged More Than 30% to an All-Time Low This Week." The article connected Thuy's October 15, 2023 statements regarding the need to raise capital to the Yorkville Advisors offering. The article stated, in pertinent part, as follows:

> VinFast Auto is reportedly struggling to gain traction in its home market, Vietnam. But that's not the only reason why the stock is plunging this week: That decline also has to do with something that VinFast's CEO said in an interview this week.
>
> **VinFast Auto needs a lot of money**
>
> In a video interview with Bloomberg that aired Monday, VinFast Auto CEO Le Thi Thu Thuy revealed the company's growth plans, stating that it plans to expand aggressively in Asia, starting with Indonesia. The EV maker is also looking at options in India.
>
> However, VinFast Auto is still a young company. ***Although it has the backing of Vietnam's largest conglomerate, Vingroup, it still requires a lot of money to run its operations and grow.*** The CEO confirmed this in the Bloomberg interview, stating ***that VinFast Auto will continue to raise "a lot of capital" to fund growth, and that its need for funds*** was a primary reason why the company had listed itself on the Nasdaq stock market.
>
> ***Case in point: On Friday morning, VinFast Auto entered into an agreement to issue shares worth $1 billion to investment manager Yorkville over the next 36 months, subject to certain conditions.***

185. *The News & Observer*, a North Carolina news outlet, agreed, reporting on October 20, 2023, that ***"[s]omething Thuy said during her Bloomberg interview seemed to spook investors. She acknowledged her company will look to raise 'a lot of capital' to fund its expansion in Asia. VinFast has already raised (and spent) billions to expand its new fleet of all-electric SUVs to drivers in more than 50 markets worldwide***."

186. On this news VinFast's ordinary share price fell $0.31 per share, or 5.45%, to close at $5.38 per share on October 20, 2023, and $0.58 per share or 10.78%, to close at $4.80 per share on October 23, 2023, for a total drop of 15.6% over two days.

## 2.    VinFast Made Sales Projections Without a Reasonable Basis

187.    On or about May 17, 2023, Vuong projected sales of 40,000 to 50,000 EVs for 2023 during VinFast's annual shareholder meeting.

188.    On August 28, 2023, *Reuters* published an article titled "Shares of EV maker Vinfast surge, extending rally." *Reuters* reported that VinFast "expects to sell as many as 50,000 electric vehicles this year."

189.    On September 21, 2023, VinFast issued a press release reporting its unaudited Q2 2023 financial results. The press release included a section titled "Business Outlook" and included a projection of vehicle deliveries, stating that the "Company expects . . . [d]eliveries of vehicles to be between 40,000 and 50,000 vehicles in FY2023."

190.    Also on September 21, 2023, VinFast held its Q2 2023 earnings call. During his prepared remarks, Mansfield stated the following regarding the Company's 2023 guidance: "In terms of guidance, Q2 results met our expectation; and for the year, we are still targeting 40,000 to 50,000 overall deliveries."

191.    During the Q2 2023 earnings call, an analyst asked for specific guidance regarding the car delivery in the first half of 2023 and in the second half of 2023 and 2024. In response to the analyst's questions, Mansfield replied:

> So I think we've already provided guidance on the earnings release for the entirety of 2023 between 40,000, 50,000 units. So if you take the first half deliveries of 9,500, you can apply significant uptick in deliveries and production numbers for the Q3 and Q4 of this year. We obviously have the capacity to manage and deliver those numbers. So we're very excited about prospects for the business. Now we aren't providing a breakdown on those deliveries and in model or country level. That's not unusual and we're copying and following our peers' guidance in terms of the level of detail that we will provide and the cadence over which we provided. Of the reservation numbers quoted up until the end of Q2, actually, all those reservation numbers are related to individuals, so retail reservations.
>
> Our B2B discussions are separate from that and would be in addition to those numbers based on different discussions that we're having with hire car companies,

fleet operators and other kinds of shared mobility operators in different jurisdictions. What we have obviously disclosed is our commitments and our arrangements with Green Smart Mobility, Vietnamese e-taxi operator, and we're very excited about expecting to deliver up to 30,000 EVs and up to 200,000 e-scooters to GSM over the course of 2024 and out to 2025. I hope that addresses that question.

192.     The statements in ¶¶188-191 were materially false and misleading because at the time they were made, Vuong, Mansfield, Thuy, and VinFast failed to disclose that VinFast had no reasonable basis for this guidance because there was an extremely limited market for VinFast's EVs outside of sales to related parties due to the safety issues and poor quality of VinFast's EVs.

