1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
JEREMIE COMEAU, Individually  : 24-cv-02750 (NGG)
and On Behalf of All Others   :
Similarly Situated,           :
                              :
          Plaintiffs,         : United States Courthouse
                              : Brooklyn, New York
                              :
    -against-                 : May 15, 2025
                              : 11:00 a.m.
                              :
                              :
VINFAST AUTO LTD., et al.,    :
                              :
          Defendants.         :


- - - - - - - - - - - - - - - X

     TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
           UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:    ROBBINS GELLER RUDMAN & DOWD LLP
                           58 S. Service Road, Suite 200
                           Melville, New York 1174
                      BY:  ALAN ELLMAN, ESQ.
                           MAGDALENE ECONOMOU, ESQ.

For the Defendant:    LATHAM & WATKINS, LLP
                           1271 Avenue of the Americas
                           New York, New York 10020
                      BY:  BLAKE DENTON, ESQ.
                           SANDRA ISABELLE SCOTT, ESQ.

Court Reporter:  Michele Lucchese, CRR, RPR
                 718-613-2272
                 e-mail:  MLuccheseEDNY@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

Proceedings                                    2

THE COURTROOM DEPUTY:  Civil cause for a pre-motion conference.

Beginning with the plaintiff, please state your appearances.

MR. ELLMAN:  Alan Ellman from Robbins Geller Rudman & Dowd on behalf of the plaintiffs.

MS. ECONOMOU:  Magdalene Economou, Robbins Geller Rudman & Dowd, on behalf of the plaintiffs.

Good morning, Your Honor.

THE COURT:  Good morning.

MR. DENTON:  Good morning, Your Honor.  Blake Denton from Latham & Watkins for the defendants.  And I'm joined by Sandra Scott also from my firm, and Carolina Pinheiro, who is in-house counsel at defendant VinFast.

THE COURT:  Thank you.  Please be seated, everybody.

Let me start by asking plaintiff's counsel basically the underpinning of the class-action complaint.

MR. ELLMAN:  Shall I stand or sit?

THE COURT:  Don't stand.  We don't stand anymore. Since COVID, everyone sits and just stays where they are.

MR. ELLMAN:  Thank you, Your Honor.  May it please the Court?

Plaintiffs allege Section 11 strict liability claims and Section 10(b) securities fraud claims.

VinFast, the defendant, corporate defendant, is a

Proceedings                                        3

Vietnam-based company that was founded in 2017.  They initially produced conventional internal combustion engine cars.  In 2021, they transitioned to manufacturing electric vehicles or EVs.  So, from that point forward, the future of the company hinged on their ability to sell electric vehicles.

THE COURT:  Were they publicly-traded in 2017 or were they privately funded?

MR. ELLMAN:  It was privately funded.  And the company was actually founded by one of the defendants Pham Vuong, who is the richest man in Vietnam.  We will discuss him later on and how he pertains to the case.

On August 15, 2023, VinFast conducted a public offering of securities on the NASDAQ.  Unbeknownst to investors, however, and prior to the offering, VinFast EVs suffered from serious operational and safety defects.  And plaintiffs know about these defects based on a whistleblower by the name of Hazar Denli, who spoke with the BBC, which published an article about what he reported.

Mr. Denli was the lead engineer in charge of manufacturing the front suspension and chassis of the VinFast vehicles.

THE COURT:  Before the IPO?

MR. ELLMAN:  Before the IPO.  So, we're talking about February of 2023.  This is five months prior to the IPO. He identified serious safety and operational issues with the

Proceedings                                                    4

chassis snapping off of the car and numerous other parts that were breaking off of the vehicle.  And he was very concerned that the company was cutting corners in order to produce vehicles prior because they knew that they had this offering coming up.  And this is all information that he gave to the BBC.

His concerns manifested a few months later, in May of 2023, also prior to the offering, when the VinFast vehicles were test-driven in the United States and automotive journalists universally panned them as being -- used terms such as abysmal, very, very bad, return to sender, and others that we allege in the Complaint.

