UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

JEREMIE COMEAU, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

  vs.

VINFAST AUTO LTD., LE THI THU THUY,
PHAM NHAT VUONG, DAVID
MANSFIELD, NGAN WAN SING
WINSTON, LING CHUNG YEE ROY,
PHAM NGUYEN ANH THU, and NGUYEN
THI VAN TRINH

       Defendants.

———————————————————— x

:   Civil Action No. 1:24-cv-02750-NGG-SDE
:   (Consolidated)
:
:
:   <u>CLASS ACTION</u>
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:   Date of Service: September 12, 2025


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE CORRECTED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................2

        A.      VinFast Prepares to Go Public in the United States ...................................2

        B.      VinFast's EVs Were Experiencing Major Marketability Defects .............3

        C.      VinFast's Lock-Up Provision Was Illusory...............................................5

        D.      VinFast Had a Present Need to Raise Capital.............................................6

        E.      Certain Defendants Made Baseless Sales Projections ................................6

III.    ARGUMENT..........................................................................................................7

        A.      The AC States Claims Under the Securities Act ........................................7

                1.      The AC Pleads Actionable Misstatements and Omissions ..............8

                        a.      Defendants Violated Items 303 and 105..........................8

                        b.      The Lock-up Was Materially Misleading .......................12

        B.      The AC States Claims Under the Exchange Act ......................................14

                1.      The AC Pleads Fraud with Particularity .......................................14

                        a.      Defendants Misrepresented VinFast's Capital Needs....14

                        b.      VinFast's Sales Projections Are Actionable .................17

                2.      The AC Adequately Alleges Loss Causation.............................24

IV.     CONCLUSION.....................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)........................................................................................24

*Altimeo Asset Management v. Qihoo 360 Technology Co.*,
19 F.4th 145 (2d Cir. 2021) .....................................................................................7, 13

*Barron v. Helbiz, Inc.*,
2021 WL 4519887
(2d Cir. Oct. 4, 2021) ................................................................................................25

*Beaubrun v. Brennan*,
2023 WL 7003714
(E.D.N.Y. Oct. 24, 2023) ......................................................................................20, 21

*Carpenter v. Oscar Health, Inc.*,
2025 WL 722729
(S.D.N.Y. Mar. 6, 2025) ...............................................................................................8

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................24, 25

*Eden Alpha CI LLP v. Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025) .........................................................................11

*Erickson v. Jernigan Capital, Inc.*,
2022 WL 3028627
(S.D.N.Y. Aug. 1, 2022) ..............................................................................................13

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)..........................................................................16

*Freudenberg v. E*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................................24

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983).......................................................................................................7

*In re Alphabet, Inc. Securities Litigation*,
1 F.4th 687 (9th Cir. 2021) ..........................................................................................20

**Page**

*In re CarLotz, Inc. Securities Litigation*,
2024 WL 1348749
(S.D.N.Y. Mar. 29, 2024) ........................................................................................21

*In re General Electric Co. Securities Litigation*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012)........................................................................17

*In re Gentiva Securities Litigation*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................19

*In re GeoPharma, Inc. Securities Litigation*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006)........................................................................21

*In re Lottery.com, Inc. Securities Litigation*,
765 F. Supp. 3d 303 (S.D.N.Y. 2025)........................................................................19

*In re MF Global Holdings Ltd. Securities Litigation*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................21

*In re Omega Healthcare Investors, Inc. Securities Litigation*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)........................................................................24

*In re Omnicom Group, Inc. Securities Litigation*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008)........................................................................25

*In re Omnicom Group, Inc. Securities Litigation*,
597 F.3d 501 (2d Cir. 2010)......................................................................................25

*In re Pretium Resources Inc. Securities Litigation*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)........................................................................23

*In re Scholastic Corp. Securities Litigation*,
252 F.3d 63 (2d Cir. 2001)..................................................................................11, 12

*In re Signet Jewelers Ltd. Securities Litigation*,
2019 WL 3001084
(S.D.N.Y. July 10, 2019) ...........................................................................................24

*In re Symbol Technologies, Inc. Securities Litigation*,
2013 WL 6330665
(E.D.N.Y. Dec. 5, 2013) ................................................................................22, 23, 24

*In re Time Warner Inc. Securities Litigation*,
9 F.3d 259 (2d Cir. 1993)...........................................................................................18

**Page**

*In re Virtu Financial, Inc. Securities Litigation*,
  770 F. Supp. 3d 482 (E.D.N.Y. 2025) .......................................................7, 13, 16, 17

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)........................................................................................17

*Kurzweil v. Philip Morris Co. Inc.*,
  1997 WL 167043
  (S.D.N.Y. Apr. 9, 1997)...................................................................................17

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011)........................................................................10, 11

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020).................................................................20

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)........................................................................................18

*Martin v. Quartermain*,
  732 F. App'x 37(2d Cir. 2018) ..........................................................................23

*Milman v. Box Hill Systems Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y.1999)....................................................................23

*Nath v. Lightspeed Commerce Inc.*,
  2025 WL 606108
  (E.D.N.Y. Feb. 25, 2025)..................................................................................18

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*,
  709 F.3d 109 (2d Cir. 2013)................................................................................7

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................9, 14, 20

*Nutriband, Inc. v. Kalmar*,
  2020 WL 4059657
  (E.D.N.Y. July 20, 2020) ..................................................................................16

*ODS Capital LLC v. JA Solar Holdings Co.*,
  2020 WL 7028639
  (S.D.N.Y. Nov. 30, 2020) ..................................................................................23

**Page**

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................15, 20

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)........................................................................16

*Oklahoma Law Enforcement Retirement System v. Papa John's International, Inc.*,
517 F. Supp. 3d 196 (S.D.N.Y. 2021)..................................................................11, 12

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)..............................................................................15, 16, 17, 23

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
681 F.3d 114 (2d Cir. 2012)...............................................................................8, 10

*Pappas v. Qutoutiao Inc.*,
2024 WL 4588491
(2d Cir. Oct. 28, 2024) .......................................................................................7, 8

*Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015)........................................................................14

*Resnik v. Swartz*,
303 F.3d 147 (2d Cir. 2002)...................................................................................18

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...............................................................................8, 12

*Roofers Local No. 149 Pension Fund v. Amgen Inc.*,
751 F. Supp. 3d 330 (S.D.N.Y. 2024)........................................................................10

*Rudani v. Ideanomics, Inc.*,
2020 WL 5770356
(S.D.N.Y. Sept. 25, 2020) ......................................................................................22

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.*,
75 F.3d 801 (2d Cir. 1996).....................................................................................14

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)..................................................................................9, 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................................14, 21

**Page**

*Thomas v. Roach*,
  165 F.3d 137 (2d Cir. 1999)..................................................................................9, 21

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..................................................................................17, 23

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................................18

*Washington State Investment Board v. Odebrecht S.A.*,
  461 F. Supp. 3d 46 (S.D.N.Y. 2020)....................................................................16

*Woolgar v. Kingstone Companies, Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)...................................................................20, 23

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
  2025 WL 2097951
  (S.D.N.Y. July 25, 2025) .....................................................................................19, 20

## STATUTES, RULES, AND REGULATIONS

15 U.S.C
  §78j(b)........................................................................................................ *passim*
  §77k............................................................................................................ *passim*
  §78o...........................................................................................................1, 25
  §78t(a) ........................................................................................................ *passim*

17 C.F.R.
  §229.105(a) .................................................................................................11
  §229.303......................................................................................................8

Federal Rules of Civil Procedure
  Rule 8 ..........................................................................................................8, 24
  Rule 9 ..........................................................................................................8
  Rule 9(b) ......................................................................................................7, 8
  Rule 15 .........................................................................................................25

Plaintiffs submit this memorandum of law opposing the motion to dismiss the Corrected Amended Complaint ("AC") filed by VinFast Auto Ltd. ("VinFast" or the "Company"), Pham Nhat Vuong (Chairman and CEO), Le Thi Thu Thuy (former CEO), David Mansfield (former CFO), and Directors Ngan Wan Sing Winston, Ling Chung Yee Roy, Pham Nguyen Anh Thu, and Nguyen Thi Van Trinh (together, "Defendants").[1]  Plaintiffs assert strict liability and negligence claims against Defendants under §§11 and 15 of the Securities Act on behalf of VinFast securities purchasers in an August 15, 2023 offering (the "Offering"), and securities fraud claims against Vuong, Thuy, Mansfield, and VinFast under §§10(b) and 20(a) of the Exchange Act on behalf of VinFast securities purchasers from August 15, 2023 to April 21, 2024 (the "Class Period").