### a.      The Truth Begins to Emerge

193.     The truth about VinFast's baseless guidance emerged over the course of a series of disclosures, causing material declines in the price of VinFast securities as a result of the revelation of the relevant truth and/or the materialization of the risks that had been concealed by Vuong, Mansfield, Thuy, and VinFast's fraud.

194.     In an analyst report dated September 22, 2023, Lightstream Research expressed skepticism that VinFast would be able to meet its target to sell 50,000 EVs in 2023 because the majority of its past sales had been to related parties. The report stated, "***More than 50% of EV volume during 1H2023 were to a related company*** while US volume was less than 200 units ***raising serious concerns over demand for VinFast's EVs.***" The report continued: "according to several news media outlets, more than half of the EVs sold during 1H2023 were to a domestic taxi company (Green and Smart Mobility) which is controlled by the parent Vingroup. ***This raises the question of how small the demand is for the company's EV models***."

195.     The analyst highlighted that VinFast had only sold a total of 11,315 EVs during the first two quarters of 2023, "suggesting that the company ***should sell another 38,685 EVs during the second half of the year***."

196. On this news, VinFast's ordinary share price fell $1.63 per share, or 10.43%, to close at $14.00 per share on September 25, 2023.

197. On October 5, 2023, VinFast issued a press release reporting its unaudited second quarter 2023 financial results. The press release included a section titled "Business Outlook" and included a projection of vehicle deliveries, stating, that "VinFast affirms its FY2023 delivery target of between 40,000 and 50,000 vehicles."

198. Also on October 5, 2023, VinFast held its Q3 2023 earnings call. During the Q3 2023 earnings call, an analyst expressed skepticism about the Company's 2023 full-year projections of 40,000-50,000 vehicle deliveries. Mansfield explained how the Company planned on meeting its projections. The exchange went as follows:

UNIDENTIFIED ANALYST: I wanted just to clarify, I think, on the first question. So you reaffirmed your guidance for the rest of the year. ***By my calculations, you would need a bit of a steep increase in Q4.*** So just can you remind us what are the key drivers there? And what's really behind your conviction of meeting that delivery guidance?

DAVID THOMAS MANSFIELD: The -- as I reiterated before the seasonal uptick in local market, Vietnamese market primarily demand for vehicles in the fourth quarter, it is notable. We expect that to drive the bulk of the uptick in volumes. We have also continued outstanding contracts with a B2B partner, GSM for the delivery of our e-taxi models that will be in a position to deliver. We have a new VF 6 model coming on to market and that's available for reservation from October 20th here in Vietnam and that we'll be delivering this quarter as well. On top of that, we have deliveries into Europe, our first VF deliveries into Europe and the deliveries of VF 8s and our first VF 9 deliveries into the North American market also.

199. On October 15, 2023, *Bloomberg* interviewed Thuy about VinFast's India and Indonesia growth plans. During the interview, Thuy reaffirmed VinFast's 2023 delivery targets, stating: "We are on target to get to 40 to 50,000 vehicles to be delivered globally this year."

200. The statements in ¶¶197-199 were materially false and misleading because at the time they were made, Vuong, Mansfield, Thuy, and VinFast failed to disclose that VinFast had no

reasonable basis for this guidance because there was an extremely limited market for VinFast's EVs, due to the myriad issues with the vehicles, outside of sales to related parties.

201.    On October 26, 2023, Lightstream Research reiterated its doubt that VinFast would be unable to meet 2023 target and discussed its "serious concerns over the company's ability to establish a market presence" in light of the volume of sales to related parties stating, in pertinent part, as follows:

> According to news media outlets, ***more than half of the EVs sold during 9M2023 were to either a related party or an affiliate of the founder. This raises serious concerns over the company's ability to sell its EVs to external customers as a majority is sold to related parties.***
>
> At the same time, Vinfast has an ambitious target of ***selling 40-50k EVs in 2023 and as at the end of 3Q2023, the company had sold a total of 21,342 EVs and the company should sell another 18.6-28.6k units during the current quarter to meet its EV target for 2023. In our view, it seems unlikely for the company to meet its target for 2023 unless they keep selling EVs to related parties or affiliates of the group as the company has not yet been able to establish its presence in the market***.

202.    On this news, VinFast's ordinary share price fell $0.19 per share, or 3.44%, to close at $5.32 per share on October 27, 2023.