And the problems that they perceived with the VinFast cars were basically similar to what Mr. Denli himself saw, that there were problems with the suspension and the drivability.

So, at this point, it's very clear to VinFast there was a very limited market for the vehicles among retail customers.  However, defendants masked the lack of demand for the vehicles by selling the vast majority of their vehicles to a related party called GSM.

THE COURT:  Is GSM a Vietnamese company?

MR. ELLMAN:  Yes, it's a Vietnamese company that is also owned by Mr. Vuong, the chairman and founder and current CEO.  It was created just two months before VinFast announced

they were going public.  It was created within the first quarter of 2023 ostensibly for the sole purpose of taking on VinFast cars.  It is an e-taxi company.  And we allege in the Complaint that numerous -- hundreds or more cars were seen -- of their e-taxis were sitting in lots growing weeds on their tires.

THE COURT:  Growing what?

MR. ELLMAN:  Weeds.  Grass on their tires.

THE COURT:  They weren't being moved?

MR. ELLMAN:  Some were being moved, but there were witness accounts that these cars were just sitting in lots.

But, in any case, even if they were being used, GSM was --  the allegation, and it's reasonable to infer based on the timing of the creation of GSM, that it was created by the defendants themselves as a receptacle for these cars in order to show that VinFast had sales.

In fact, prior to the offering, VinFast sold two-thirds of its cars to GSM and only a third to retail, to actual customers, to arm's length customers.

During the class period, as much as 82 percent of VinFast EVs were sold to GSM.  So, it's very clear that there was a very limited demand for VinFast cars because of the marketability issues that were known at the time of the offering.  These facts were not disclosed in the offering documents.

So, plaintiffs allege four categories of misstatements:  The first is violations of regulation SK under the Securities Act, which specifically items 303 and 105; the second are false and misleading sales projections; the third are false and misleading statements concerning the company's capital needs; and the fourth is a false and misleading lock-up provision in VinFast offering documents.

Turning to the first category of misstatements:  The Item 303 claim, pursuant to Item 303, an issuer must disclose unusual or infrequent events or transactions or known trends or uncertainties that either are or likely to affect the company's income, revenue, and sales.

In this case, defendants needed to disclose that their EVs suffered from operational and safety problems leading to an inability to sell those cars to retail customers.  And this is evidenced by the fact that prior to the offering two-thirds of their cars were sold to a related party.  And defendants knew about these issues.  Because Item 303 requires that the trends be known.  So plaintiffs have pled sufficient facts to raise the inference that defense knew about these trends.

First of all, Mr. Denli, the whistleblower reported these problems to senior VinFast executives.  And he was asked by the BBC if Mr. Vuong, the defendant Vuong knew about the problems, and Mr. Denli said Vuong knew about them because the

company had a strict -- followed strict reporting guidelines. In addition, there were several additional factors.

THE COURT:  He reported it?

MR. ELLMAN:  He reported it to senior executives.

THE COURT:  To senior executives.

MR. ELLMAN:  And he said he believed that Mr. Vuong knew about them.  He doesn't -- he didn't say whether or not told Mr. Vuong himself.  That's part of the holistic analysis of whether he knew.  There are several other crucial factors that show Mr. Vuong knew about these problems.

According to Mr. Denli, Mr. Vuong was personally involved in the production of the electric vehicles.  Mr. Vuong had insisted that the friend -- that the company use a friend's supply company to supply parts for the production of the EVs.  Mr. Vuong also invested approximately $11 billion of his own money in the production.

THE COURT:  11.

MR. ELLMAN:  Billion U.S. dollars.

That's alleged in -- that's noted in an article that is cited in the Complaint.

In addition, GSM, which was the related party, was controlled and owned by Vuong himself.  So the allegation is that GSM was created just to stuff the channel and GSM was owned and controlled by Mr. Vuong.

In addition, the production of electric vehicles was

the core operation of VinFast, which permits the inference that senior executives are aware of what is going on with the core operation of the company.

Further, the CEO, the defendant Thuy knew about the bad reviews that the cars had received.