## I.    INTRODUCTION

Plaintiffs allege particularized facts demonstrating that Defendants made materially false and misleading statements and omissions related to central aspects of VinFast's business: namely the marketability of its electric vehicles ("EVs") and the demand for them, as well as its capital position and projected sales.  Before the Offering, the EVs were plagued with serious safety defects—made known to Defendants by a whistleblower—which materially diminished the demand for the vehicles.  Defendants concealed these issues and disguised the limited demand by creating an e-taxi company two months before VinFast went public.  Prior to the Offering, this affiliated entity purchased two-thirds of total VinFast EV sales, which created a false impression about market demand for the EVs.

VinFast's Offering Documents omitted to disclose the known uncertainty that its EVs were then experiencing material marketability issues.  They also failed to disclose these then-existing material factors that made an investment in the Offering speculative and risky.

---

[1]    References to "¶" are to the AC (ECF No. 38).  "MTD" refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the AC, dated July 14, 2025.  "Def. Ex." refers to exhibits to the Declaration of Colleen C. Smith, dated July 14, 2025.  "Pl. Ex." refers to exhibits to the Declaration of Alan I. Ellman, submitted herewith.  Undefined capitalized terms are as defined in the AC.  Emphasis is added and internal citations and quotations are omitted unless otherwise noted.

Moreover, on the day VinFast went public, Mansfield and Thuy falsely stated that VinFast's capital position was "very comfortable . . . at the moment" and VinFast was "not in a rush" to obtain additional capital and "[did not] need more equity capital" (the "Capital Raising Statements"). Only two weeks later, however, VinFast filed a confidential registration statement with the SEC (the "Confidential RS"), seeking to raise $800 million by releasing shares from a lock-up provision described in the Offering Documents (the "Lock-up"). Then, no later than six weeks after the Offering, VinFast obtained $955 million in loans from its parent Vingroup and $291 million as a grant from Vuong. Thus, VinFast obtained over $2 billion in new capital soon after telling investors that it did not need any. The only plausible inference is that the Capital Raising Statements were false when made. For similar reasons, the Lock-up was false and misleading when made as well.

Defendants also made sales projections (the "Projection Statements") without a reasonable basis. VinFast ultimately missed its projections due to the marketability problems of its EVs and lack of demand. Finally, VinFast restated its financials and admitted to pulling 2024 sales into 2023—a desperate attempt to meet the projections. When investors learned the truth about these matters, VinFast stock plummeted.

In an attempt to discredit the AC's well-pled allegations, Defendants mischaracterize the law and the facts, and seek to diminish Plaintiffs' strong support for falsity and scienter. All of Defendants' arguments should be rejected and their motion denied in its entirety.

## II. STATEMENT OF FACTS

### A. VinFast Prepares to Go Public in the United States

VinFast is a Vietnam-based automotive manufacturer founded in 2017. ¶3. In 2022, it transitioned from manufacturing traditional combustion-engine vehicles to EVs. *Id*. VinFast is a subsidiary of Vingroup, one of the largest private enterprises in Vietnam. ¶53. VinFast was founded by Vuong, who served as Chairman of the Board until January 2024, when he became the

- 2 -

Company's CEO.  ¶45.  Vuong is also the founder and Chairman of Vingroup, and he controls more than 99% of VinFast's stock through various entities that are majority-owned by him.  *Id*.

On May 12, 2023, VinFast and Black Spade Acquisition Co. entered into a business combination agreement.  ¶4.  On June 15, 2023, VinFast filed a Registration Statement, and on July 28, 2023, it filed a Proxy Statement (together with the Registration Statement, the "Offering Documents").  ¶6.  VinFast began trading on the NASDAQ on August 15, 2023.  *Id*.

**B.      VinFast's EVs Were Experiencing Major Marketability Defects**

In February 2023, Hazar Denli, the lead engineer of the team working on the VinFast EV's front suspension and chassis prior to production for consumer use, identified "improperly designed components in the car's chassis, including its suspension system."[2]  ¶76.  He reported major safety issues: "At low mileages, some of the[] [chassis] were snapping off," which "created a risk that under stress, such as hitting a pothole at speed, the wheels could become misaligned, causing the car to veer to the left or right without prompting, and the driver could lose control."  *Id*.  "We saw, for example, the front strut-to-knuckle connection was loosening, which could be extremely dangerous," he said.  *Id*.  "It could cause a loosening of the entire structure that could cause wheels to come off. In a crash scenario, it could be completely unsafe."  *Id*.

Denli became concerned VinFast was cutting corners with safety and keeping costs down by employing a small team of inexperienced engineers.  ¶77.  He said that in February and March 2023, while running vigorous testing on VinFast cars, two components snapped off and another two failed; other components later failed.  *Id*.  Denli stated that certain parts were failing after fewer than 25,000 km, when normally they would be expected to last for at least 150,000 km.  *Id*.  "In the drive units,

---

[2]    Denli's allegations are from a *BBC* article titled "Electric car whistleblower sacked by Jaguar Land Rover," published on December 18, 2024 and annexed hereto as Pl. Ex. 1.  Denli was employed by Tata Technologies Ltd. ("TTL"), and began working on VinFast vehicles in September 2022.  ¶¶75-76.  For three years, VinFast employed TTL to design its VF6 and 7 models.  ¶81.

some of the brackets were completely failing and falling out on to the road," he said. *Id*.

Denli said the incidents "started causing alarm bells to go off just a short time before we went into production." *Id*. He escalated his concerns to senior executives at TTL and VinFast and recommended they redesign the faulty components and manufacture safer, higher quality parts. *Id*. Denli said Vuong "knew of our concerns . . . or issues reported . . . we follow strict reporting guidelines etc. He basically didn't care." ¶86. Denli's recommendations to fix the issues "would have sharply boosted costs and required VinFast Group to postpone production of the car." ¶78. But VinFast, according to Denli, was "preparing to sell shares in itself and raise funds by floating" on a public stock exchange, and "instead pushed ahead with production." *Id*. Unwilling to be associated with the VinFast EV, Denli resigned in May 2023. Pl. Ex. 1 at 4.

A fatal VinFast crash in April 2024 prompted Denli to post additional concerns on *Reddit*. ¶¶80-86. Denli also filed reports with the SEC and National Highway Traffic Safety Administration ("NHTSA") Whistleblower Programs. ¶89. On September 10, 2024, NHTSA announced it was investigating VinFast VF8's sold in the U.S. ¶105. The investigation aligns with Denli's allegations, as it focuses on steering malfunctions and lane-keeping system failures. ¶¶80, 105.