203.    On January 18, 2024, after the truth had begun to leak out, *Reuters* reported that VinFast "said it delivered nearly ***35,000*** cars in 2023, ***below its target of at least 40,000 units***, blaming slow EV adoption in some regions, tough competition and uncertain economy." More than 70% of those deliveries were to GSM.

204.    On April 11, 2024, *Reuters* published an article titled "Vietnam EV maker VinFast's challenges escalate risk for parent Vingroup." The article highlighted VinFast's "***struggles to attract retail buyers***" and "***faces weakening global EV demand***." The article also disclosed that ***over 80%*** of VinFast's 2023 sales were to Vingroup-affiliated companies, and stressed that "the extent of VinFast's reliance on Vingroup companies for sales and financing have not been previously reported":

*But struggling to penetrate even its home market, VinFast last year generated 82% of its $1.1 billion of vehicle sales from companies that are part of Vingroup or owned by Vuong*, who is also VinFast's CEO and effectively controls nearly 98% of the Nasdaq-listed EV maker.

*Nearly all of VinFast's retail sales in Vietnam were also aided by hefty discounts offered through a joint marketing campaign with Vinhomes, Reuters has found.*

*The extent of VinFast's reliance on Vingroup companies for sales and financing have not been previously reported*.

*The company had so far said about 70% of its vehicle deliveries last year went to Green SM (GSM)*, a taxi operator and leasing provider 95% owned by Vuong.

205. On this news, VinFast's ordinary share price fell $0.43 per share, or 10.67%, to close at $3.60 per share on April 12, 2024.

206. On April 17, 2024, *Reuters* published an article titled "Vietnam's VinFast's jump in EV deliveries drives Q1 revenues higher." *Reuters* again pointed to VinFast's tremendous reliance on sales to related parties, stating: "VinFast chairwoman Thuy Le told Reuters over half of that number went to its affiliate Green SM, a taxi operator and leasing provider backed by VinFast founder and other 4% to its sibling company, Vinhomes."

207. On this news, VinFast's ordinary share price fell $0.35 per share, or 11.4%, to close at $2.72 per share on April 17, 2024.

208. On April 21, 2024, *Hunterbrook Media* published an article titled "What's Going On With VinFast?" The article discussed VinFast's sales to affiliated companies, stating, "[m]ore than 70% of those deliveries were to other companies owned by VinFast's Chief Executive Pham Nhat Vuong, according to SEC filings that were reported on by Reuters earlier this month. They *accounted for more than 90% of Vinfast's total sales revenues*."

209. The article also discussed VinFast cars' "abysmal" reviews, and that Hunterbrook's investigation revealed VinFast cars sitting in lots, "*stored in the field for months*."

- 52 -

210. On this news, VinFast's ordinary share price fell $0.09 per share, or 3.57%, to close at $2.43 per share on April 22, 2024.

**b.    Post-Class Period Events**

211. On July 29, 2024, VinFast issued a press release stating that it intended to restate its financial statements for 2023. On September 10, 2024, the Company filed its Form 20-F/A restating its financials for 2023 (the "Restatement"). The Restatement corrected "accounting errors relating to recognition of revenue from the sale of [EVs]." The Restatement specifically detailed that certain sales were improperly recognized as revenue in 2023, stating:

> *1. Our sale of 454 EVs and 2,192 e-scooters to our affiliate, GSM Green and Smart Mobility Joint Stock Company ("GSM"), were invoiced and recorded as revenue in fiscal year 2023. However, a regular internal review identified that the dispatching of these EVs and e-scooters for delivery began in early 2024, thus, these sales should not have been recognized as revenue in 2023.* Therefore, we corrected this error by adjusting the corresponding revenue, amount due to a related party, other receivables, cost of sale, inventories, accrual for sale transaction, warranty provided and the related impact of provision for inventories; [and]
>
> *2. We sold 205 EVs to an unrelated third party in Vietnam in 2023 and recognized revenue from those sales for fiscal year 2023. A regular internal review identified that a majority of these EVs were returned to us in February 2024 for a software update. Under these circumstances, the risks and control of those vehicles had not been fully transferred to the customer in 2023 and revenue for these sales should not have been recorded in fiscal year 2023.* Therefore, we corrected this error by adjusting the corresponding revenue, advance from customer, other receivables, cost of sale, inventories, accrual for sale transaction, warranty provided and the related impact of provision for inventories[.]