Plaintiffs also allege in Item 105 claim under Reg S-K and Section 11 of the Securities Act, which involves a discussion, or requires a discussion of material risk factors.

Defendants failed to warn of the existing marketability problems and that a large proportion of their EVs had already been sold to a related party and would likely continue to be sold to related parties.

Defendants, as they point out in their letter, did list certain risk warnings in their offering documents, but those risks warnings failed to address risks that had already transpired and that's those -- those purported warnings aren't sufficient to inoculate their statements from liability, meaning the cars were already suffering from problems, from serious marketability problems, and two-thirds of the cars had already been sold to GSM.

THE COURT:  You're saying that they knew about certain risks.  They weren't projecting future risks that might occur.

MR. ELLMAN:  Correct.  And they also framed the risks as future hypothetical generic risks, when the reality

Proceedings                                            9

is they already existed.

THE COURT:  I understand your claim.  Go ahead.

MR. ELLMAN:  The second category of misstatements are false and misleading sales projections.

Defendants Vuong, CFO Mansfield, CEO Thuy, and VinFast made statements during the class period that the company projected sales for 2023 of 40 to 50,000 electric vehicles.

Projections generally are actionable when they lack a reasonable basis.  And VinFast and defendants' projections lacked a reasonable basis for several reasons:  Number one, as I mentioned, the marketability problems.  It was very unreasonable to expect that they would sell this number of cars when retail customers weren't buying them because they had these operational and safety problems.

Number two, they would need to sell triple the first half 2023 sales in the second half.  So just by the numbers, quantitatively, that's very unreasonable to project that.

Number three --

THE COURT:  Where were they --  in their paperwork for the IPO, what was their market intended to be, if you know?

They are in Vietnam.  Would it have been in Asia or more globally?

MR. ELLMAN:  They were trying to sell globally,

Vietnam was their home market that was there -- frankly, I believe that was only market to that point that had sold EVs. But we know they certainly test-driven the models in the U.S. as evidenced by those reviewers in San Diego test-driving them.  So I can tell you that they were trying to sell them outside of Vietnam.

In addition, two-thirds of the -- to underscore the unreasonableness of the projections, two-thirds of the sales to date had been to a related party just raising the likely -- the inference that it was going to be unlikely that they could find buyers to buy all these other cars, and that related party, GSM, was created just a few months before, presumably, inferentially for that purpose of taking on the sales.

Defendants have raised in their letter that the PSLRA safe harbor should apply because projections are generally forward-looking statements.  But the safe harbor does not apply when projections are made with actual knowledge of falsity.  And plaintiffs adequately allege actual knowledge -- I'm sorry.  Actual knowledge is generally pled where defendants either didn't genuinely believe their projections, actually knew that the projections had no reasonable basis or were aware of undisclosed facts tending to undermine the accuracy of the projections.

And plaintiffs adequately allege all three of those bases, because, as I've been discussing defendants knew about

the marketability problems, that there were serious operational and safety defects with the cars and that retail customers would not buy them in that year, and also the related-party sales that to date they had only sold a third of their vehicles to retail customers and two-thirds of their sales were to this entity GSM that they controlled and they were able to force them to buy them.

And defendants also had a motive to make these sales projections because they needed to inflate the company's sales and revenue because its revenue had plummeted in the first half of -- I'm sorry -- the first quarter of 2023 compared to the previous year because they were no longer producing and selling their conventional combustion engine cars.

The third category of misstatements are the statements regarding VinFast capital needs.

On the day of the offering, the CFO, Mr. Mansfield made statements -- he had been asked whether the company needed -- what was the state of the company's capital needs, did it need more capital.  And he said that the company was very comfortable in its capital position and that they were in no rush to raise additional funds.  And the CEO, Ms. Thuy, made similar statements.  Those statements were false primarily because at the time of the offering -- at the time that they made those statements, VinFast was planning to release millions of shares from the lock-up provision that was

included in the offering documents with the proceeds of the sale of those shares going back to VinFast.  So that they were going to -- they said on the same day that these defendants made the statements they didn't need capital; they were planning to raise additional capital.  We know this because VinFast filed a confidential registration statement with the SEC a mere two weeks later, where they sought to release millions of VinFast shares from the lockup with the insiders selling and the proceeds going back to the company.