In May 2023, automotive journalists in the United States began reviewing the VinFast VF8.[3] ¶12. The resoundingly negative reviews corroborated Denli's concerns, including complaints about ride quality, cheap materials, and how the vehicle was not ready for deliveries to customers. *Id*. As one outlet summed it up, reviews of the VF8 model "have sparked words like ***abysmal, 'very, very bad,' 'yikes,' 'simply unacceptable,' and 'return to sender***.'" ¶100. The consensus was that the VF8 was "nowhere near ready for customer deliveries that are already taking place" due to concerns including: (i) the car "shudders violently"; (ii) "bobbing, swaying, and bucking, producing near-constant head-tossing motions"; (iii) issues with steering response; and (iv) basic functions not

---

[3]    The VF8 uses the same chassis Denli worked on. ¶81; Pl. Ex. 1 at 4.

working reliably. *Id.* Thuy and another VinFast executive minimized the negative reviews, calling them "noise," "balanced," and "positive, or at least neutral." ¶¶13, 99-103.

Due to the EVs' marketability issues, at the time of the Offering there was an extremely limited market for VinFast EVs. ¶14. So during Q1 2023—two months before VinFast announced its intent to go public—Vingroup created the e-taxi company Green and Smart Mobility ("GSM") to buy VinFast EVs and mask the lack of demand. ¶¶14-17. Only providing incomplete information, the Offering Documents failed to fully and accurately disclose the extent of reliance on related parties.[4] ¶73. Unbeknownst to investors, VinFast's sales to GSM amounted to a staggering two-thirds of sales during Q1 and Q2 2023. ¶17. In actuality, VinFast's reliance on related parties was even greater due to discounts provided to Vinhomes, a real estate developer controlled by Vuong. ¶126. VinFast offered EV vouchers worth up to $14,000 to Vinhomes home buyers in 2023. *Reuters* reported that "EV sales from the discount programme generated around 14% of [VinFast's] EV revenues . . . which could amount to nearly all of its retail sales in Vietnam." ¶122.

In September 2023, news outlets began reporting the true magnitude of sales to related parties and lack of demand for the EVs. ¶15. On September 12, 2023, *Barron's* reported that 7,100 out of 11,300 EV sales in the first half of 2023 went to GSM. ¶17. On April 21, 2024, Hunterbrook Media reported that "[m]ore than 70% of those deliveries were to other companies owned by . . . Vuong[.] They accounted for ***more than 90% of Vinfast's total sales revenues***." ¶19.

## C.    VinFast's Lock-Up Provision Was Illusory

Just two weeks after VinFast went public, Defendants made radical changes to the Lock-up, which had subjected certain VinFast equityholders to a 180-day lockup of their shares. ¶21. On August 30, 2023, VinFast filed the Confidential RS, indicating it planned to release a number of

---

[4]    For example, the Offering Documents cited a figure of 18,700 EVs sold, but this represented total sales since 2021, not sales for Q1 and Q2 2023— the period during which GSM existed. ¶134.

"ordinary shares to be offered and sold by [a related party] from the lock-up restrictions," with the proceeds going back to VinFast. ¶¶142-143. On September 21, 2023, VinFast revealed that it released over 46 million shares from the Lock-up, worth nearly $800 million. ¶173.

### D.        VinFast Had a Present Need to Raise Capital

On August 15, 2023, the day VinFast went public and the first day of the Class Period, Mansfield and Thuy touted VinFast's capital position to quell concerns that it needed to raise more capital. ¶¶168-169. VinFast, however, did have a present need, **and** was actively seeking, to raise capital at that time, as demonstrated by its actions. Specifically, VinFast: (i) sought to lift the Lock-up only two weeks after the Offering; (ii) announced on October 5, 2023 that, as of September 30, 2023, the Company accessed nearly $1 billion in loans from Vingroup and more than $290 million in grants from Vuong; and (iii) announced on October 20, 2023, that it entered into an agreement with Yorkville Advisors ("Yorkville") giving VinFast the option to require Yorkville to subscribe for up to $1 billion of VinFast shares at any time during the agreement's term. ¶¶24-25, 28.

On October 15, 2023, *Bloomberg* interviewed Thuy and published an article titled "VinFast to Expand Into South-East Asia, Raise More Capital," where she stated VinFast would seek to raise "a lot of capital," causing an 18% stock decline. ¶26. On October 17, *The Wall Street Journal* attributed the stock decline to Thuy's statements to *Bloomberg*. ¶181; *see also* ¶185.

### E.        Certain Defendants Made Baseless Sales Projections

On May 17, 2023, before the Offering, Vuong told investors at VinFast's annual meeting that VinFast projected EV sales for full-year 2023 to be between 40,000 and 50,000. ¶29. Vuong had no reasonable basis to make this projection because: (i) the EVs were plagued with marketability problems; (ii) VinFast would need to sell nearly triple its first-half 2023 sales in the second half to meet its target; (iii) the vast majority of prior sales were to related parties; and (iv) Vingroup created GSM just two months before VinFast announced its intent to go public to inflate sales. ¶¶54, 167.

- 6 -

The projections were affirmed by Vuong, Thuy, Mansfield, and VinFast during the Class Period. ¶¶189-191, 197-199.  On January 18, 2024, VinFast announced it missed its projections, delivering less than 35,000 EVs in 2023, despite selling 72% of them to GSM.  ¶¶31, 121.  After the Class Period, VinFast restated its financials, admitting it pulled 2024 sales into 2023.  ¶¶211-212.

## III.    ARGUMENT

### A.    The AC States Claims Under the Securities Act

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 496 (E.D.N.Y. 2025) (Garaufis, J.).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The court must "draw[] all reasonable inferences in the plaintiff's favor." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021).

To plead a claim under §11, a plaintiff must allege: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading" in a registration statement or prospectus. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013).  A plaintiff asserting a §11 claim "need not allege scienter, reliance, or loss causation." *Id.*  As a result, §11 "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

Because §11 claims "need not include allegations of fraud, this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of [Rule] 8(a)." *N.J. Carpenters Health Fund*, 709 F.3d at 120.  A §11 claim "sounding in negligence or strict liability will not be subjected to the heightened standard of Rule 9(b) merely because of the complaint's other claims." *Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024).  "A plaintiff may retain

- 7 -

the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its [§11] claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Id*.

### 1. The AC Pleads Actionable Misstatements and Omissions

Plaintiffs' §11 claims are subject to Rule 8 because they are pled according to this Circuit's instructions in *Pappas*.[5] *See id*.; ¶¶147-163. The §11 and §10(b) claims are also based on different legal theories and different alleged misstatements and omissions. *Compare* ¶¶58-59 *with* ¶¶60-61.

#### a. Defendants Violated Items 303 and 105

**Item 303**. Under Item 303, a registrant must "[d]escribe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations" and "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303. An Item 303 claim requires a plaintiff to allege facts that raise a "plausible inference" that the company was aware of a trend or uncertainty that would likely materially impact its financial condition. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121-22 (2d Cir. 2012). "Item 303 requires not only a 'discussion' but also an 'analysis' of known material trends, and that disclosure is necessary to an understanding of a

---

5     Defendants contend that the §11 claims are subject to Rule 9(b) because they are pled with §10(b) claims. *See* MTD at 8-9. Defendants do not cite *Pappas*, but rely exclusively on *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), decided twenty years earlier. MTD at 8. In *Pappas*, the Second Circuit held: "Nothing in Rule 9 or in this Court's prior decision in *Rombach* forecloses pleading Section 10(b) fraud and Section 11 negligence as alternatives with the former claim to be governed by Rule 9(b) and the latter by Rule 8." 2024 WL 4588491, at *1. Defendants argue that the §11 claims include wording "classically associated with fraud," MTD at 8-9 (quoting *Rombach*, 355 F.3d at 172), through allegations of "materially false and misleading" statements. But such allegations are not per se allegations of fraud. *See Carpenter v. Oscar Health, Inc.*, 2025 WL 722729, at *4 (S.D.N.Y. Mar. 6, 2025) ("Allegations that statements or omissions were 'materially false or misleading' or contained 'untrue statements of material fact' do not, however, necessarily sound in fraud, as such allegations simply track the language of [§]11[.]").

company's performance, and the extent to which reported financial information is indicative of future results." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015).