212. The Restatement reveals the lengths Vuong, Mansfield, Thuy, and VinFast went to in their scheme to achieve their baseless projections. Not only did they stuff the channel by selling as much as 82% of their EVs to related parties, they even resorted to pulling 2024 sales into 2023 in a desperate attempt to meet the projections. Nevertheless, they failed.

213. The market for VinFast securities was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and omissions alleged

herein, VinFast securities traded at artificially inflated prices during the Class Period. Lead Plaintiffs and members of the Class purchased or otherwise acquired VinFast securities relying upon the integrity of the market price of VinFast securities and market information relating to VinFast, and have been damaged thereby.

214. During the Class Period, Vuong, Mansfield, Thuy, and VinFast materially misled the investing public, thereby inflating the price of VinFast securities, by publicly issuing materially false and misleading statements and omitting to disclose material facts necessary to make their statements, as set forth herein, not materially false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, and operations as alleged herein.

215. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiffs and members of the Class. As described herein, during the Class Period, Vuong, Mansfield, Thuy, and VinFast made or caused to be made a series of materially false or misleading statements about VinFast's capital position and 2023 sales projections. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of VinFast securities and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Vuong, Mansfield, Thuy, and VinFast's materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

## B.    ADDITIONAL SCIENTER ALLEGATIONS

216. As alleged herein, Vuong, Mansfield, and Thuy acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Vuong, Mansfield, and Thuy, by virtue of their receipt of information reflecting the true facts regarding VinFast, their control over, and/or receipt and/or modification of VinFast's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning VinFast, participated in the fraudulent scheme alleged herein.

217.    Vuong, Mansfield, and Thuy, by virtue of their high-level positions with the Company during the Class Period, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and final condition, as alleged herein. Vuong, Mansfield, and Thuy, because of their positions within VinFast, controlled the content of the Company's public statements during the Class Period. The only other plausible inference that could be drawn from these pronouncements is that Vuong, Mansfield, and Thuy either fabricated the information they provided to investors and the market or they deliberately ignored information they possessed or had access to relating to such matters. In either event, such deliberate recklessness satisfies the scienter requirement.

218.    VinFast, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done

knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true facts from investors.

219.    VinFast's core operations are the sales of its EVs. VinFast's sales projections pertain directly to the Company's core operations. During the Class Period, Vuong, Mansfield, and Thuy repeatedly affirmed Vuong's May 2023 projections of 40,000 to 50,000 deliveries in 2023 in press releases and on earnings calls. Vuong, Mansfield, and Thuy's affirmations of the projections reflect that they were receiving specific information regarding VinFast's deliveries and sales.

220.    Additionally, Vuong was motivated to list VinFast publicly and artificially inflate VinFast securities to promote VinFast's parent company Vingroup, which Vuong owned, in Vietnam and on the Vietnamese stock exchange.

221.    These facts, in conjunction with the additional indicia of scienter detailed herein, collectively support a strong inference of scienter for each of Vuong, Mansfield, and Thuy.

### C.    LOSS CAUSATION/ECONOMIC LOSS

222.    During the Class Period, as detailed herein, Vuong, Mansfield, Thuy, and VinFast engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of VinFast securities and operated as a fraud or deceit on Class Period purchasers of VinFast securities by failing to disclose and misrepresenting the adverse facts detailed herein. As described in detail herein, when Vuong, Mansfield, Thuy, and VinFast's prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of VinFast securities declined significantly as the prior artificial inflation came out of the price of VinFast securities.

223.    As a result of their purchases of VinFast securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Vuong, Mansfield, Thuy, and VinFast's materially false and misleading statements

had the intended effect and caused VinFast securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $82.35 per share at close on August 28, 2023.

224.    By concealing from investors the adverse facts detailed herein, Mansfield and Thuy presented a misleading picture of VinFast's capital position.  Additionally, Vuong, Mansfield, Thuy, and VinFast repeatedly affirmed Vuong's May 2023 projections without a reasonable basis.  When the truth about the Company's true need to raise capital and its failure to meet its projections for 2023 was revealed to the market through a series of partial corrective disclosures, the price of VinFast securities fell significantly.  These declines removed the inflation from the price of VinFast securities, causing real economic loss to investors who had purchased VinFast securities during the Class Period.

225.    As previously discussed, the declines in the price of VinFast securities after the corrective disclosures came to light were a direct result of the nature and extent of Vuong, Mansfield, Thuy, and VinFast's fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in VinFast securities negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Vuong, Mansfield, Thuy, and VinFast's fraudulent conduct.