THE COURT:  So these shares were in the possession of insiders and they were then retrieved by the company?

MR. ELLMAN:  Essentially.  There was a lock-up provision in the -- which is typical in the offering documents, that prevented insiders from selling shares, their VinFast shares for 180 days after the offering.  But these -- certain insiders were -- VinFast was seeking to have --

THE COURT:  So they couldn't benefit during the first --  using that provision would deny them the ability to benefit from an increase in the value of shares during that period?

MR. ELLMAN:  Correct.

And there is the additional aspect here where the insiders, not only were certain insiders going to be permitted to sell their shares, but the proceeds of the sale were going to go back to the company, so that it shows VinFast, at the

time that they made the statements saying they didn't need --
there was no rush to raise capital, they were actively seeking
to raise capital.

So, even though this is two weeks after the
offering, that they filed this confidential registration
statement, it's a reasonable inference to draw that at the
time of the offering this was in the works, because you don't
just file that at the snap of a finger, something like that.

In addition, about a month after the statements in
the offering, VinFast accessed a billion-dollar loan from Mr.
Vuong, the defendant, the chairman, which also shows that they
really did need capital at the time the statements were made.
And another month after that, they entered into an agreement
with a hedge fund to access another billion dollars.

THE COURT:  So that's two billion?

MR. ELLMAN:  Plus the release from lockup raised
approximately 700 million.

THE COURT:  So that's 2.7.

MR. ELLMAN:  Yes.

THE COURT:  Billion.

MR. ELLMAN:  At a time when they said we are very
comfortable, no rush.

And the fourth category -- and I'm nearing the end
-- is the false and misleading lock-up provision itself, which
is a Section 11 claim.  And as I stated, the lock-up provision

prevented insiders from selling for 180 days.  It said that they had agreed to this.

Defendants, in their letter, said we haven't shown that they didn't genuinely agree to it.  But it's a reasonable inference, especially this is Section 11 claim under Rule 8.  There's no scienter and Rule 8 pleading.  It's a reasonable inference to draw that they were -- an SEC filed two weeks later was in the works at the time of the offering documents.

THE COURT:  All right.  Defense would like to make a motion to dismiss all of the claims?

MR. DENTON:  Correct, Your Honor.

THE COURT:  Tell me about the bases for that.

I have read both letters.

I'm trying to get my arms around the complexity, if there is such complexity, of the claims and the circumstances.  And I would like you to focus on why you would be entitled to the granting of a motion to dismiss in a case where there is so much factual disagreement as to what's going on and some discovery, even if it is limited discovery, might be necessary before going into motion practice since I don't want to do everything twice, if I can avoid it.

MR. DENTON:  Absolutely.  Absolutely.

THE COURT:  And speak the microphone.

MR. DENTON:  Thank you, Your Honor.

THE COURT:  It would help.  Is the light on?

Proceedings                                    15

MR. DENTON:  It is.

THE COURT:  That's fine.  It is good to have that.

MR. DENTON:  Thank you, Your Honor.  Blake Denton, again, from Latham & Watkins for the defendants.

THE COURT:  Did you go to law school in New York?

MR. DENTON:  I did.  I went to Brooklyn Law School right down the street.  I interned for Judge Pollack and saw a trial.

THE COURT:  She's still here but not for long.  She's retiring.

My law clerk on this case -- the reason I am asking, is Haley Bork.  She graduated from Brooklyn Law School and last year she clerked for Judge Beth Robinson at the Second Circuit.  She graduated first in her class at Brooklyn Law School and I snagged her.

MR. DENTON:  That's fantastic.  I did not graduate first in my class.

THE COURT:  You didn't have to say that.  You are a partner at Latham & Watkins.  That's good enough for me.  Go ahead.

MR. DENTON:  Thank you very much for the time today, Your Honor.