Defendants violated Item 303 by failing to disclose in the Offering Documents the known trend, uncertainty, and/or unusual event or transaction that VinFast EVs suffered from major operational problems, and, as a result, GSM accounted for two-thirds of sales over the first two quarters of 2023, with the rest aided by Vinhomes discounts. ¶¶121-122, 131-136. As of the Offering, Defendants knew of the operational problems, *see supra* at 4 and *infra* at 19-22, and knew of the magnitude of GSM sales because Q2 ended a month and a half earlier. ¶¶133-135. As senior officers and directors, Defendants at least had access to that information. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("access to information" sufficient to plead scienter).

First, Defendants do not even contend that they disclosed the marketability problems. Second, Defendants argue that the volume of related-party sales and dependence on Vingroup for sales were "robustly" disclosed in the Offering Documents. MTD at 11; *see also id*. at 5, 14-15. Not so. Critically, Defendants did not disclose total EV sales of 11,300 for the first half of 2023, nor that GSM accounted for two-thirds of sales during that period or that the remainder of sales were aided by large discounts through Vinhomes. *See* Def. Ex. 4 at 47, 291. In fact, the 18,700 sales figure in the Offering Documents (sales since 2021) misled investors to believe that sales to GSM for the first half of 2023, *i.e.*, the time GSM existed, represented a much smaller proportion of total sales—38% instead of 63%.[6] ¶¶134-135. Defendants also argue that the Offering Documents disclosed related-party sales in Q1 2022 and Q1 2023, *see* MTD at 14-15, but that disclosure described revenue, not

---

[6] Defendants themselves misunderstood the 18,700 figure, stating in their pre-motion letter that Defendants "did disclose [VinFast's] 'relationships with related parties, including GSM, *as well as sales to them*' of 18,700 EVs." ECF No. 41 at 4. If Defendants and their counsel misunderstood the Offering Documents' disclosure of EV sales, a reasonable investor also likely would have. Defendants fail to address the 18,700 sales figure and the Vinhomes allegations in their brief, and have conceded any argument against those allegations at this stage. *See Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) (argument is waived unless a party raises it in its opening brief).

sales, and it failed to include revenue for the first half of 2023.  *See* Def. Ex. 4 at F-76.

In any case, the issue is not limited to disclosure of marketability problems and data regarding related-party sales, but also whether, in light of Item 303's disclosure requirements, Defendants analyzed the magnitude of VinFast's reliance on those transactions and the impact of those two related uncertainties on future sales and revenues.  Defendants' "patchwork commentary" on related-party transactions "did not live up to that obligation."  *Stratte-McClure*, 776 F.3d at 105; *see also Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330 (S.D.N.Y. 2024) ("Given the sheer size of the potential liability Amgen was facing, Defendants' vague characterizations of the amounts the IRS was seeking . . . rendered its disclosure of the tax dispute neither 'clear' nor 'complete.'  To the contrary, investors were left in the dark about the magnitude of that liability.").

This case is akin to *Panther Partners*.  The plaintiffs there alleged a violation of Item 303 for defendants' failure to disclose the "known . . . uncertainty" that their semiconductor chips "were defective and were causing system failures where they were deployed."  681 F.3d at 117.  The Second Circuit held that, viewed in the context of Item 303's disclosure obligations, "the defect rate, in a vacuum, is not what is at issue.  Rather, it is the manner in which uncertainty surrounding that defect rate, generated by an increasing flow of highly negative information from key customers, might reasonably be expected to have a material impact on future revenues."  *Id*. at 120.  Similarly, in *Litwin v. Blackstone Group, L.P*., where plaintiffs alleged defendants violated Item 303 for failing to disclose negative trends in the real estate market, the Second Circuit found that "the focus of plaintiffs' claims is the required disclosures under Item 303—plaintiffs are not seeking the disclosure of the . . . downward trend in the real estate market. . . . Rather, plaintiffs claim that Blackstone was required to disclose the manner in which those then-known trends, events, or uncertainties might

- 10 -

reasonably be expected to materially impact Blackstone's future revenues."  634 F.3d 706, 718-19

(2d Cir. 2011).  Like the defendants there, VinFast made no such disclosures.

Tellingly, in its 2024 Annual Report filed on April 28, 2025 (the "2024 Annual Report," annexed hereto as Pl. Ex. 2)—after the Class Period—VinFast belatedly included *the exact* information Plaintiffs allege was missing from the Offering Documents, *i.e.*, a clear and concise explanation of the magnitude of the Company's reliance on sales/revenue to related parties:

> Although the number of EVs that we sold to unrelated third parties increased from 2022 to 2023, *our percentage of revenue from sales of vehicles to related parties increased from approximately 7.0% in 2022 to approximately 75.0% in 2023* primarily due to strong demand from Vingroup affiliates, in particular GSM, which placed large orders for EVs and e-scooters in order to build its fleet for its newly-launched taxi business.

Pl. Ex. 2 at 96.[7]

**Item 105**.  Item 105 requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment" in a security "speculative or risky," and requires the issuer to "adequately describe[ ] the risk."  17 C.F.R. §229.105(a).  Defendants violated Item 105 by failing to warn of existing marketability issues and the resulting risk of a very small market for VinFast's EVs, and that a large majority of EVs had already been sold to, and would continue to be sold to, related parties.  Defendants knew these risks: Vuong knew of Denli's concerns and Thuy knew of the bad reviews.[8]  *See supra* at 4-5.  VinFast's boilerplate warnings

---

[7]  "[C]ourts may take judicial notice of public disclosure documents required by law to be filed, and actually filed, with the SEC," *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 293 (E.D.N.Y. 2025), and plaintiffs may "rel[y] on post-class period data to confirm what a defendant should have known during the class period."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

[8]  Defendants discount Denli, calling him "a former contractor," MTD at 15, but overlook that he was "appointed to lead the engineering team working on the VinFast car's front suspension and chassis."  ¶75.  Additionally, Defendants rely on *Oklahoma Law Enforcement Retirement System v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196 (S.D.N.Y. 2021) (MTD at 15), but that case is inapt because the plaintiff had not "adequately pled that the toxic culture and sexual misconduct" at the company was "reasonably likely to have material effects on [its] financial conditions or results of

- 11 -

related to its "dependen[ce] on Vingroup affiliates for key aspects of its business" including "sales of electric vehicles to GSM" (MTD at 11, 14-15) and financial backing (*id.* at 4) did not disclose the magnitude of those sales as a proportion of total sales. *See* Def. Ex. 4 at 47. Defendants' disclosure of an agreement with GSM to purchase up to 30,000 EVs over a *future* two-year period (MTD at 4-5, 7) is insufficient, as it did not disclose the magnitude of *previous* sales. And warnings about past and future recalls and potential failures to "cost efficiently implement new technologies or adjust . . . manufacturing operations" (MTD at 6, 15) were meaningless given that Defendants failed to disclose the manufacturing and safety problems that already existed. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173. Since the risks had already transpired, Defendants' cases are inapposite. *See* MTD at 15.