226.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Vuong, Mansfield, Thuy, and VinFast's fraudulent scheme to artificially inflate the price of VinFast securities and the subsequent significant decline in the value of VinFast securities when Vuong, Mansfield, Thuy, and VinFast's prior misrepresentations and other fraudulent conduct were revealed.

227.    As detailed in ¶¶172-186, 193-210 above, when the truth about VinFast's capital condition and baseless projections was revealed over time through corrective disclosures, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the securities' prices.  By the end of the Class Period, VinFast's stock price closed at $2.43 per share on April 22, 2024.

### D.    APPLICABILITY OF PRESUMPTION OF RELIANCE

228.    Lead Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine, because the market for VinFast's publicly traded securities was open, well-developed and efficient at all times during the Class Period.  As a result of the materially false and misleading statements alleged herein, VinFast securities traded at artificially inflated prices during the Class Period.  Further, Lead Plaintiffs and members of the Class purchased VinFast securities in reliance on the integrity of the market price of the securities and the market information relating to VinFast, and were damaged thereby.

229.    At all relevant times, the market for VinFast securities was an efficient market for the following reasons, among others:

(a)    VinFast securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, VinFast filed periodic public reports with the SEC;

(c)    VinFast regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    VinFast was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

(e)    As a result of the foregoing, the market for VinFast securities promptly digested current information regarding VinFast from all publicly available sources and reflected such information in the price of the securities.  Under these circumstances, all purchasers of VinFast securities during the Class Period suffered similar injury through their purchase of VinFast securities at artificially inflated prices and a presumption of reliance applies; and

(f)    Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose. Specifically, Lead Plaintiffs are entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Vuong, Mansfield, Thuy, and VinFast failed to disclose material information regarding the Company's manufacturing, operations, forecasts, and business prospects.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Mansfield, Thuy, and VinFast's material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT III

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Vuong, Mansfield, Thuy, and VinFast

230.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

231.    During the Class Period, Vuong, Mansfield, Thuy, and VinFast disseminated or approved the statements specified above, which they knew, or deliberately disregarded, were

materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

232.    Vuong, Mansfield, Thuy, and VinFast violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of VinFast securities during the Class Period.

233.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VinFast securities.  Lead Plaintiffs and the Class would not have purchased VinFast securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Vuong, Mansfield, Thuy, and VinFast's misleading statements.

## COUNT IV

### Violations of Section 20(a) of the Exchange Act
### Against Vuong, Mansfield, and Thuy

234.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235.    Vuong, Mansfield, and Thuy and/or persons under their control, violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic

injury to Lead Plaintiffs and members of the Class.  By virtue of their positions as controlling persons, each of these defendants is liable pursuant to §20(a) of the Exchange Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

236.    Each of these defendants acted as a controlling person of some or all of their co-defendants, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws.  Vuong, Mansfield, and Thuy had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above.  By virtue of their high-level positions, ownership of, and contractual rights with, VinFast, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, Vuong, Mansfield, and Thuy had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the materially false and misleading statements alleged above.

## VIII.  NO SAFE HARBOR

237.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Certain of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Vuong,

Mansfield, Thuy, and VinFast are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company making the statement who knew that those statements were false or misleading when made.

## IX.    CLASS ACTION ALLEGATIONS

238.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of VinFast securities during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

239.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, VinFast securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there could be hundreds or thousands of members in the proposed Class.  Record owners and members of the Class may be identified from records maintained by VinFast or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

240.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

241.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

242.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Securities Act was violated by Defendants as alleged herein;

(b)    whether the Exchange Act was violated by Vuong, Mansfield, Thuy, and VinFast as alleged herein;

(c)    whether statements made by Defendants misrepresented and/or omitted material facts about the business and operations of VinFast; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

243.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

X.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining pursuant to Rule 23 of the Federal Rules of Civil Procedure that this action may be maintained as a class action, and certifying Lead Plaintiffs as Class Representatives and Lead Plaintiffs' counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XI.      DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

DATED:  January 15, 2025                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            ALAN I. ELLMAN
                                            MAGDALENE ECONOMOU


                                                    */s/ Alan I. Ellman*
                                            ALAN I. ELLMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            srudman@rgrdlaw.com
                                            aellman@rgrdlaw.com
                                            meconomou@rgrdlaw.com

                                            Lead Counsel for Lead Plaintiffs