So, to address Your Honor's questions head-on, so we are asking permission to move to dismiss on two elements that the plaintiffs do not properly plead, and that's why we should

not get past the pleading stage here.  And that's, first, false and misleading statement and that applies to every single one of their claims; and then, second, scienter, which applies to all of their Exchange Act claims.

Let's talk about falsity, which applies to every claim.  So, there are 12 statements made by my clients which the plaintiff claims were false.  We identify in our papers the grounds for dismissal, including that they don't plead that any were actually false and that they are subject to a host of legal protections:  Forward-looking statements, opinion statements, puffery, things like that.

Generally, as you heard from plaintiff's counsel, they generally have four buckets of different false claims -- false statements that they say are in this case.  And I'm happy to go through all of them if useful.  But why don't I focus now on the one they feature in their amended complaint. They lead with it in their letter brief.  Counsel led with it in his argument here in front of Your Honor, which is that my client did not -- misled investors and they were unaware that VinFast was reliant upon sales to related parties, including that taxi company GSM.

First, Your Honor, that's not a statement that VinFast made a misrepresentation.  That's an omissions claim. And those are not actionable under the Supreme Court's *Macquarie* decision, unless they render other statements

affirmatively false or misleading.  So right there the plaintiffs are already behind.

But, in any event, the entire theory is preposterous and it's contradicted by the very documents that they cite and incorporate by reference in their case.  The related-party transactions, both past and expected future ones, are disclosed all over the documents that they cite, and they leave that out when they draft their Complaint.

So, if you look at the July 2023 proxy statement, which was issued for investors to consider when deciding whether or not they wanted to buy in the public offering, it warned investors that VinFast is, quote, dependent upon Vingroup's affiliates for key aspects of its business, including sales of vehicles.  But then the proxy goes a level deeper than that.  It has a one-page chart titled Related-Party Transactions, and it breaks out every Vingroup affiliate by name, including GSM.  It gets its own line item. How much revenue from VinFast they had for sales in 2022, how many they had so far in the first quarter for 2023.

And then on top of that, it spells out how many are contracted in the future.  It says, quote, Vehicle sale agreement with GSM for the sale and delivery of up to an aggregate of 30,000 cars and 200,000 scooters over the next two years.  And then it breaks that out further.  And it does that for 2023 versus 2024 and shows the expected amount of

sales for each year and the total expected revenue.

So, Your Honor, this claim that investors were misled, they didn't know that we were reliant upon sales to GSM in order to make our numbers is just wrong, and it is contradicted by the very documents they rely upon.

So, Your Honor, if there are other categories you're interested in, I'm happy to go through the other ones.  But it's the same story with all of them.

Each one of them is contradicted by the very documents they rely upon, and it is also subject to host of a legal protections for forward-looking statements, puffery, opinions, et cetera.

So, Your Honor, the plaintiffs don't come close to pleading false statements with particularity as required by the PSLRA and by Rule 9.  So, that's why our plaintiffs, in their papers, try to lower the bar for themselves.  They argue that well, we have Section 11 claims about the offering documents and those aren't subject to Rule 9(b), so we can get away with pleading less.

And you heard a lot in their argument about different things they infer and things they think would be logical again because they don't actually plead them.  They don't have the facts.  So, instead, they try to connect the dots and weave together a story.

But, Your Honor, they're just wrong on the pleading

burden.  The Second Circuit and courts in this district have held time and time again that where a party tries to package together the same facts for Section 10 fraud and Section 11 false offering materials the whole case is subject to Rule 9(b)'s heightened pleading standard.  That's the case even when you have a clever plaintiff, like we do here, who makes self-serving statements in its pleading that the Section 11 claims are non-fraud claims.

The Second Circuit has ruled on this in the *Rombach v. Chang* case.  Judge Matsumoto reached the exact same conclusion in *Pitman v. Imunovant*.  So, this is well-established.  They are subject to the higher pleading standard whether they like it or not based on how they pled their case.

We think right there they don't plead falsity.  They can't plead falsity, and so it should be dismissed.  For that reason alone, the whole case should go.

Then, on top of that, Your Honor, for the Exchange Act claim, where there is a scienter requirement, the plaintiffs also failed to plead that.