The Court need look no further than the 2024 Annual Report to find the detailed risk warnings concerning related-party sales that should have been included in the Offering Documents:

> ***A considerable portion of our EV deliveries to date has been to certain affiliates***.
>
> In 2024, 27.6% of our EV deliveries and 15.8% of our e-scooter deliveries were to parties related to our Company. The majority of these deliveries were to Green and Smart Mobility Joint Stock Company ("GSM"), which is an electric taxi company in Vietnam owned by Mr. Pham.

Pl. Ex. 2 at 19 (emphasis in original). These post-Class Period risk disclosures buttress Plaintiffs' claims because they are the very disclosures Plaintiffs allege were lacking, albeit for a different time period.[9] *See* ¶138; *see also Scholastic*, 252 F.3d at 72.

### b.      The Lock-up Was Materially Misleading

Plaintiffs adequately allege under §11 that the Lock-up was false and misleading. ¶¶139-

---

operations." *Id.* at 213. Here, Plaintiffs allege that major safety issues with the EVs impaired their marketability and severely limited demand, thereby impacting VinFast's sales and revenue. Plaintiffs more fully address Defendants' baseless attacks on Denli below. *See infra* at 18-21.

[9]      As of the Offering, GSM sales were 63% (higher with Vinhomes-aided sales). *Supra* at 5, 9.

146.  The provision stated that certain VinFast shareholders agreed not to transfer their shares within 180 days of the Offering.  ¶70.  Two weeks later, VinFast filed the Confidential RS, indicating that an unspecified number of locked-up shares would be released.  ¶¶142-146.

Defendants argue that Plaintiffs "speculate that because VinFast later exercised its right to release 46.2 million shares held by Vingroup from the [Lock-up], it must have been that 'Defendants were already planning' the release when the statements were made."  MTD at 18.  Defendants utterly ignore the import of the Confidential RS's filing *just two weeks* after the Offering.  Plaintiffs raise a plausible inference that Defendants planned to release these shares from the Lock-up as of the Offering because doing so requires fulfilling certain requirements, and Defendants could not have completed them in two weeks.  For example, "changes to the lock-up period . . . may involve renegotiating terms with investors,"[10] and VinFast did just that.  *See* ¶144.  Changes to the Lock-up also required Board approval, *see* MTD at 18, and it would have taken additional time for Defendants to obtain Board consent.  Further, it naturally takes time to prepare and exchange drafts of an SEC filing.  Accordingly, Plaintiffs plausibly allege that Defendants planned to release the shares as of the Offering.  *See Erickson v. Jernigan Cap., Inc.*, 2022 WL 3028627, at *4 (S.D.N.Y. Aug. 1, 2022) ("Plaintiff is entitled to the reasonable inference that a $300 million deal that closed less than two weeks later . . . was not 'inchoate'" at time of shareholder vote); *Qihoo*, 19 F. 4th at 151 ("The allegations create a plausible inference that a concrete plan was in place at the time [the company] issued the Proxy Materials."); *see also Virtu*, 770 F. Supp. 3d at 497 ("Determining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing

---

[10]  Julia Kagan, *What Is a Lock-Up Period? How It Works, Main Uses, and Example*, INVESTOPEDIA (Aug. 13, 2024), available at: https://www.investopedia.com/terms/l/lockup-period.asp#:~:text=Lock%2Dup%20periods%20are%20when,liquidity%20and%20maintain%20market%20stability.

- 13 -

court to draw on its judicial experience and common sense.").[11]

## B.    The AC States Claims Under the Exchange Act

To state a claim under §10(b), a complaint must allege facts that, considered holistically and not in isolation, support a strong inference that defendants acted with scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The inference "need not be irrefutable . . . or even the most plausible of competing inferences," but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. The scienter requirement is met where a complaint alleges facts showing either: (1) "motive and opportunity to commit fraud"; or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Recklessness may be shown by allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate; or [] failed to check information they had a duty to monitor." *Id*. at 311.

### 1.    The AC Pleads Fraud with Particularity

#### a.    Defendants Misrepresented VinFast's Capital Needs

Mansfield and Thuy knowingly or recklessly made misstatements concealing VinFast's present need, and contemporaneous plan, to raise additional capital. ¶61. The day of the Offering, Mansfield stated that VinFast: (i) was "very comfortable" with its capital position "at the moment"; (ii) was "not in a rush" to raise additional capital; and (iii) "[does not] need more equity capital."

---

[11]    Because Plaintiffs have plausibly alleged that the changes to the Lock-up were in process as of the Offering and could not have been made within two weeks after VinFast went public, *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.* (cited in MTD at 18), is unpersuasive. *See* 153 F. Supp. 3d 628, 645 (S.D.N.Y. 2015) (plaintiff did not plausibly allege why defendant could not have completed the steps to finalize a purchase within six weeks, so the purchase could have been initiated after the challenged statement). As is *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996), where the court rejected plaintiffs' claim that the defendant had a duty to disclose its alleged strategy to reduce its prices since it had already test marketed Marlboro at reduced prices. The court reasoned: "[t]hat Philip Morris engaged in test marketing of Marlboro at reduced prices . . . is not significant. Companies conduct many experiments and tests in connection with their products[.]" *Id*. at 810.

- 14 -

¶¶168-169.  The same day, Thuy said: "When the time is right for another transaction, for the transaction to bring in significant funding for VinFast, we will do so."  ¶170.  It is reasonable to infer that, at that time, VinFast was acting in a contradictory manner by planning to: (i) release millions of shares from the Lock-up worth nearly $800 million, with the proceeds going to VinFast,[12] only two weeks after the Offering; (ii) access more than $1.2 billion in funding from Vuong and Vingroup no later than six weeks after the Offering (and likely sooner); and (iii) enter into an agreement with Yorkville to raise $1 billion two months after the Offering.  *See supra* at 12-13; ¶171.

The Capital Raising Statements are statements of current fact, not opinion.[13]  *See* MTD at 16.  "Defendants' blanket characterization of the statements as mere opinions strains credulity," because "[s]tatements of opinion include subjective statements that reflect judgments as to values that [are] not objectively determinable," and VinFast's current need for capital is objectively determinable.  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019).  Moreover, the Capital Raising Statements do not include phrases such as "I believe" or "I think," which can indicate that the statements in question are statements of opinion.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015).[14]  Because

---

[12]    Defendants emphasize that the proceeds from these shares flowed to VinFast and not to any individual defendant, *see* MTD at 7, 20, but that is precisely the point—VinFast needed the capital.

[13]    Plaintiffs do not claim VinFast did not have future "expectations of raising capital," MTD at 16, rather that Mansfield and Thuy denied VinFast's **present** need for capital.  Defendants highlight that Mansfield "anticipated raising capital 'over the next 18 months,'" *id*. at 17, but that underscores that VinFast claimed it was not seeking capital at the time of the Offering.  Similarly, Plaintiffs do not dispute that the Capital Funding Agreement with Vingroup existed before the beginning of the Class Period, *id.*, but rather allege that Defendants planned to access capital from that agreement at the time they denied needing additional capital.  Additionally, Defendants wrongly assert that Vingroup and Vuong had already "provided VinFast combined grants of over $1.5 billion" pursuant to the Capital Funding Agreement prior to the Offering.  *Id*. at 4.

[14]    The Capital Raising Statements are actionable even if they are considered opinions because Plaintiffs have identified "particular (and material) facts going to the basis for the issuer's opinion— facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have— whose omission makes the opinion statement at issue misleading to a reasonable person reading the

- 15 -

Plaintiffs adequately allege the Capital Raising Statements were false when made, Defendants' cited cases, finding the plaintiffs there did not plead falsity, fail. *See* MTD at 16.