So, normally, in these types of securities cases, what you see is former employees quoted in the Complaint, sometimes dozens -- a dozen or more of them who spoke with the plaintiff's lawyers, told them about something shady going on at the company and gave evidence that the defendants knew what

was going on, that defendants lied on purpose, and they put that in the Complaint.

Our plaintiffs don't have a single person at the company, present or former, who says that anybody lied about anything.  They don't have any internal company documents.  They don't even have people who can establish what information any defendant had at any point in time that supposedly contradicted their statements.

So, instead, what we have is a lawyer invented fraud by hindsight case supported by no actual people past or present from the company.  So, you know, plaintiff's counsel knows that this is a problem because they need to plead not only that somebody said something that was incorrect, but they need particularized facts that the speaker knew it was a lie at the time that they were saying it.

So, you heard counsel talk about how they try to get around this through these -- its a triple hearsay claim where they repeat what they've read in the BBC article, which in turn quotes posts from Reddit from somebody named Hazar Denli who did not even work at VinFast and left long before the IPO actually even occurred.  So there's many, many problems with using that statement.

Most of the allegations are totally irrelevant to the different buckets of claims here.  They say nothing about sales to GSM or lockup agreements or anything.  They just say

that this person said that it wasn't a good car while it was going through these early testing prototype stages, right.

But, in any event, on top of that, plaintiff doesn't claim to have spoken to Mr. Denli, instead they are just repeating what they read in an article and you can't do that in order to meet your burden here to plead fraud with particularity.

And we cited in our papers a case from Judge Engelmyer in the S.D.N.Y. on that very point, saying that a plaintiff can't seek to avoid dismissal by pleading witness statements that it has just read about and it hasn't verified itself. And that, again, goes with Rule 11 and everything, that if you allowed this to go past the motion to dismiss and we get into discovery and we find out what's in their Complaint actually isn't true, we can't have the plaintiff go well, I didn't talk to the guys, so I can't be held responsible for this.

That's why the Courts are clear, it's a non-delegable duty. If they're going to quote somebody and rely upon him to say hey, this person knows that the chairman committed fraud, you have to actually talk to him, you have to actually get info. You can't say well, I read an article that quoted him and quoted his Reddit posts. That doesn't work.

So, Your Honor, we think the plaintiffs' claim falls well short of their pleading burden. That's why we are here

asking Your Honor to allow us to move to dismiss.

To that end, the parties have agreed on a stipulated briefing schedule that is at docket entry No. 34, which this Court ordered back in November, and it is keyed off when the Court rules that we can bring that motion. So, if Your Honor rules today that we can bring that motion, the parties have conferred and made sure we calculated the same. I can give the dates.

THE COURT: In just a moment.

Anything else from plaintiff's counsel before we set a schedule?

MR. ELLMAN: Yes, Your Honor. If I could just briefly address some of the points that Mr. Denton made.

THE COURT: Sure.

MR. ELLMAN: Mr. Denton's -- some of his arguments are just wrong as a matter of law. The Supreme Court's recent *Macquarie* decision addressed the Item 303 claim in the Section 10(b) context, but plaintiffs only allege a 303 claim under Section 11, which the Supreme Court did not touch the ability for plaintiffs to allege a failure of the duty to disclose under Reg S-K, and it's a -- freestanding omissions are -- plaintiffs can -- if they can adequately plead them, they can bring them under Section 11, which is the only section of the securities law that we bring the 303 claim under. So he's simply wrong on that score.

In terms of another legal issue of the pleading standard of pleading -- in terms of pleading Section 11 claims with Section 10(b) claims in the same Complaint, counsel cites the *Rombach* case from 2004 from the Second Circuit, but the Second Circuit, just last year, in the *Pappas* case in 2024, which very clearly permits plaintiffs to plead Section 11 claims alongside Section 10(b) claims without raising the pleading burden for the 11 claims as long as they're pled separately and the plaintiffs disclaim allegations of fraud for the 11 claims, which we've done.