Defendants argue these statements are puffery, *see id.*, but they are not given the "context in which the[y were] made." *Virtu*, 770 F. Supp. 3d at 503-04 (statements not puffery when made "during a time of concern"). The statements were made the day VinFast went public, when the market was concerned about the "billions" it had "already raised (and spent)." ¶185.[15] The Offering Documents repeatedly stated VinFast would require "significant" amounts of additional capital in the future—so Thuy and Mansfield went out of their to say VinFast did not have a ***current*** need for additional capital to allay investors' concerns. *See* Def. Ex. 4 at 17, 26; Pl. Ex. 3 at 241; *see also Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020) (statements "made to reassure investors as to specific risks . . . cannot be dismissed as 'mere puffery.'").

Plaintiffs allege a strong inference of scienter for the Capital Raising Statements. Defendants planned to access capital and release the shares as of the Offering, and it is reasonable to infer that, as CEO and CFO, Thuy and Mansfield were closely involved in capital-raising efforts. *See, e.g, Nutriband, Inc. v. Kalmar*, 2020 WL 4059657, at *11 (E.D.N.Y. July 20, 2020) (Garaufis, J.) ("[G]iven that the [D]efendants were the highest-ranking executives of the [company], it would 'strain[] credulity' to believe they were not involved (and aware of) these misrepresentations."). And where, as here, the misstatements are specific, "[t]he specificity of [such] statements regarding

statement fairly and in context." *Id*. at 194. Plaintiffs have done so by alleging the Company actively planned to raise capital at the time the statements were made.

[15] Defendants cite *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179 (S.D.N.Y. 2020) (MTD at 17), but that case is inapposite because the plaintiffs failed to show "defendants could not have reasonably believed" the statements at issue and because "all of [the] capital-raising activities were public." *Id*. at 210, 212. Here, Defendants ***disclaimed*** a current need to raise capital and concealed their capital-raising activities. Defendants' reliance on *Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*, 300 F. Supp. 3d 551 (S.D.N.Y. 2018), is misplaced because there, the statements "were too general to cause a reasonable investor to rely upon them." *Id*. at 569. Here, the statements are concrete and intended to induce investor reliance. *See* ¶¶168-170.

[the issue] is strong circumstantial evidence that [Defendants] were receiving some form of specific information regarding the relevant issue." *Virtu*, 770 F. Supp. 3d at 522; *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("In order to speak so knowledgeably" regarding a subject, defendant "must have educated himself" about that subject).

### b.    VinFast's Sales Projections Are Actionable

Vuong, Thuy, Mansfield, and VinFast made, and repeatedly affirmed, actionably false and misleading sales projections. On May 17, 2023, Vuong projected sales of 40,000 to 50,000 EVs for 2023. ¶187. On August 28, 2023, *Reuters* repeated Vuong's projection that VinFast "expects to sell as many as 50,000 electric vehicles this year."[16] ¶188. VinFast, Vuong, Mansfield, and Thuy subsequently affirmed the projections in press releases and on earnings calls. ¶30.

Projections are actionable when they lack a reasonable basis. *See Kurzweil v. Philip Morris Co. Inc.*, 1997 WL 167043, at *8 (S.D.N.Y. Apr. 9, 1997); *see also Omnicare*, 575 U.S. at 189 (opinion statement must "fairly align[ ] with the information in the issuer's possession at the time."). Opinion statements such as these are also actionable when plaintiffs plead the defendants "did not hold the belief [ ] professed" or omitted information that made the statement "misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). The Projection Statements lacked a reasonable basis because: (i) VinFast's EVs were plagued with undisclosed marketability problems that decimated demand (*see supra* at 3-5; ¶¶74-106); (ii) VinFast would need to sell nearly triple its first-half 2023 sales in the second half to meet its projection (¶167); and (iii) the vast majority of prior sales were to related parties (*see supra* at 5; ¶¶54, 167), making it highly

---

[16]    Defendants rely on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), to argue Defendants cannot be liable for *Reuters'* repetition of Vuong's projection. MTD at 13. *Janus* actually supports Plaintiffs. In *Janus*, the Supreme Court held that "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." 564 U.S. at 142-43. Because *Reuters* attributed the projection to VinFast, VinFast can be liable for it.

unlikely that VinFast would reach the projection through sales to arms-length buyers.[17]

**Motive**.   Plaintiffs have also adequately pled Defendants' scienter for the Projection Statements.  Defendants had a strong motive to complete the Offering at an inflated stock price, so they sought to make VinFast appear attractive to investors by making baseless projections, denying capital needs, and inflating sales following a steep sales decline after the Company ceased production of traditional cars.  *See* Pl. Ex. 3 at 232 (revenues decreased by 49.2% from Q1 2022 to Q1 2023 "primarily due to a decrease in revenue from sales of vehicles").  Courts have found motive pled where defendants made statements to maintain an inflated stock price prior to an offering.  *See, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (finding motive not to disclose information and thereby maintain an inflated stock price when disclosure would have lessened stock's value before offering); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (finding that a "secondary offering can provide a motive for fraud").

Defendants were also motivated to rush production before the Offering and ignore manufacturing problems.   Denli explained how VinFast dismissed his concerns and recommendations, and "pushed ahead with production" ahead of the Offering because fixing the issues "would have sharply boosted costs and required VinFast Group to postpone production of the car."  ¶¶10, 78, 86.  Denli also described how the Company locked engineers in a factory overnight "due to pressure from VinFast for staff to keep working to get the car to market."  ¶90.

---

[17]   Defendants' argument that the Projection Statement allegations are "pure omissions" (MTD at 13) misconstrues the AC.  "A pure omission occurs when a speaker says nothing, in circumstances that do not give any special significance to that silence." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 258 (2024).  Here, the Projection Statements themselves were misleading because there was no reasonable basis to make them.  Unlike in *Nath v. Lightspeed Commerce Inc.*, Plaintiffs have "provide[d] the court with some affirmative statement rendered misleading by the omission."  2025 WL 606108, at *4 (E.D.N.Y. Feb. 25, 2025).  And because Plaintiffs have pled how Defendants failed to disclose that there was no reasonable basis to make the Projection Statements, did not genuinely believe the statements, and omitted material information, Defendants' reliance on *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002), also fails.

Plaintiffs can rely on the *BBC* article that reported Denli's allegations because the *BBC* identified Denli and his position, and he made particular and detailed allegations about the safety issues he observed first-hand and Vuong's awareness of them. *See zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 2025 WL 2097951, at *18 (S.D.N.Y. July 25, 2025) (crediting a short seller report since the report "identifies its source . . . rather than terming the source confidential or anonymous); *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 328 (S.D.N.Y. 2025) ("newspaper articles may be credited to the extent that other factual allegations would be, that is, if they are sufficiently particular and detailed to indicate their reliability"). Thus, Plaintiffs are not obligated to independently "verify the truth of [Denli's] allegations." MTD at 13 n.3.

Denli's allegations are corroborated by the negative reviews,[18] NHTSA investigation,[19] and a second whistleblower in an article published by *The Times* on December 23, 2024 (¶¶90-91), annexed hereto as Pl. Ex. 4. The second whistleblower described being locked in the factory over a weekend "as part of VinFast's push for productivity," stating "the production process was so rushed that lockdowns were a frequent occurrence." ¶91. *The Times* reviewed an internal document confirming that a lockdown had taken place.[20] *See* Pl. Ex. 4 at 2. It's no wonder that the vehicles were rife with manufacturing and safety problems.