In terms of Mr. Denton's point about the -- we don't cite former employees or unnamed confidential witnesses.  We do better than that.  We cite a man whose name, Hazar Denli, his position, he was the lead engineer on the production of the chassis and the suspension of the vehicles.  He was there when they were making the vehicles.  It doesn't matter that he was employed by Tata Motors.  Tata Motors was contracted by VinFast to manufacture this aspect of the cars.

THE COURT:  Tata Motors was an Indian company?

MR. ELLMAN:  It is an Indian company, yes.

THE COURT:  Tata Motors is a very famous Indian entrepreneur.

MR. ELLMAN:  Yes.

So, VinFast contracted with Tata Motors for Mr. Denli to be the lead engineer on the production of this aspect

of their vehicles.  And he -- undoubtedly, he spoke with a reputable media organization, the BBC, and he told them particularized and specific details of the problems that he personally perceived.

As we cite in the *Lottery.com* case from earlier this year, plaintiff's are allowed to rely on news articles and people quoted in news articles as long as what they say is particularized and detailed.  There is no need for plaintiffs to speak with former employees or confidential witnesses.  I'm sure if we did we would be hearing from defense counsel that there's all these problems.  We don't identify who they are. We do better than that.  We cite Mr. Denli.

There's a stay of discovery as imposed by the PSLRA. So, defendants can't complain that we haven't conducted discovery and deposed Mr. Denli.  We have no ability to do that.  We don't have the subpoena power.  If we get into discovery, then we can do that.

THE COURT:  Would you want to begin discovery?

MR. ELLMAN:  Yes, we would.

THE COURT:  Immediately?

MR. ELLMAN:  We believe we have sufficiently stated a claim and that we pass the burden.  And if Your Honor agrees, then, yes.

THE COURT:  I'm curious about that.

MR. ELLMAN:  We believe we state a claim and there

is no reason to have drawn out briefings.

THE COURT:  I have a motion to dismiss.  We will talk about that some more.

Anything else?

MR. ELLMAN:  Finally, the last point about -- defendant's counsel said VinFast disclosed everything that needed to be disclosed about sales to related parties.  What they -- plaintiffs allege that they didn't disclose the proportion of sales to GSM.  He's correct that they did disclose the number of sales to GSM, but they didn't disclose the denominator of that calculation so that investors were unable to determine that -- yes, they knew that 7,100 cars were sold to GSM, but they didn't know what the total sales were.  In fact, defendant's, in their letter, say that 18,700 -- the offering documents say that 18,700 cars were sold.  But that's wrong.  That's factually wrong.  And we actually point that out in the Complaint.  18,700 is the number of cars sold by VinFast since it started selling electric vehicles over a two-year period.  We're talking about a two-quarter period that GSM was in existence.  So defendants don't even understand from the offering documents what the real number of total sales was, so how could an investor know.

It is material to an investor to know -- if I'm going to invest in a company, are we going to be able to sell these new cars to retail customers.  At this point, two-thirds

Proceedings                                        26

of the sales were going to this company that was created simply by Mr. Vuong in order to goose the sales and stuff the channel.

THE COURT:  Goose?

MR. ELLMAN:  Goose the sales and stuff the channel. Channel stuffing.

THE COURT:  Channel stuffing.

MR. ELLMAN:  And this was -- we plead this under Item 303.  So this was a trend.  This was a known trend that defendants failed to disclose that the cars were importantly suffering from these operational and safety issues that Mr. Denli identified.  And they bore -- it bore out when the -- pun intended, when the rubber met the road, when the cars were being test-driven.  The automotive journalists universally said these cars had a terrible drive.  They were getting motion sickness because there were issues with the suspension that Mr. Denli identified.

THE COURT:  It was a different form of suspension for an EV as opposed to combustion engine vehicles, isn't that right?  Or generally speaking?

MR. ELLMAN:  These automotive journalists knew what they were --

THE COURT:  I mean, that was the reason, I assume, or I would I think.

I don't drive an EV, so I wouldn't know.

Proceedings                                              27

MR. ELLMAN:  I don't either, so I don't know.