**Conscious Misbehavior or Recklessness**. The AC adequately pleads that Defendants knew, or recklessly disregarded, information making the Projection Statements false and misleading. Denli explained how VinFast executives and Vuong were alerted to major safety problems before those

---

[18]   Defendants describe the negative reviews as "a scattering" and "cherry-picked," MTD at 12, 15, but do not cite any reviews that paint VinFast's EVs in a positive light.

[19]   *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (governmental investigation is "one piece of the puzzle" with respect to scienter).

[20]   Additional corroboration of Denli's allegations is provided by internal documents obtained by the *BBC*, revealing a TTL engineer confirmed to Jaguar Land Rover, Denli's subsequent employer, "there were problems with components Mr Denli had warned about on Reddit." Pl. Ex. 1 at 6.

statements were made.[21]  Denli informed senior VinFast executives about the EVs' safety issues (¶77), and he said Vuong knew of his concerns because VinFast "follow[ed] strict reporting guidelines etc. [Vuong] basically didn't care."[22]  ¶86.  Denli's allegations are supported by Vuong's involvement during production: Denli noted that Vuong insisted on using his friend's company as a supplier, demonstrating his close monitoring of production.  ¶83.  Moreover, Vuong invested more than $11 billion of his own and Vingroup's money in VinFast, drawing his focus to EV production.  Pl. Ex. 5 at 1.[23]  Also, GSM was created just two months before VinFast announced its intent to go public and Defendants knew GSM accounted for two-thirds of sales during the first half of 2023.  ¶¶54, 133-136, 217; *see supra* at 5, 9.  At the very least, Vuong, Thuy, and Mansfield had access to all of this information.  *See Novak*, 216 F.3d at 308.  Further, the production problems identified by Denli emerged before the Class Period in the form of the negative reviews (known by Thuy).  ¶103.

Defendants severely understate Plaintiffs' scienter allegations by harping on the lack of confidential witnesses in the AC.  There is "no authority requiring confidential witness allegations." *Lexmark*, 367 F. Supp. 3d at 38; *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021).  Denli's allegations are actually stronger than that of a confidential witness because his identity is no secret.[24]  *See zCap Equity Fund*, 2025 WL 2097951, at *18.  Moreover, Defendants do

---

[21]  Defendants contend Plaintiffs do not explain what they mean by "marketability."  MTD at 15. Besides for being a plain-English word, "marketability" is a term Defendants themselves use repeatedly throughout their brief, indicating they understand its meaning.  *See id*. at 11, 13-15, 22-23.  Defendants also assert that Plaintiffs "generically attack[] VinFast's' entire fleet," *id*. at 15, but in fact the chassis Denli worked on was used in many VinFast models.  *See* Pl. Ex. 1 at 4.

[22]  Denli explained how Vuong received or had access to information contrary to the Projection Statements, rendering Defendants' cases inapt as the plaintiffs there failed to do so.  MTD at 21-22.

[23]  Plaintiffs' Ex. 5 is an article cited in the AC at ¶¶18, 120, and 204, and can be relied upon.  *See Beaubrun v. Brennan*, 2023 WL 7003714, at *3 (E.D.N.Y. Oct. 24, 2023).

[24]  Likewise, Defendants' cases attacking Plaintiffs' reliance on the *BBC* article do not help them because they involved confidential witnesses.  *See* MTD at 22 (citing *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y. 2020), and *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d

not dispute that Denli's allegations are detailed and particularized, and have conceded the point. *See Thomas*, 165 F.3d at 145. Denli's allegations also constitute one of multiple factual bases of Defendants' scienter, which are considered holistically.[25]

Defendants' argument that Plaintiffs' scienter theory "makes no logical sense," MTD at 20, is belied by Vuong's own admission that his financial commitment to VinFast made little economic sense. *Reuters* reported that Vuong told shareholders: "***If it were just for business and making money***, the Vingroup leadership ***would not be foolish enough*** to dive into a difficult field like car manufacturing . . . Vingroup decided to create VinFast out of ***social responsibility and patriotism***."[26] Pl. Ex. 5 at 3. Vuong's admission eviscerates Defendants' argument.[27]

"The 'core operations' doctrine also bolsters the inference of scienter here." *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024). Manufacturing EVs was VinFast's core operation—revenue from vehicle sales was 82.8% in FY 2022 and 77.9% in Q1 2023. *See* Pl. Ex. 3 at 231; ¶219. Since selling EVs was "critical to the long term viability" of VinFast, *CarLotz*, 2024 WL 1348749, at *16, it is reasonable to infer that Defendants knew, or had access to information, about the EVs' marketability issues and magnitude of sales to related

---

193, 221 (S.D.N.Y. 2020)).

[25] In addition, the restatement reveals the lengths Defendants went to achieve their projections—they pulled 2024 sales into 2023 in a last-ditch effort to meet the guidance. ¶212. VinFast was still unable to meet the projections, *id.*, revealing just how baseless the projections were in the first place. Yet Defendants make no mention of VinFast's restated financials in their brief, and have thus conceded any challenge to the allegations concerning the restatement. *See Thomas*, 165 F.3d at 145.

[26] Because of Vuong's admission, Plaintiffs' scienter theory is not "illogical," and Defendants' reliance on *In re GeoPharma, Inc. Securities Litigation*, 411 F. Supp. 2d 434, 447 (S.D.N.Y. 2006) (finding plaintiffs' allegations inconsistent and "illogical") (MTD at 21), misses the mark.

[27] Since Plaintiffs have adequately pled scienter under theories of both motive and conscious misbehavior or recklessness, Defendants' arguments related to lack of motive, and their reliance on cases in support, are unpersuasive. *See* MTD at 19-20. In any case, pleading motive is not required. *See Tellabs*, 551 U.S. at 322. Nor are Plaintiffs required to plead insider sales. *See, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013).

- 21 -

parties.[28]  Contrary to Defendants' argument, *see* MTD at 22, the inference of scienter here is strengthened by the Defendants' positions at VinFast.  *See supra* at 16.  And the specificity of the Projection Statements further strengthens the scienter allegations.  *See id*. at 16-17.

**Comparing Inferences of Scienter**.  Plaintiffs allege a strong inference that Vuong, Thuy, Mansfield, and VinFast made misstatements and omissions while they knew or had access to contrary information.  Defendants' proffered theory, that VinFast disclosed that "it was subject to macro and business-specific risks" and "shared good faith assessments with investors, while warning them of the risks," MTD at 23-24, is not more compelling.  Defendants' risk warnings failed to warn investors of the existing serious problems with VinFast EVs.  *See supra* at 11-12.  Nor did VinFast adequately describe its reliance on related parties, *i.e.*, that ***more than 90%*** of VinFast's total sales revenues were attributed to related companies, despite possessing that information at the time of their statements.  ¶¶121-122, 126.  Viewed holistically, Plaintiffs' inference of scienter is at least as compelling, if not much more so, than Defendants' opposing inference.

**No Safe Harbor**.  Defendants' reliance on the PSLRA safe harbor in defense of the Projection Statements fails.  *See* MTD at 9-11.  As an initial matter, while sales and "[r]evenue projections are certainly forward-looking statements . . . [c]ourts in this circuit have consistently held that material omissions are not protected by the PSLRA safe harbor."  *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *6 (S.D.N.Y. Sept. 25, 2020) (citing cases).  The Projection Statements are not protected by the safe harbor because Defendants omitted then-existing, undisclosed facts that made it highly unlikely that VinFast would achieve the guidance.  *See supra* at 17.