But Mr. Denli, who was expert engineer in designing EVs suspension, knew that there was a problem with it.

So, to wrap things up, they knew that there was a known trend that the cars had serious marketability problems and that they weren't selling them to retail customers and they were selling a tremendous portion to a related party and that was not disclosed.

THE COURT:  Well, there are a lot of factual issues here.  I'm not sure that this can be resolved on a motion to dismiss, but perhaps it can.  You have a right to make a motion.

What is the schedule that you all have agreed to?

MR. DENTON:  Yes, Your Honor.  It would be July 14th for our motion to dismiss.

THE COURT:  Go ahead.

MR. DENTON:  September 12th for plaintiff's opposition.

October 27th for our reply.

THE COURT:  Is that agreeable to the plaintiff?

MR. ELLMAN:  Yes.

THE COURT:  Okay.  It is agreeable to the Court.

My question is whether at least some discovery should take place while you are engaged in motion practice.

And your position?

MR. ELLMAN:  I --

THE COURT:  Or do you want to wait?  I'm sure the defense wants to wait.

MR. ELLMAN:  The discovery stay is in place under the PSLRA.  Plaintiff believes we have adequately stated a claim, and it should be lifted.  The motion should be denied and it should be lifted.

MR. DENTON:  Your Honor, that's an important point here, which is because we are talking about securities claims, this is governed by the PSLRA, put in place an automatic discovery stay.  And because Congress specifically -- because there was this influx of these security cases -- and by definition, they all write 50-page complaints.  They all include a bunch of facts.

THE COURT:  You're used to that.

MR. DENTON:  So courts were just allowing these to go forward.  Congress specifically put in place, there is a stay of discovery until they survive a motion to dismiss, and we are going to put in place this strict heightened pleading standard, pleading with particularity, where they need to make their case upfront and prove an entitlement to relief.  So, we would say no, discovery is definitely not appropriate.  We don't think it's ever appropriate in this case.  We think that they have to meet their burden on the pleadings before they can even get to that level.

Proceedings                                        29

THE COURT:  We will live with the PSLRA.

Is there anything else from plaintiff for today?

MR. ELLMAN:  One last thing.  Your Honor has an individual practice encouraging junior attorneys to participate in oral argument.  I don't know if Your Honor wants oral argument on the pleadings to dismiss.

THE COURT:  I may want it on this one.  I wanted to hear from you today because there are a lot of moving parts in this Complaint and serious arguments in favor of dismissal of some of the claims.  I wanted to start with a discussion so that I would be able to jump.  I'm giving you a lot of time to work on this.

July 14th isn't that far in the future.  That is why I agreed to the schedule for the benefit of the associates at Latham & Watkins in particular.

MR. DENTON:  I assure you they appreciate it.

THE COURT:  I bet they do.

I encourage more junior lawyers to engage in oral argument.  If you would like to have oral argument, I would be delighted to have you here on oral argument.

MR. ELLMAN:  Plaintiffs welcome that.

THE COURT:  Any problem with that?

MR. DENTON:  No, of course not, Your Honor.

THE COURT:  I think it is useful for newer lawyers to get up in court and make the pitch for their clients.

Proceedings                                          30

There's an alternative to that.  If you go to work for a public agency, like the U.S. Attorney's Office or the State Attorney General, or Corporation Counsel for the City of New York, you're on your feet right away.

     If you go to a firm, the larger, the less opportunity you have, I encourage it.  We will put it down for oral argument after I have had a chance to review the papers that you submit.  Okay?

     MR. ELLMAN:  Thank you, Your Honor.

     THE COURT:  Anything else for today?

     MR. ELLMAN:  No.

     THE COURT:  Anything else, sir?

     MR. DENTON:  No.  Thank you so much, Your Honor.

     THE COURT:  Okay.  Thanks, everybody.  Have a nice day.

     MR. ELLMAN:  You, too.

     (Matter adjourned.)

     *    *    *    *    *

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

/s/ Michele Lucchese                    May 15, 2025
_____                _____
Michele Lucchese                       DATE