Further, the safe harbor does not apply because the Projection Statements were "made with actual knowledge that they [were] misleading or false."  *In re Symbol Techs., Inc. Sec. Litig.*, 2013

---

[28]   Because Plaintiffs have alleged numerous facts showing scienter, Defendants' cases attacking core operations allegations as the sole basis for scienter are inapposite.  *See* MTD at 23.

- 22 -

WL 6330665, at *12 n.4 (E.D.N.Y. Dec. 5, 2013).[29]  Actual knowledge is pled by alleging that defendants: "(1) did not genuinely believe [their projections], (2) actually knew that they had no reasonable basis for making the [projections], or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the [projections]." *Id*.  Plaintiffs satisfy these prongs because Vuong, Thuy, Mansfield, and VinFast affirmed the guidance even though they knew about major problems with the EVs and the limited market for them. *See supra* at 9, 19-22.  For these reasons, the Projection Statements are actionable under *Omnicare* and *Tongue*.  *See supra* at 17. Accordingly, Defendants are wrong that the AC does not allege facts demonstrating Defendants' knowledge of the pervasive marketability problems rendering the projections unachievable, *see* MTD at 11, or that the AC "does not identify with particularity any information known to Defendants about VinFast's potential market that made the sales projections unrealizable." *Id*. at 12.

Defendants argue they warned that the Company's "actual vehicle sales and revenue could differ materially from expected levels," *id*. at 10, but they omitted then-existing, known facts that undercut the projections. "[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *Milman v. Box Hill Sys. Corp*., 72 F. Supp. 2d 220, 231 (S.D.N.Y.1999).  Defendants also contend that they "robustly disclosed sales to, and VinFast's reliance on, related parties, as well as potential

---

[29] Defendants' argument that the Projection Statements are inactionable opinions, as well as reliance on their cited cases, MTD at 11, fail for the same reason—because the AC pleads Defendants knew the Projection Statements lacked a reasonable basis and omitted material information. *See* MTD at 11-12 (citing *Martin v. Quartermain*, 732 F. App'x 37, 41(2d Cir. 2018) (speaker "believed that [] estimates would prove accurate" because the estimates were "presump[tively] . . . unbiased and fact-based")); *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 477 (S.D.N.Y. 2017) ("Plaintiffs point to no facts that show that Pretium did not expect and believe the final results of the Bulk Sample Program would support its estimates of the Brucejack Project."); *Woolgar*, 477 F. Supp. 3d at 224 ("The Complaint is devoid of allegations demonstrating—or even plausibly suggesting—that Defendants did not honestly believe their opinions")).  And *ODS Capital LLC v. JA Solar Holdings Co.*, 2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020), supports Plaintiffs because there, the court held that plaintiffs "plausibly alleged that [d]efendants could not have possibly believed that the projections JA Solar provided were accurate."

risks associated with vehicle safety."[30]   MTD at 11.   The AC, however, does not allege mere "potential risks"—the EVs' undisclosed marketability issues had already transpired, undermining the reasonableness of the projections.   *See* ¶¶74-104 (allegations beginning in February 2023, prior to the Class Period); *see also supra* at 3-5.   Defendants' purported cautionary language (MTD at 10) does not shield them.   *See Symbol*, 2013 WL 6330665, at *15 ("the cautionary language did not specifically reveal the particular risks allegedly known" to the company).

### 2.   The AC Adequately Alleges Loss Causation

"The vast majority of courts" in this Circuit "have required that loss causation only meet the notice requirements of Rule 8." *In re Omega Healthcare Inv., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 n.7 (S.D.N.Y. 2021).   The AC need allege only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). A corrective disclosure need not be a "mirror image tantamount to a confession of fraud."[31] *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

Plaintiffs adequately allege loss causation because they have pled that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020).   Defendants argue that certain Projection Statement corrective disclosures are a "grab bag of news articles" insufficient for loss causation, MTD at 24, but ignore that several of those disclosures are analyst reports, which provide support for loss causation. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) (analyst "reported on increasing bankruptcy figures for Signet borrowers. . . . It was not, as Defendants contend, merely a journalist's negative opinion, but an analysis of how and why Signet's

---

[30]   As discussed above, Defendants' disclosure of related-party sales was deficient. *Supra* at 9-10.

[31]   Section 11 has no loss causation requirement, *see supra* at 7, so Defendants cannot challenge the Item 303 and 105 claims and the Lock-up claims on that basis.   To the extent they do, *see* MTD at 25, that challenge fails.

underlying business was weaker than most people realized.  It thus qualifies as corrective."); *see*

¶¶194-195, 201.  Plaintiffs allege that, as analysts cast doubt on demand for VinFast EVs, the truth

leaked out about the limited demand due to the marketability issues.  *See* ¶¶203-204, 206, 208-209;

*see also Dura*, 544 U.S. at 342 (loss causation where "the relevant truth begins to leak out.").

Defendants' attacks on the Capital Raising Statement corrective disclosures also fail.  First,

¶179 quotes a news article that contains a corrective disclosure made by Thuy, not "journalists'

opinions."  MTD at 24.  Next, Defendants do not offer any explanation as to how VinFast's filing of

the Confidential RS (¶173) and the disclosure of the Yorkville agreement (¶182) were

"materialization of a *known* risk."  MTD at 25 (emphasis in original).  To the contrary, Defendants

concealed their contemporaneous need to raise capital, so Thuy's disclosure of that need two months

later revealed a previously *undisclosed* risk.[32]  The remainder of the paragraphs Defendants cite, *see*

*id*. at 24, are not alleged as corrective disclosures, but are news articles explaining how other

disclosures revealed the truth of Defendants' false statements.  *See* ¶¶175, 181, 184-185.[33]

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court deny the motion to dismiss in its entirety.

Should the Court find the AC to be deficient in any respect, Plaintiffs respectfully request leave to

amend.  *See Barron v. Helbiz, Inc.*, 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021) (consistent with

Rule 15's "permissive standard," leave to amend should be "freely give[n]").

---

[32]   *In re Omnicom Group, Inc. Securities Litigation*, cited by Defendants, is distinguished because the alleged corrective disclosure was "a negative journalistic characterization of *previously disclosed* facts."  597 F.3d 501, 512 (2d Cir. 2010); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) ("consistent with the analyst coverage [the corrective disclosure] had disclosed nothing new").  Here, the disclosures revealed new information, *i.e.*, release of shares from the Lock-up, access to the Capital Funding Agreement, and the existence of the Yorkville agreement. Defendants are thus incorrect that Plaintiffs identified no new material information upon disclosure of VinFast's access of additional capital from the Capital Funding Agreement.  *See* MTD at 25.

[33]   Because the AC states §11 and §10(b) claims, Plaintiffs have also stated control-person claims pursuant to §15 and §20(a), respectively.

DATED:  September 12, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
MAGDALENE ECONOMOU


                    /s/ Alan I. Ellman
                  ALAN I. ELLMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
aellman@rgrdlaw.com
meconomou@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

- 26 -

## CERTIFICATE OF SERVICE

A copy of the foregoing was served on this 12th day of September, 2025 by sending it via

electronic means to counsel for Defendants as follows:

Colleen C. Smith
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Email: colleen.smith@lw.com

Blake Denton
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: blake.denton@lw.com

Attorneys for Defendants VinFast Auto Ltd., Le Thi
Thu Thuy, Pham Nhat Vuong, David Mansfield,
Ngan Wan Sing Winston, Ling Chung Yee Roy,
Pham Nguyen Anh Thu, and Nguyen Thi Van Trinh


*/s/ Alan I. Ellman*
ALAN I. ELLMAN