UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JEREMIE COMEAU, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

-against-

VINFAST AUTO LTD., LE THI THU THUY, PHAM NHAT VUONG, DAVID MANSEFIELD, NGAN WAN SING WINSTON, LING CHUNG YEE ROY, PHAM NGUYEN ANH THU, and NGUYEN THI VAN TRINH,

Defendants.

**MEMORANDUM & ORDER**
**24-CV-2750 (NGG) (SDE)**

NICHOLAS G. GARAUFIS, United States District Judge.

In this consolidated, putative securities fraud class action, Lead Plaintiffs Dr. Filippo Nannicini, Alessandra Nannucci, and Lorenzo Nannicini ("Plaintiffs") undertake to bring "non-fraud" and "fraud" claims against VinFast Auto Ltd. ("VinFast")—a Vietnam-based manufacturer of electronic vehicles ("EVs")—and seven of VinFast's current and former officers and directors (the "Individual Defendants," and collectively with VinFast, "Defendants") pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (the "Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as well as U.S. Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (*See* Corrected Amended Complaint ("Compl.") (Dkt. 38) ¶¶ 1-2, 35-36.) Based on these alleged primary violations, Plaintiffs also bring control liability claims under Section 15 of the Securities Act, 15 U.S.C. § 78o(a), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1. (*Id.*)

Defendants moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on October 27, 2025 (the "Motion to Dismiss") and the court held oral argument on the motion on January 15, 2026. (*See* Motion to Dismiss ("Mot.") (Dkt. 44-1); Pls.' Opp. To Mot. To Dismiss ("Opp.") (Dkt. 45); Defs.' Reply (Dkt. 46); Min. Entry Dated 1/15/2026.) For the following reasons, Defendants' motion is GRANTED.

## I. BACKGROUND

The court draws the following facts from the Corrected Amended Complaint ("Complaint"), and documents upon which it relies and incorporates, including documents publicly filed with the SEC.[1] For purposes of a motion to dismiss, the court assumes that the facts alleged in the complaint are true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

### A. Overview

1. VinFast

VinFast is a Vietnam-based manufacturer of EVs and a subsidiary of Vingroup Joint Stock Company ("Vingroup"), "one of the largest private enterprises in Vietnam." (Compl. ¶¶ 43, 53.) Its operational headquarters are in Vietnam and its legal and financial headquarters are in Singapore. (*Id.* ¶ 43.) Vingroup was founded by Individual Defendants Pham Nhat Vuong ("Vuong"), a billionaire and one of the richest men in Vietnam. (*Id.* ¶ 5.) VinFast was founded in 2017. (*Id.* ¶ 3) It initially began selling traditional combustion engine cars, but transitioned to exclusively selling EVs in September 2022. (*Id.* ¶¶ 3, 63-64.) Around

[1] *See Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193 (S.D.N.Y. 2020) ("The court may take judicial notice of documents publicly filed with the SEC . . . and may consider any legally required public disclosure document filed with the SEC on a motion to dismiss.").

this time, VinFast also launched its VF 8 model, an Electric SUV, the first deliveries of which were made to U.S. customers in March 2023. (*Id.* ¶ 65.) VinFast also manufactures and sells electric scooters and buses, aiming to "create[e] an e-mobility ecosystem" of "world-class products." (July 28, 2023 Proxy Statement/Prospectus ("Proxy") (Dkt. 44-6) at 165.)

From its founding in 2017 through the Offering in August 2023, VinFast was privately funded by Vuong and Vingroup.[2] (*Id.* ¶¶ 5, 53.) As relevant here, Vingroup's many other subsidiaries include VinHomes, the largest commercial real estate developer in Vietnam, and Green and Smart Mobility ("GSM"), a taxi/car rental company. (*Id.* ¶¶ 54, 56.) GSM was founded in March 2023, about two months prior to VinFast announcing its intention to go public, and it "exclusively use[s] VinFast EVs" in its fleet. (*Id.* ¶ 54.) Throughout its history, VinFast engaged in related party transactions, largely with two Vingroup affiliates, selling a significant portion of its vehicles to GSM, and offering vouchers providing a discount of up to $14,000 on VinFast EVs to VinHomes buyers. (*Id.* ¶¶ 17, 122.)

2. Individual Defendants

The seven Individual Defendants are Vuong (VinFast's former Chairman of the Board and current Managing Director and CEO);[3] Le Thi Thu Thuy ("Thuy") (VinFast's former CEO and current Chairwoman of the Board);[4] David Mansfield ("Mansfield")

---

[2] For example, in April 2023, VinFast entered into a capital funding agreement with Vuong and Vingroup that gave VinFast more than $2.5 billion. (*Id.* ¶ 53.)

[3] Vuong served as Chairman of the Board from May 12, 2023 until January 2024. (Compl. ¶ 45.)

[4] Thuy served as CEO from May 12, 2023, through January 2024, when Vuong took over as Managing Director and CEO. (*Id.* ¶¶ 44, 45.)

(VinFast's former CFO);[5] and four former VinFast Directors: Ngan Wan Sing Winston, Ling Chung Yee Roy, Pham Nguyen Anh Thu, and Nguyen Thi Van Trinh. (Compl. ¶¶ 44-50).[6] Plaintiffs allege that each of these Defendants "signed or authorized the signing of the Registration Statement." (*Id.*)

### B. VinFast Goes Public

On May 12, 2023, VinFast and Black Spade, a special purpose acquisition company, announced that they were entering into a business combination agreement (the "Business Combination"), which would cause VinFast's shares to be publicly traded on the NASDAQ (Compl. ¶¶ 66, 71.) In connection with this agreement, VinFast filed a Form F-4 registration statement ("Registration Statement") and a proxy statement and prospectus ("Proxy" and collectively with the Registration Statement, the "Offering Documents") on June 15, 2023 and July 28, 2023, respectively. (*Id.* ¶¶ 67-68; Dkts. 44-5, 44-6.) Ultimately, the combination agreement was finalized on August 14, 2023, and VinFast's shares became publicly traded on the NASDAQ beginning on August 15, 2023 (the "Offering"). (*Id.* ¶ 71.)

#### 1. Reliance on Related Parties

The Offering Documents contain a great deal of information regarding the business, in both narrative form and in data. Relevant here, VinFast disclosed its extensive reliance on related parties, saying:

[5] Mansfield served as CFO from May 12, 2023 through January 2024. (*Id.* ¶ 46.)

[6] Winston served as a Director from May 12, 2023 to May 1, 2024. (*Id.* ¶ 47.) Thu served as a Director from May 12, 2023 until June 2024. (*Id.* ¶ 49.) The Complaint does not allege when either Roy or Trinh served as Directors, stating only that they served as Directors "at all relevant times." (*Id.* ¶¶ 48, 50.)

> VinFast has relied on Vingroup for financial support and are dependent on Vingroup affiliates for key aspects of its business. Accordingly, VinFast has engaged in various related party transactions with Vingroup, and any potential conflicts of interest or unfavorable market conditions or adverse business operation of Vingroup and Vingroup affiliates could have an adverse effect on VinFast's business and results of operations. Due to VinFast's close association with Vingroup and its affiliates, VinFast could also be impacted by matters affecting their reputation, including litigation, regulatory or other matters.

(Proxy at 47.) VinFast also disclosed that it had sold 18,700 EVs in total; 9,500 of these sales were in Q2 2023, and approximately 7,100 of the EVs had been sold to GSM as of June 30, 2023. (*Id.* at 167, 291.) Moreover, the Offering Documents include a table of related party transactions, including Q1 2023 revenue data on sales to GSM as well as VinHomes Voucher redemptions. (*Id.* at F-76.)

2. Other Disclosed Risks

VinFast also warned that it was a "new entrant" innovator in the EV space and had not yet achieved a sizable market share. (*Id.* at 30.) It stated that "VinFast's long-term results depend on upon its ability to successfully introduce and market new products and services . . . it cannot predict the level of market acceptance or the amount of market share these vehicles or services will achieve, if any." (*Id.*) VinFast disclosed the additional risk of possible future recalls for "performance or safety-related issues," and in doing so, disclosed a number of prior recalls ranging from October 2022 to May 2023. (*Id.*) The Proxy expanded on this risk, saying "[s]uch recalls, whether voluntary or involuntary . . . could harm VinFast's reputation, particularly as a new entrant" and reduce sales. (*Id.*) It also warned of the risks to the business of negative publicity. (*Id.*)

3. Lock-up provision

VinFast's offering documents also included a "lock-up provision," which prevented certain shareholders from trading VinFast shares within 180 days of the offering. (Compl. ¶ 140; Proxy at 4; Registration Statement at 7.) The agreement explicitly included the option to "subsequently relax" this provision, and the Offering Documents disclosed that a "release of lock-up or other transfer restrictions on VinFast's outstanding equity securities" could "result in large and sudden changes in the volume and price at which VinFast ordinary shares trade." (Registration Statement at 7, 63 (the lock-up provision could be "subsequently relaxed including as a result of a modification, waiver, amendment, or written consent of the Company Board.").)

On August 30, 2023, two weeks after going public, VinFast exercised this option and filed a confidential registration statement (the "Release") which ultimately released 46,293,461 shares owned by related party Vietnam Investment Group Joint Stock Company ("VIG")[7] from the lock-up provision. (Compl. ¶¶ 21, 142-145, 173.) The Release noted that all of proceeds from the sale of these shares were to be reinvested in VinFast "as a grant." (*Id.* ¶¶ 145, 173, 177.)

4. Capital Needs

VinFast warned in the Offering Documents that EV manufacturing is a "capital intensive business" and that it would "require significant additional capital to support business growth," noting that it "expect[ed] to fund [its] capital requirements through additional debt and equity financing." (Proxy at 26.)

**C. VinFast's Public Statements**

Following the offering, VinFast leadership—specifically, Defendants Mansfield, Thuy, and Vuong—made public statements

[7] VIG is majority-owned by Vuong. (Compl. ¶ 45.)

regarding VinFast's capital position and its projected sales. (Compl. ¶¶ 165-66.) In brief, they expressed that they were "very comfortable" with VinFast's level of capital and were "not in a rush" to raise more, but also stated that they would do so "[w]hen the time is right." (Compl. ¶¶ 166, 170.) On May 17, 2023, at an annual shareholder meeting, Vuong publicly projected that VinFast would sell 40,000-50,000 EVs in 2023, and Defendants continued to affirm these projections throughout 2023, including on earnings calls and when questioned by analysts. (Compl. ¶¶ 167, 191, 199.)

### D. Media Coverage and Stock Price Drops

In May 2023, VinFast's VF 8 models received several negative reviews. (*Id.* ¶¶ 93-106.) A few months later, in September 2023, media reports began to express skepticism and concern regarding VinFast's sales projections and their level of sales to related parties. (*Id.* ¶¶ 193-210.) For instance, a Lightstream Research analyst noted that the VinFast had only sold 11,315 EVs in the first half of 2023, causing them to question whether VinFast could reach its 2023 projections by selling "38,685 EVs during the second half of the year." (*Id.* ¶ 195.) Following this and subsequent reporting regarding the projections and level of sales to GSM, VinFast's stock price continued to drop, reaching a level of $2.43 per share on April 22, 2024, down from $14.00 per share on September 25, 2023 and the class period high of approximately $81 per share. (*Id.* ¶¶ 33, 196, 210.)

### E. Whistleblower Hazar Denli's Allegations and Negative Reviews

In December 2024, the media coverage most pertinent here was published, when the BBC issued an article interviewing and detailing the allegations of a whistleblower, Hazar Denli, including certain allegations derived from comments he had previously made on the internet forum *Reddit*. (*Id.* ¶¶ 74, 80-81.) Denli led

the engineering team for the front suspension and chassis of VinFast's vehicles beginning in September 2022. (*Id.* ¶ 75.) In summary, starting in February and March 2023, Denli alleged that he had identified significant problems with the chassis which could cause pieces to snap off and cause drivers to lose control of the vehicle, posing safety concerns and endangering lives. (*Id.* ¶¶ 76-77, 80; JLR Whistleblower Sacked for Publishing Concerns about VinFast Cars ("BBC Article") (Dkt 45-2) at 1.) Denli's allegations went further; he claimed that his concerns were ignored, as fixing them would have involved increased costs in advance of going public. (Compl. ¶¶ 10-11.) Denli also alleged that Vuong was aware of the problems with the vehicles due to "strict reporting guidelines" but that Vuong "basically didn't care," though Denli did not claim the two had ever communicated directly. (*Id.* ¶ 86.) Beyond issues with the vehicles themselves, Denli criticized the working conditions at VinFast, which he referred to as "modern day slavery." (*Id.* ¶ 85.) These conditions included allegedly being locked down on site until a prototype was completed. (*Id.*) Eventually, given his dissatisfaction, Denli resigned in May 2023. (BBC Article at 4.)

While none of the reviewers who had written the May 2023 negative reviews had experienced these safety issues of which Denli warned, they did note carsickness, cheap materials, and overall poor ride quality. (Compl. ¶¶ 93-106.) Some opined that the VF 8 was not ready to be sold to customers. (*Id.* ¶ 93.)

### F. NHTSA Investigation

At some time before publicly airing his grievances and concerns with the BBC and elsewhere online, Denli had "filed whistleblower reports with the SEC Whistleblower Program and the NHTSA Whistleblower Program." (*Id.* ¶ 89.) As a result, the National Highway Traffic Safety Administration ("NHTSA") announced that it was investigating a certain reportedly flawed software system in VinFast's VF 8, called the Lane Keep Assist

system. (*Id.* ¶ 105.) After the Motion to Dismiss was fully briefed, Plaintiffs brought NHTSA's findings to the court's attention. (10/30/2025 Letter re NHTSA Investigation (Dkt. 48).) NHTSA's report indicated that "[i]n certain wide and sweeping turns, the [lane keep assist system] can activate . . . possibly resulting in the need for unexpected steering adjustment by the driver" but that "[t]here have been no crashes or injuries related to this condition in the United States." (NHTSA Report (Dkt. 48-1).) Ultimately, "VinFast worked cooperatively with NHTSA . . . [and] voluntarily recall[ed] . . . VF 8 vehicles to update the [lane keep assist] software calibration." (*Id.*) The investigation did not note any physical defects with the vehicles or the chassis specifically. (*Id.*)

In contrast, based on the record before the court and the representations of the parties, it seems as though the SEC never acted on Denli's report or opted to investigate VinFast. (*See* 1/15/2026 Oral Argument Tr. ("Oral Arg. Tr.") (Dkt. 51) at 79:13-15 ("There is no SEC investigation. I'm happy to represent that to Your Honor. There's no ongoing SEC investigation, there was no SEC investigation.").)

### G. Plaintiffs' Allegations and Claims

Broadly speaking, Plaintiffs' allege that Defendants made both misleading and material misrepresentations and omissions in both the Offering Documents and in the public statements discussed throughout the background. The statements and omissions Plaintiffs take issue with can be broadly categorized as follows: the lock-up provision, failure to disclose the extent of reliance on related parties, sales projections statements, failure to disclose safety defects and "marketability" issues with the cars, and capital position statements. For the sake of clarity, the specific statements and omissions will be addressed in the relevant discussion sections.

Based on the above categories of alleged statements and omissions, Plaintiffs bring claims under Section 10(b) of the Exchange

Act and SEC Rule 10b-5 ("Section 10 Claims"), as well as Section 11 of the Securities Act ("Section 11 Claims"). While there is overlap between the two groups of claims given the general themes in the complaint and briefing, they can be best separated as follows: the Section 10 Claims allege misstatements and omissions related to the capital position statements, the sales projections, and to the extent they rendered the projections misleading, the "marketability issue" omissions and related party transaction omissions. The Section 11 Claims arise out of the lock-up provision, and pure omissions of related party transactions, and "marketability issues" from the Offering Documents. A broad overview of these allegations is outlined below.

Plaintiffs allege that VinFast faced significant safety issues with its EVs, which were documented in news outlets overseas and by "automotive journalists" in the United States. (Compl. ¶¶ 12, 74.) Plaintiffs assert that, as a result of these known safety issues, the EVs faced "marketability issues" and a lack of consumer demand. (*Id.* ¶ 106.) To boost sales and allegedly mask this lack of demand for VinFast's EVs, Plaintiffs allege that Defendants engaged in multiple sales to related party GSM and offered discounts to customers of related party VinHomes. (*Id.* ¶¶ 106, 121.) First, Plaintiffs claim that only two months before announcing their intention for VinFast to go public, Defendants established GSM—whose e-taxi service exclusively uses VinFast EVs—in an effort purely to prop up sales. (*Id.* ¶ 54.) They assert that VinFast failed to disclose that it was GSM, not external customers, who had purchased nearly two-thirds of VinFast's EVs in the direct lead up to the Offering in the first half of 2023. (*Id.* ¶¶ 109, 167.) Second, Plaintiffs claim that as part of Defendants' plan to boost sales and "conceal" marketability issues, VinFast also offered EV "vouchers" of up to $14,000 to VinHomes home buyers, which generated "around 14% of [VinFast's] EV revenues." (*Id.* ¶ 122.)

In addition, VinFast's Offering Documents contained the "lock-up provision," which subjected certain VinFast equity holders—including Vingroup and VIG—to a 180-day trading freeze. (*Id.* ¶ 140.) However, just two weeks after the Offering, VinFast filed a confidential registration statement with the SEC that released VIG from the lock-up provision. (*Id.* ¶¶ 142-43.) On September 21, 2023, VinFast revealed that it had released over 46 million shares from the lock-up, worth nearly $800 million, "to be sold by the Company Selling Securityholders"—*i.e.*, VIG—and that "all of the proceeds" were to go to VinFast. (*Id.* ¶ 173.) Plaintiffs allege that the lock-up provision was false when made, and that given the two-week intervening time period, Defendants must have planned to exercise the release at the time of the offering. (Opp. at 2.)

Finally, Plaintiffs allege that on the day of the Offering, and shortly thereafter, Individual Defendants Mansfield and Thuy made misstatements when they "touted VinFast's capital positions to quell concerns that it needed to raise more capital." (*Id.* at 6 (citing Compl. ¶¶ 168-69).) According to Plaintiffs, VinFast *did* have a then-present need for capital and "was actively seeking to raise additional" capital at that time. (Compl. ¶ 23.) Plaintiffs contend this is demonstrated by VinFast (1) seeking to lift the lock-up only two weeks after the Offering; (2) announcing on October 5, 2023 that, as of September 30, 2023, VinFast had accessed nearly $1 billion in loans from Vingroup and more than $290 million in grants from Vuong; and (3) announcing on October 20, 2023 that it entered into an agreement with asset manager Yorkville Advisors giving VinFast the option to require Yorkville Advisors to subscribe for up to $1 billion of VinFast shares at any time during the agreement's term (the "Yorkville Agreement"). (Opp. at 6 (citing Compl. ¶¶ 24-25, 28.)

### H. Procedural History

Initially, two separate putative class action lawsuits were filed in this District: *Comeau v. VinFast*, 24-CV-2750 (NGG) (RML) and *Qian v. VinFast*, 24-CV-3956 (NGG) (RML). On November 1, 2024, on referral by the court of Plaintiffs' motions on the issues, Magistrate Judge Robert M. Levy consolidated the two actions, appointed Nannucci and the Nannicinis as lead plaintiffs, and approved Robbins Geller Rudman & Dowd LLP as lead counsel for the proposed class. (*See* Mem. & Order (Dkt. 31) at 1, 4.) Plaintiffs then filed a Corrected Amended Complaint on January 22, 2025. (*See generally* Compl.) According to the Complaint, the proposed class consists of: (a) "all persons or entities that purchased VinFast securities" in the Offering; and (b) "all persons or entities that purchased or acquired VinFast securities between August 15, 2023 and April 21, 2024, inclusive" (the "Class Period"), and "who were damaged thereby." (*Id.* ¶¶ 1, 2.) On October 27, 2025, defendants filed the Motion to Dismiss. (*See generally* Mot.) After the motion was fully briefed, the court heard oral argument from the parties on January 15, 2026. (Min. Entry Dated 1/15/2026.) The court reserved decision, and the Motion to Dismiss was deemed submitted. (*Id.*)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[8] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

[8] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 496 (E.D.N.Y. 2025)*; see also ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 (2d Cir. 2000). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in a plaintiff's favor. *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, the court need not credit conclusory, implausible allegations or "bare assertions" without adequate factual support. *See Bank v. CreditGuard of Am.*, No. 18-CV-1311 (PKC) (RLM), 2019 WL 1316966, at *10 n.9 (E.D.N.Y. Mar. 22, 2019); *Dolce v. Connetquot Cent. Sch. Dist.*, No. 25-1197, 2026 WL 2560338, at *4 (2d Cir. Aug. 31, 2026).

### B. Pleading Standard

Plaintiffs' claims under Section 10 must satisfy heightened pleading requirements as required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) ("A complaint alleging securities fraud must . . . satisfy the[se] heightened pleading requirements."). Accordingly, for those claims, Plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, Plaintiffs must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* Further, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—here, scienter. *Anschutz Corp.*, 690 F.3d at 108. Scienter is a "mental state embracing intent to deceive manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Determining whether an inference of scienter is "strong" is a comparative inquiry, and a complaint may only survive if the court is satisfied that "the inference of scienter [is] cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

Section 11 claims may also be subject to the heightened pleading standards of Rule 9(b). Courts generally determine whether Section 11 claims must be held to the heightened Rule 9(b) pleading standards by determining whether they "sound in fraud." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 392 (E.D.N.Y. 2013) (citing *Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004)).

## III. DISCUSSION

### A. Plaintiffs Fail to Adequately Plead "Marketability" and Safety Issues

One of Plaintiffs' primary theories underlying both their Section 10 and Section 11 Claims is that "VinFast's EVs were plagued with marketability problems." (Compl. ¶ 167.) While not entirely clear from the Complaint, the phrase "marketability problems" in this context seems to be a catchall that includes manufacturing defects and safety risks with VinFast's EVs as well as an alleged

related lack of consumer demand.[9] Since the alleged marketability issues are central to multiple claims, the court addresses this threshold, factual sufficiency issue as a precursor to its legal analysis of the claims themselves.[10] For the reasons stated below, Plaintiffs have not adequately alleged that VinFast's EVs were experiencing the severe and pervasive "marketability" problems they posit or that Defendants knew of this "fact" at the time of the offering. Therefore, as noted below, all claims relying on "marketability issues" must be dismissed.

In the Motion to Dismiss, Defendants argue that the marketability allegations are vague and rely on "cherry-picked negative reviews . . . and third-hand, unverified allegations from Mr. Denli[11]—a former contractor who is not alleged to have spoken

[9] To be clear, Plaintiffs' Opposition refers to alleged marketability issues and the demand for vehicles separately, indicating that they are not entirely synonymous. (*See* Opp. at 1 ("namely the marketability of its electric vehicles [ ] *and the demand for them*."); *see also id.* at 12 ("Plaintiffs allege that major safety issues with the EVs impaired their marketability and severely limited demand.").)

[10] The legal standards for both the Section 10 and Section 11 Claims themselves are addressed below. However, the court ends the "marketability" analysis a step earlier: since the claims founded on marketability issues do not "allege sufficient facts to state a plausible claim" at all and must fail. *Videri, Inc. v. ONAWHIM (OAW) Inc.*, No. 23-CV-2535 (GHW), 2024 WL 4027980, at *6 (S.D.N.Y. Sept. 3, 2024) (quoting *Twombly*, 550 U.S. at 570.)

[11] While Defendants argue that the court cannot credit Denli's allegations at all, since Plaintiffs did not ever speak to him directly and thus violated their responsibilities under Fed. R. Civ. P. 11, the court does not decide on the Rule 11 issue here. Any question of Rule 11 sanctions is not properly before the court without a genuine motion and full briefing on the matter. Accordingly, the court credits Denli's factual allegations to the extent it would any other factual allegations. *See In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 527 (E.D.N.Y. 2025) ("Newspaper articles should be credited only to the extent that other factual allegations would be —if they

with any Defendant." (Mot. at 15.) Defendants then go on to argue that any possible harms or risks to VinFast from these alleged issues, such as possible recalls, related party sales, or other sales shortcomings were "repeatedly disclosed." (*Id.*)

In response, Plaintiffs largely repeat the factual allegations in the complaint, pointing to Denli's allegations of safety concerns and "corroboration" by public negative reviews and the NHTSA investigation. (Opp. at 19 n.20.) Regarding any vagueness concerns, Plaintiffs double down that marketability is "a plain-English word" and "Defendants themselves use [it] repeatedly throughout their brief, indicating they understand its meaning." (*Id.* at 20 n.21.) At oral argument, Plaintiffs elaborated further on their theory of corroboration, saying the news articles were the "tip of the iceberg" and "did not even come close to revealing the systemic and pervasive problems that Denli observed." (Oral Arg. Tr. at 7:7-11.)

A court need not credit conclusory allegations or those unsupported by factual assertions. *ATSI Commc'ns*, 493 F.3d at 99. For the foregoing reasons, the court finds that the Complaint has failed to provide sufficient factual allegations to plead known "marketability" issues with VinFast's EVs.

Denli's allegations are insufficient to establish any safety concerns or defects at the time of the offering, when the alleged omissions took place, for three main reasons. The first reason centers around timing. As alleged in the complaint, Denli first identified safety concerns with the VF 8 model in February 2023 and ultimately resigned in May 2023, months before the August 15, 2023 offering. (Compl. ¶¶ 9, 79.) Since the complaint alleges

---

are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").

only that Denli had identified safety issues but subsequently resigned months before the offering, it does not allege that he was in a position to know or inform others of the safety of VinFast's vehicles *at the time of the offering*. Even crediting his allegations, they do not speak to the state of the EVs months later at the time of the offering, and thus what information about the EVs' safety Defendants were obligated to provide. Indeed, the negative reviews released in May 2023 (the same month Denli resigned) prompted VinFast to "reflect on the feedback . . . and make [their] vehicles better" such that the marketability would ostensibly improve. (*Id.* ¶ 103.) Though this issue is not directly before the court, Plaintiffs' allegations of the unusually intense working conditions and "lockdowns" VinFast imposed on its employees during Denli's tenure are highly alarming and concerning to the court. (Compl. ¶¶ 85, 90-91.) Nonetheless, VinFast's alleged utilization of such reprehensible labor practices supports an argument that significant changes to the EVs and their safety could have been made in the intervening months between Denli's departure and the offering. Therefore, taking the non-conclusory factual allegations as true, there is insufficient support for the inference that the vehicles were experiencing the alleged marketability issues at the time of the offering.

The second reason is that Plaintiffs do not allege that Denli ever spoke to Vuong or any of the defendants in this action. Again, even crediting Denli's allegations, this lack of communication defeats any inference that the alleged marketability defects were known to defendants at the time of the offering. The only showing Plaintiffs make on this point is Denli's conclusory and unverified statement in an interview that Vuong "knew of [his] concerns" due to the unspecified reporting guidelines at VinFast. (Compl. ¶ 11.) This is not enough. Plaintiffs do not offer *any* further allegations as to Vuong's knowledge, or any allegations that Vuong shared this information with any other defendants, conclusory or not. Thus, to the extent that the safety problems ever

existed at the time of the offering or even beforehand, the allegations are insufficient to support the inference that these defects were known to Defendants at any point, let alone at the time of the offering.

Third, the negative reviews on which Plaintiffs rely heavily as supposed corroboration for Denli's safety concerns, while resoundingly critical of VinFast's VF 8, do not rise to the level of the grave safety concerns Denli raised. (*Id.* ¶¶ 93-106.) In simple terms, Plaintiffs cannot have it both ways. On one hand, they claim that the reviews serve as corroboration for Denli's safety concerns, while also maintaining that they were merely the "tip of the iceberg" and "did not even come close to revealing the . . . problems that Denli observed." (Oral Argument Tr. at 7:7-11.) These reviews are also insufficient for the same reason Denli's allegations are: they occurred months prior to the offering. Given this timeline and total lack of factual allegations regarding the alleged defects *at the time of the offering*, Plaintiffs are unable to nudge the marketability issues inference across the line from possible to plausible. *See Twombly*, 550 U.S. at 570.

Moreover, to the extent these articles and negative reviews serve as independent evidence as opposed to merely corroboration for the "marketability issues," they were publicly available and thus inactionable since non-disclosure of already-public information cannot harm investors. *Ganino*, 228 F.3d at 167 ("[A] misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.").[12]

---

[12] Despite Plaintiffs' objections, Defendants are entitled to make this argument in their reply, as it sufficiently relates and responds to the opposition arguments and arguments in their opening. *See Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 299 (E.D.N.Y. 2016), *aff'd on other grounds*, 707 F. App'x 724 (2d Cir. 2017).

The only other corroboration to which Plaintiffs point for marketability concerns is that NHTSA opened an investigation in response to Denli's reports.[13] (Compl. ¶ 13.) However, the findings of the NHTSA investigation actually cut against Plaintiffs' theory. While the investigation was ongoing at the time of the complaint, the ultimate result was merely a voluntary recall in order to update software. (NHTSA Report at 1.) Far from the disastrous and deadly safety issues Plaintiffs urge, NHTSA concluded that "[t]here have been no crashes or injuries" resulting from this software issue. (*Id.* at 3.) This investigation does not corroborate Denli's allegations that there were potentially deadly physical manufacturing defects with the chassis of the vehicles. To the contrary, the fact that NHTSA's investigation failed to unearth any problems beyond one that a software update could fix supports an inference opposite from Plaintiffs'. The court finds the reasonable possible inferences from NHTSA's findings are that (1) the defects never existed, (2) they were not nearly as severe as alleged, or (3) if they did exist at all, they were resolved by the time of the offering.

Lastly, to the extent marketability issues also refer to a lack of general market demand instead of safety issues and manufacturing defects, the court finds that VinFast adequately disclosed this information. VinFast disclosed that it was an upstart EV manufacturer that was yet to achieve market acceptance, provided sales figures, and disclosed related-party sales. (*See* Proxy at 30 (VinFast "cannot predict the level of market acceptance or the amount of market share these vehicles or services will achieve, if any.").) All of the information disclosed and publicly available would allow an investor to gauge the level of market demand. A

[13] Plaintiffs also urge Denli's story is corroborated by a whistleblower who also spoke to the alleged factory lockdowns. (Compl. ¶ 91.) Again, while these alleged lockdowns are deeply troubling to the court, they do not provide any corroboration for the alleged marketability issues.

similar point can be made for any safety and manufacturing defects. The harm of such defects would simply be reduced sales figures, something borne out in the data disclosed, or in the disclosure that VinFast had previously performed recalls and could be required to do so again in the future. (*See* Proxy at 30.) Lastly, to the extent safety defects reduced sales or otherwise harmed VinFast, that would mean they were publicly ascertainable and inactionable. *See Ganino*, 228 F.3d at 167.

Given the overarching context here and insufficiencies identified with Plaintiffs' "marketability" allegations, Plaintiffs fail to adequately allege that VinFast's EVs experienced safety and "marketability" defects at the time of the offering. With this pleading failure in mind, the court now addresses the specific Section 10 Claims and Section 11 Claims.

**B. Section 10 Claims**

Plaintiffs fail to adequately plead that Defendants made actionable materially false and misleading statements and omissions with scienter, and thus their Section 10 Claims must fail.

1. Claims and Elements

Section 10(b) of the Exchange Act provides that it is unlawful to deceive investors through "misrepresentation[s] or nondisclosure" in connection with the purchase or sale of a security. *Ganino*, 228 F.3d at 161. Rule 10b-5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance," *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999), and prohibits "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5(b). "Pure omissions" are not actionable under Section 10, as they do not render other statements misleading. *See Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264-65 (2024).

To state a claim under Section 10, Plaintiffs must allege with particularity "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp.*, 35 F.4th 95, 102-03 (2d Cir. 2022). With respect to (1), material misrepresentations require a showing that the statements were false when made, and alleged omissions must render another statement misleading. *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12, 14 (2d Cir. 2019). Materiality, in essence, requires that the information be important to a reasonable investor, and this fact-intensive inquiry is rarely appropriate for decision on a motion to dismiss. *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646-47 (S.D.N.Y. 2017). Primarily at issue in this case and the court's analysis are elements (1) and (2).

Plaintiffs' Section 10 Claims arise from three main categories of alleged statements and omissions. The first are VinFast's capital position statements, which Defendants argue were inactionable puffery. The second are VinFast's sales projections, which Defendants argue were forward-looking and opinion statements. (Compl. ¶¶ 61, 165.) The third are statements regarding the related party sales, which Defendants argue were not false. Related to the sales projections are alleged omissions of marketability issues[14] and sales to related parties. (*Id.*) For the reasons stated below, none plausibly state a claim under Section 10. The court first discusses whether each are actionable misrepresentations in turn, then discusses scienter separately.

[14] As discussed above, Plaintiffs fail to adequately plead marketability issues. *See supra* Section III.A.

2. Capital Position Statements

Plaintiffs have not adequately alleged that the Capital Position statements are actionable material misrepresentations, as the first prong of the six-factor *Noto* test requires. The Capital Position statements alleged to be misleading are laid out below:

1. Mansfield: "So we actually are very comfortable with our capital position at the moment, although we will obviously take our opportunities as they present themselves now we have the listing vehicle and we can participate with investors. We are not in a rush to do so, and we will obviously be working hard to educate investors about the stock as we have continued to do so for the last two years or so. And you know, when that opportunity presents itself, we will look into getting back into the capital market."

2. Mansfield: "We have a number of strategic investors and institutional investors lined up. We expect to formulate some kind of capital raising over the next 18 months for sure. We don't need more equity capital but if an opportunity is presented, we'll obviously take advantage of that while we can."

3. Thuy: "We . . . have the commitment from our shareholder, Vin[g]roup, and our chairman, up to $2.45 billion dollars, so that will help us continue on our path, we have been talking as part of a traditional IPO . . . to a lot of the investors after becoming public today, we will continue the dialogue a lot to the investors, sovereign wealth funds, so many other institutional investors as well. When the time is right for another transaction, for the transaction to bring in significant funding for VinFast, we will do so. Meanwhile, we had very regular conversations with our, with potential investors."

(Compl. ¶¶ 168-170 (emphasis omitted).) Plaintiffs allege that these statements were materially false and misleading because

they concealed Defendants' then-present need to raise capital and their concrete plans to do so—namely, defendants relaxing the lock-up provision only two weeks after the Offering; receiving nearly $1 billion in loans from Vingroup and Vuong; and entering into the Yorkville Agreement. (*Id.* ¶¶ 24-25, 28.)

Defendants raise two main arguments as to the capital position statements. First, they argue the statements identified were not actually false or misleading given the qualifying, indefinite language used and given the context of surrounding statements and other disclosures reflecting an intent to raise capital in the future. (Mot. at 17.) Second, Defendants argue that the statements are inactionable puffery and opinions. (*Id.* at 16-17.) The court agrees.

Under Second Circuit law, "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. Thus, "generally optimistic opinions" that are not "determinate, verifiable statement[s]" are "*precisely* the type of puffery . . . consistently held to be inactionable." *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417-18 (2d Cir. 2023). This rule logically follows, because "[u]p to a point, companies must be permitted to operate with a hopeful outlook." *Rombach*, 355 F.3d at 174. Similarly, opinion statements are not "objectively determinable" and thus are not actionable. *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018). Statements regarding a company's "sound capital structure" and "comfortable position" have been found to be inactionable puffery, for example. *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 211–12 (S.D.N.Y. 2020), *vacated on other grounds*, *Sherman v. Abengoa, S.A.*, 156 F.4th 152 (2d Cir. 2025). Generally, opinion statements and puffery are inactionable when, in view of the "total mix of information" available, no "reasonable investor would have been misled," *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 318-19 (S.D.N.Y. 2020), and they "convey[] no

meaningful, objective data that an investor would rely upon." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018).

Here, the Capital Position statements are exceedingly general; they merely express VinFast executives' "comfort" with their capital position and the fact that they were "not in a rush" to acquire more. (Compl. ¶¶ 168-170.) These statements are directly analogous to those held to be puffery in other courts, and precisely the type of general corporate optimism that is inactionable and would not mislead a reasonable investor. *See Francisco*, 481 F. Supp. 3d at 211-12. As Defendants argue, "VinFast's expectations of raising capital were no secret to investors" given their disclosures in the offering documents, and given the plain language of *the quoted statements themselves.* (Mot. at 16; *see also* Compl. ¶¶ 168-170.) A reasonable investor would have looked to the Offering Documents and the Executives' complete statements and concluded that VinFast was looking to pursue additional capital at some time in the future if the opportunity arose. This total mix of information would not have led them astray.

On a broader level, too, the Capital Position statements were neither false nor misleading. In the very passages quoted in the complaint, Mansfield expressly indicated actions VinFast was taking to *raise capital* and that they "for sure" would be raising capital over the next 18 months. (Compl. ¶ 169.) Put simply, the statements themselves contemplate taking opportunities to raise capital as they arose. These statements, which expressly anticipated further capital raising efforts, did not "conceal" VinFast's intentions to raise capital. Additionally, viewed in tandem with the Offering Documents, which explicitly indicated the capital-intensive nature of the automotive industry, the statements would not serve to mislead investors into thinking no additional capital would ever be needed. A natural reading of the statements is that VinFast's executives were not overly concerned or

pessimistic about their levels of capital, but rather, as they said, open to opportunities as they arose. (*Id.* ¶ 168.) Especially in view of the heightened pleading standards requiring particularity here, Plaintiffs fail to adequately plead that the Capital Position statements were actionable or misleading. In sum, a reasonable investor would not have been misled by these statements given the total mix of information available.

3. Sales Projections

Plaintiffs have likewise failed to adequately allege with particularity that the Sales Projection statements are actionable misrepresentations. Plaintiffs point to multiple statements, which all state and reaffirm the projections of 40,000 to 50,000 vehicle deliveries in 2023. (Compl. ¶¶ 190-192.) Plaintiffs allege that these statements were "materially false and misleading because"—given a lack of market demand due to the safety issues, negative reviews on the alleged poor quality of the EVs, Denli's public statements, and the related party sales—there was no reasonable basis for the projections. (*See, e.g.*, *id.*) As dispensed with above, Plaintiffs unsuccessfully use these statements as a part of their marketability allegations. The court now discusses Plaintiffs' further allegations that the projections were misleading by omission because the majority of deliveries in the first half of 2023 were made to GSM.

In the Motion to Dismiss, Defendants argue that these projected sales figures are "quintessential forward-looking statements protected by the PSLRA's safe harbor." (Mot. at 9.) Defendants assert that since these statements were accompanied by cautionary language, they cannot be actionable. (*Id.* at 10.) Relatedly, Defendants argue that these projections are *per se* inactionable because they are opinion statements. Defendants also argue that the statements were not false when made, and Plaintiffs made no showing that they were not genuinely held. (Mot. at 12.)

Next, they argue that the (what they claim to be) conclusory allegations about marketability issues fail to "identify with particularity and information known to Defendants about VinFast's potential market that made the sales projections unrealizable." (*Id.*)

Forward-looking statements are those "whose truth cannot be ascertained until some time after they are made." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 386 (S.D.N.Y. 2024). Under the PSLRA, forward-looking statements are given safe-harbor protections against liability if, as relevant here, "(1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' or (2) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" *See In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 245 (2d Cir. 2016) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Projections of things like revenues, sales, earnings, and other financial data are specifically defined as forward-looking in the PSLRA. *See* 15 U.S.C. § 78u-5(i)(1)(A-D).

Opinion statements are also inactionable absent specific allegations that (1) Defendants "did not hold the belief [ ] professed," (2) "the supporting fact[s] [] supplied were untrue," or (3) Defendants omitted information that made the statement "misleading to a reasonable investor." *Tongue,* 816 F.3d at 210 (*citing Omnicare, Inc. v. Laborers Dist. CouncilConst. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015)). Projections and estimates are "a well-established species of opinion." *Martin v. Quartermain*, 732 F. App'x. 37, 40 n.1 (2d Cir. 2018).

The Sales Projections statements here are classic forward-looking statements warranting safe harbor treatment. As a threshold matter, they are unquestionably financial projections whose truth could not be evaluated until well after they were made.

Consequently, they cannot be actionable unless they were knowingly false when made *and* unaccompanied by cautionary language. *See Vivendi*, 838 F.3d at 245. Neither apply here. First, as Defendants point out, the Sales Projection statements in the Offering Documents were accompanied by the cautionary statement warning of "the risk that the Company's actual vehicle sales and revenue could differ materially from expected levels," and that sales depended on VinFast EVs achieving market acceptance, among other cautionary language. (Mot. at 10.)

Plaintiffs' Section 10 claims arising from the sales projections statements independently fail because they do not adequately allege that the statements were made with knowledge of falsity. Although Plaintiffs repeatedly allege that there were general "marketability defects" of which Defendants were aware, pointing to negative reviews and Denli's allegations, these do not concretely tie these issues to sales numbers. Plaintiffs do not provide an estimate of what the projections should have been or any reasoning as to why they believe the estimate is wrong, merely arguing they were unrealistic. In other words, even if demand for VinFast's EVs were severely lacking and Plaintiffs properly alleged "marketability defects"—which they do not—Plaintiffs do not allege *how* that indicates Defendants believed the projections of 40,000-50,000 deliveries were unachievable. To the contrary, Defendants very well could have taken consumer demand and any potential deficiencies with the EVs into account when creating the projections and adjusted them accordingly. Plaintiffs' argument comes down to the plainly conclusory assertion that because demand was generally weak, 40,000 to 50,000 sales would be unrealistic. This argument falls far short of their burden under Rule 9(b) to plead this point with particularity. *See Woolgar*, 477 F. Supp. 3d at 223 (holding it is insufficient "to [merely] allege that an opinion was unreasonable, irrational, excessively optimistic," or otherwise argue "fraud by hindsight").

In contrast with Plaintiffs' arguments that the projections were entirely unrealistic and could not have been believed by Defendants, VinFast ended up selling "nearly 35,000" EVs in 2023. (Compl. ¶ 203.) While the ultimate result is not dispositive in evaluating the reasonability of past projections made, the fact that VinFast came up only about 12% short of their target range detracts from the force of Plaintiffs' arguments that there was no basis to make the projections in the first place. To illustrate, had VinFast sold only 5,000 vehicles, that could add some credibility to the inference that the sales projections were not genuinely held when made. Here, however, a slight miscalculation or underperformance does not support the inference of fraud, and to hold otherwise would be to endorse the rejected "fraud by hindsight" approach. *See Woolgar*, 477 F. Supp. 3d at 223.

Another ground making the statements inactionable is that they are archetypal opinion statements to which an exception does not apply. For the same reasons described above, Plaintiffs do not establish that they were not genuinely believed, or lacked a reasonable basis, especially because VinFast nearly achieved them. Accordingly, the factors in *Tongue* are satisfied and the projections are inactionable as opinions as well.

Additionally, Plaintiffs' arguments as to the sales projection statements are in logical tension with one another. Plaintiffs argue that there was no basis for the projections because of a lack of demand, but simultaneously that they were misleading because the majority of sales were made to related parties. Plaintiffs seem to ignore the possibility that ***because*** VinFast was able to make a large number of sales to GSM, the projections were in fact realistic and had a substantial basis. VinFast indeed may have had a stronger basis for these projections than the average company would, because they were in a better position to know the number of sales they would be able to make to

related parties. Plaintiffs have not pleaded facts with enough specificity to determine that their alternative is plausible.

Lastly, to the extent Plaintiffs' claim argues the projections were misleading by omission of related party sales, VinFast repeatedly and sufficiently disclosed its reliance on and sales to related parties. *See infra* Section III.C.3. The same applies to the "marketability" omission argument. *See supra* Section III.A. Ultimately, Plaintiffs fail to plead that the sales projection statements are actionable, false, or misleading.

4. Scienter

In addition to being otherwise inactionable, the Section 10 Claims also fail because Plaintiffs fail to adequately allege a strong inference of scienter as required to maintain them. In brief and as explained below, Plaintiffs do not provide sufficient direct or circumstantial factual allegations to support a strong inference of intent to defraud or recklessness.

Scienter is a "mental state embracing intent to deceive manipulate or defraud." *Ernst*, 425 U.S. at 193 n.12. In order to plead a Section 10 claim under the PSLRA's demanding standard, Plaintiffs must "state with particularity facts giving rise to a strong inference that [ ] Defendant[s] acted with" scienter. 15 U.S.C. § 78u-4(b)(2). The Supreme Court has construed the "strong inference" requirement to mean that the inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 314 (2007). Accordingly, this analysis requires a court to evaluate the sufficiency of Plaintiffs' showing, determine whether the inference is cogent or 'makes sense,' and then weigh competing inferences. *Id.* Plaintiffs can surpass the first hurdle by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Even if that showing is made, courts then weigh competing inferences, and if a non-fraudulent inference is at all stronger than Plaintiffs' theory of scienter, Plaintiffs have not met their burden. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (same).

Defendants argue that Plaintiffs fail to plead a strong inference of scienter for several reasons. First, Plaintiffs "do not and cannot point to a single first-hand account of fraud observed at VinFast." (Mot. at 19.) Beyond the lack of direct first-hand evidence, Defendants argue the complaint also fails to plead any plausible motive as to why any Defendant would commit fraud here. Most notably, none of the individual defendants are alleged to have profited in any way from the occurrences here, as "Plaintiffs admit all of the proceeds of [stock] sales . . . went directly to the company (and benefited shareholders)." (*Id.* at 20 (citing Compl. ¶¶ 216-221).) They continue that other generic motives, like inflating VinFast's stock price, are insufficient. (*Id.* (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).) Defendants conclude that without allegations that Defendants personally and concretely benefited from the fraud, which do not exist here, there cannot be a strong inference of scienter. (*Id.* at 20-21.)

Plaintiffs respond by arguing that the lack of confidential witnesses is not a weakness because the identity of their witness, Denli, is known. (Opp. at 20.) Relatedly, they aver that Denli's allegations state with particularity a basis for the strong inference of scienter, arguing that Defendants knew the disclosures contained false and misleading statements and omissions. (*Id.* at 21.) They argue that this knowledge of falsity establishes at least conscious misbehavior or recklessness. (*Id.* at 14, 20 (*citing Novak v.*

*Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).) Regarding the argument that their theory of motive is illogical, Plaintiffs argue that Vuong was motivated by a strong sense of "social responsibility" and Vietnamese patriotism rather than profit. (Opp. at 21.) They argue Vuong's statements regarding his idiosyncratic motives for running VinFast "eviscerate" Defendants' arguments regarding lack of cogent motive. (*Id.*)

Plaintiffs do not meet their burden here at any stage of the inquiry. First, while they are correct that there is "no authority requiring confidential witness allegations" for a securities fraud claim, *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019), Plaintiffs still provide *no* direct evidence of scienter, from a confidential source or otherwise. The circumstantial evidence is lacking as well—especially considering the heightened pleading requirement—and requires several large, implausible inferential leaps to arrive at fraud. Denli's allegations provide at most the conclusory assertion that Vuong knew of his concerns because of supposed reporting guidelines. But Vuong's alleged knowledge of issues with the EVs is far from sufficient to conclude he had an "intent to . . . defraud" investors. *Ernst*, 425 U.S. at 193 n.12. Even assuming Vuong actually knew of Denli's concerns when reported, this does not necessarily suggest that Defendants fraudulently disclosed or omitted anything. As detailed above, Vuong stated that he used media reports to work to improve the EVs, and could have done the same with Denli's statements. (*See* Compl. ¶ 103.) Alternatively, he may have reviewed Denli's concerns and "honestly believe[d]" that they were not problematic. *Aratana*, 315 F. Supp 3d at 765 (finding no scienter when company reasonably "honestly believe[d]" its positive reporting). Conclusory allegations that Vuong knew of issues with the EVs likewise fall far short of establishing that he knew the sales projections were false or lacked basis when made. *See supra* Section III.B.3. Plaintiffs offer no facts or explanation to show that these concerns were

not accounted for in the projections or how the projections should have differed. Additionally, Denli's allegations plainly could not support scienter as to any statements or omissions other than the sales projections or the related "marketability issues." For example, his concerns regarding safety have no relevance whatsoever to VinFast's need for capital or the lock-up provision.

Moreover, Plaintiffs' theory of motive based in patriotism does not persuade the court, nor does it save their allegations from the defects identified in Defendants' motion to dismiss. The lack of scienter becomes particularly clear when one considers that the alleged theory of fraud would inevitably be discovered by the end of 2023. For instance, in the context of the sales projections, the alleged fraud would surely be exposed at the end of 2023 when VinFast announced it sold fewer than the projected number of vehicles. The same is true of Plaintiffs' theory of scienter for the capital position statements. There, any fraud would soon be revealed when VinFast decided to raise capital. And again, no Defendant benefited from this "fraud." Overall, Plaintiffs' urged theory that Vuong and Defendants were motivated to temporarily prop up the stock price through inflated projections solely out of a sense of patriotism and for no personal benefit, only for the 'fraud' to be exposed less than a year later strains credulity.

Ultimately, the court is left to weigh two competing inferences: (1) that Defendants committed a short-term fraud for no personal or financial benefit only out of a sense of patriotism, against (2) that Defendants did not intend to defraud investors. The court concludes that Plaintiffs' urged inferences here are far weaker than Defendants' proposed inference that they did not intend to defraud investors. Plaintiffs have therefore failed to adequately plead scienter and their Section 10 Claims fail for this reason as well.

Plaintiffs' Section 10 claims fail at each step of the analysis. The statements Plaintiffs allege to be fraudulent are inactionable opinions, puffery, and protected forward-looking statements. None are false or misleading. Plaintiffs are also unable to establish a cogent theory of scienter, especially in light of the PSLRA's heightened pleading requirements. Consequently, Plaintiffs' Section 10 Claims must be dismissed. Given the deficiencies discussed thus far, the court need not reach the issue of loss causation. *See In re Xunlei Ltd. Sec. Litig.*, 180-CV-467 (PAC), 2019 WL 4276607, at *12 (S.D.N.Y. Sept. 10, 2019) ("The Court need not reach loss causation here because Plaintiffs' failure to adequately plead scienter or a misstatement or omission is dispositive of the Section 10(b) claim.").

### C. Section 11 Claims

#### 1. Pleading Standard

As a threshold matter, the court must determine whether the Section 11 Claims are required to meet the heightened pleading standard under Rule 9(b). *See Gentiva*, 932 F. Supp. 2d at 392. To do so, the court considers whether: "(1) the complaint contains merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the Securities Act claims; (2) the allegations themselves include classic fraud language; (3) the complaint does not show any basis for the claims that is non-fraudulent; and (4) the plaintiffs do not separate the factual allegations supporting the fraud claims and negligence claims, but rather require the courts to parse the complaints." *Id.* Here, the court finds that Plaintiffs' Section 11 Claims are sufficiently distinct from the Section 10 fraud claims and will not be analyzed under Rule 9(b)'s heightened pleading standards.

Here, Plaintiffs provided more than a blanket disclaimer. They deliberately separated out the claims into different sections, provided separate allegations, and expressly disclaimed that the claims sounded in fraud. Importantly, Plaintiffs' Section 11

Claims largely arise from statements and omissions in the Offering Documents that do not logically necessitate a mental state beyond negligence. For instance, allegations that the data provided on related party transactions did not fully inform the investing public of the extent of their reliance is alleged to be and reasonably could result from negligence. Moreover, the "materially false and misleading" language Plaintiffs use, while also associated with fraud, entirely tracks the non-fraud-associated language used in Section 11. *See Carpenter v. Oscar Health, Inc.*, No. 22-CV-3885 (VSB), 2025 WL 722729, at *4 (S.D.N.Y. Mar. 6, 2025) ("Allegations that statements or omissions were 'materially false or misleading' or contained 'untrue statements of material fact' do not, however, necessarily sound in fraud, as such allegations simply track the language of Section 11[.]"). Put differently, Plaintiffs' Section 10 and 11 Claims are "analytically distinct, even if overlapping conduct forms the basis for both." *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021). Therefore, the Section 11 Claims need not meet the heightened Rule 9(b) standard.

2. Claims and Elements

Plaintiffs' Section 11 Claims arise from three categories of statements and omissions: (1) VinFast's alleged failure to disclose the extent of its reliance on and sales to related parties, (2) the lock-up provision, and (3) VinFast's alleged omission of its vehicles' "marketability issues" and lack of outside demand for them. (Compl. ¶ 59.) Category (3) is discussed in more detail above. *See supra* Section III.A. For the reasons described below, Plaintiffs also fail to state a claim under Section 11 in categories (1) or (2).

To state a Section 11 claim, a plaintiff must allege "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; ***or*** (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *N.J. Carpenters Health Fund v. Royal*

*Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011)) (emphasis added). When a claim is premised on (2), a plaintiff must show that defendants were under a legal obligation to disclose the information requested. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 n.3 (2015). Just as with the Section 10 Claims, a Plaintiff has adequately pled materiality when a "reasonable investor would have considered [the statement or omission] significant in making investment decisions." *Ganino*, 228 F.3d at 161.

Here, Plaintiffs premise their Section 11 omissions theories on category (2) above. Specifically, they claim that Defendants had obligations arising out of Items 105 and 303 of SEC Regulation S-K, 17 C.F.R. §§ 229.105, 229.303 ("Item 105" and "Item 303" respectively). Item 105 requires "a discussion of the material factors that make an investment . . . the offering speculative or risky." 17 C.F.R. §§ 229.105(a). Item 303 requires a company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Based on these Items, Plaintiffs contend that VinFast was obligated to disclose more information regarding its sales to related parties and its vehicles' marketability problems, as these were risk factors and known trends. (Opp. at 9, 11.)

### 3. Sufficient Disclosure of Sales to and Reliance on Related Parties

Plaintiffs allege Defendants were required to and failed to disclose the "known trend [or] uncertainty" and risk that the majority of VinFast's sales were made to related parties. (Compl. ¶ 20.) Plaintiffs fail to state a Section 11 claim arising out of alleged omissions regarding VinFast's sales to related parties.

Defendants argue that claims from this alleged omission fail because related-party sales were in fact "robustly disclosed." (Mot. at 11, 14-15.) In doing so, Defendants point to narrative disclosures regarding reliance on related parties, (*id.* (citing Proxy at 47)), as well as a table of related-party transactions including revenues from sales to GSM, (*id.* at 5 (citing Proxy at F-76).)

In their Opposition, Plaintiffs respond that Defendants did not specifically disclose their total EV sales in the first half of 2023, preventing an investor from calculating the exact proportion of EV sales were made to GSM. (Opp. at 9.) Moreover, Plaintiffs point to VinFast's subsequent 2024 Annual Report which "included ***the exact*** information Plaintiffs allege was missing from the Offering Documents." (Opp. at 11.) Plaintiffs also cite to and rely on various cases they argue are analogous, like *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330 (S.D.N.Y. 2024), where the court held that mere narrative disclosure was insufficient under Item 303, as it did not alert investors to the enormous magnitude of penalties sought. (*See* Opp. at 11.)

In reply, Defendants contend that Plaintiffs fail to dispute that "VinFast repeatedly disclosed its sales to, and reliance upon, related parties," and that Plaintiffs merely "would have liked for VinFast to slice the data some additional ways." (Reply at 7.) Defendants emphasize that Plaintiffs cite no case law or support requiring the data to be arranged in this precise way, and that the cases Plaintiffs do rely on are distinguishable, because they involve companies "omitt[ing] material disclosures in favor of generic risk warnings." (*Id.* at 8.) Finally, defendants argue that Plaintiffs' reliance on VinFast's subsequent disclosures with more detailed information fails. The court largely agrees.

As explained above, a Section 11 claim based on pure omission requires an affirmative obligation to disclose the information, which Plaintiffs allege arises from Items 105 and 303. While there is no explicit test for what constitutes sufficient disclosure

under Items 105 and 303 beyond the language in the items itself, case law provides illustrative examples. For instance, in *Amgen*, Defendant failed to meet its disclosure obligations by providing merely a generic narrative warning regarding potential liability from an IRS investigation. 751 F. Supp. 3d at 348. In contrast, when a warning directly addresses the risk or uncertainty at issue, there is no Item 303 or 105 violation. *See Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 555-56 (S.D.N.Y. 2021) (holding Defendant met its Item 105 disclosure obligations when it disclosed investment risks and risks of entering the fintech market despite Plaintiff's allegations to the contrary). Ultimately, the case law delineates a guiding principle of whether a reasonable investor would have been adequately informed of the risks, trends, and uncertainties alleged. *See id.* at 556.

Based on the record, Defendants met their disclosure obligations here. In summary, VinFast disclosed the following information regarding related party transactions: (1) narrative language explaining that they were "dependent on Vingroup affiliates . . . [and] engaged in various related party transactions"; (2) a table of revenue from related party transactions including Q1 2023 sales from GSM[15] and VinHomes Voucher redemptions; (3) that VinFast sold 7,100[16] total EVs to GSM as of June 30, 2023; (4) that VinFast had sold 18,700 total EVs since its inception;[17] and (5) that VinFast sold 9,500 total EVs in Q2 of 2023. (Proxy at 47, F-76, 291, 167.) The only data Plaintiffs contend are missing are

[15] GSM was founded in Q1 2023, so no prior data was available.

[16] This figure is derived from the sum of a vehicle-specific breakdown of 4,000 VF e34, 2,800 VF 8, and 300 VF 5 vehicles.

[17] Plaintiffs argue that this total sales figure is unclear and confusing. (Opp. at 5.) However, given the context surrounding it, including VinFast's history of sales spanning back to 2021, the court holds it adequately discloses the total EVs sold.

the number of EVs VinFast sold in Q1 of 2023, which would allow an investor to calculate the exact proportion of vehicles sold to GSM in the first half of 2023. (Opp. at 9.)

Based on these disclosures, a reasonable investor would have understood that GSM, a related company founded in early 2023, accounted for approximately 40% of VinFast's total EV sales since *2021*, and that VinFast had sold over half of its total EVs since inception in just Q2 of 2023. From this information, an investor would have concluded that related party sales made up a very significant portion of VinFast's 2023 sales, and that its 2023 sales made up the majority of its total EV sales since 2021. To be sure, Defendants' argument that Plaintiffs simply wanted the data rearranged or "slice[d] another way" is inaccurate, as the number of EVs sold in Q1 2023 is genuinely missing and not merely presented in different form. That said, while these disclosures did not divulge the reliance on related parties to the most precise extent possible, they were more than sufficient to fulfill the obligation under Items 303 and 105 to adequately disclose "known trends and uncertainties" and risk factors. Further, Plaintiffs' cited cases are inapposite. Unlike here, the Defendants in those cases provided only vague warnings in narrative form, downplaying the magnitude of significant issues. *See, e.g.*, *Amgen Inc.*, 751 F. Supp. 3d at 348 (finding disclosures insufficient when defendants provided only narrative explanation that an IRS audit "could have a material impact," and failed to disclose that the IRS was seeking $10.7 billion dollars). Here, conversely, VinFast disclosed its significant reliance on related parties through several data points and narrative explanation, putting a reasonable investor on notice that VinFast relied quite extensively on related parties for sales of its EVs. VinFast provided far more than the generic warnings at issue in Plaintiffs' cited cases.

Ultimately, the court holds that the ample information disclosed regarding related party transactions was sufficient to put a reasonable investor on notice of the significant number of related party sales. VinFast's numerous and detailed disclosures amount to far more than "patchwork commentary" and satisfy their obligations under Items 105 and 303. (Opp. at 10 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015).) Since the court concludes that there was no omission as to related party sales, it does not reach the question of materiality. *Cf. Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 14-CV-9443 (ER), 2017 WL 1192888, at *7 n.10 (S.D.N.Y. Mar. 29, 2017)

4. Omitted "Marketability Problems"

For the reasons previously explained, *see supra* Section III.A, Plaintiffs have failed to adequately plead that any "marketability issue" existed or was known to Defendants at the time of the offering. Defendants are not and cannot be obligated to disclose a fact that does not exist. *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 402 (S.D.N.Y. 2020) (A party "cannot be faulted for failing to disclose a fact or analysis that did not exist."), *aff'd,* 847 F. App'x 35 (2d Cir. 2021). Furthermore, VinFast did in fact disclose past recalls for safety issues and the possibility of future ones occurring, (*See* Proxy at 30), adequately warning investors of the risks of safety problems, *see Novak*, 216 F.3d at 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant. . . . [A]llegations that defendants should have anticipated future events and made certain disclosures . . . do not suffice to make out a claim of securities fraud."). Therefore, since Plaintiffs cannot establish a known uncertainty, or disclosure obligation regarding marketability issues, they do not adequately plead a material omission under Section 11.

5. Lock-up Provision

Plaintiffs' third and final basis for their Section 11 Claim is grounded in an allegedly false statement regarding the lock-up provision, as opposed to the previous two claims based on omissions. However, Plaintiffs do not plausibly allege that the lock-up provision was false when made, so this claim likewise fails.

Defendants maintain that since the lock-up provision expressly contemplated a potential release and even warned that this release could impact the share price, the fact that Defendants later exercised this option does not render the provision false or misleading. (Mot. at 18.) They continue that since "Plaintiffs allege no particularized facts establishing that" Defendants intended to change course beforehand, the claim must fail. (*Id.*) A company's statements, they argue, are "not rendered misleading by the company's subsequent consideration of an alternative plan." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F. 3d 801, 810-11 (2d Cir. 1996); *see also Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, No. 24-CV-646, 2024 WL 4647131, at *4 (2d Cir. Nov. 1, 2024).

Plaintiffs allege that the lock-up provision included in the offering was illusory and thus false and materially misleading at the time it was made. Plaintiffs argue that since Defendants exercised their option to release the lock-up provision within just two weeks of the Offering, they must have known or planned they would do so prior to or at the time of the offering. (Opp. at 13.) In line with this theory, Plaintiffs further allege that this release required Board approval and negotiating terms with investors, which they argue would have taken longer than just two weeks. (*See id.* (citing *Erickson v. Jernigan Cap., Inc.*, No. 20-CV-9575 (MKV), 2022 WL 3028627, at *4 (S.D.N.Y. Aug. 1, 2022), and *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021), for the proposition that a complex transaction

occurring so quickly creates a plausible inference that Defendants never truly intended to abide by the provision).)

Defendants reply that Plaintiffs' arguments regarding the amount of time and steps it would take to exercise the lock-up release are merely speculation and "conjecture, unsupported by facts." (Reply at 9 ("Plaintiffs are therefore left to speculate that because VinFast later released shares from the lock-up, they can impute knowledge back to the time the Proxy was filed.").)

In the securities fraud context, statements do not become misleading merely because a company decided to change course after making the statement. *See San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F. 3d at 811; *Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014)*, aff'd sub nom. In re Lululemon Sec. Litig.,* 604 F. App'x 62 (2d Cir. 2015) ("A statement believed to be true when made, but later shown to be false is insufficient . . . *contemporaneous* falsity" is required). On the other hand, a disclosure, or lack thereof, *can* be false or misleading when the surrounding context plausibly supports the inference that the statement was not genuinely believed when made, including when an inchoate transaction was "already in place." *Erickson,* 2022 WL 3028627, at *4.

The court agrees that Plaintiffs' speculative and conclusory allegations regarding the timing of this transaction do not raise a plausible inference that the provision was false and misleading at the time of the offering. Crucial to the court's determination is the fact that the lock-up provision expressly discussed the option for it to be released and the fact that doing so could impact share prices. The surrounding context here further indicates that the two-week time period alone is insufficient to give rise to the plausible inference that the provision was illusory at the time of the offering. For example, as discussed in the oral argument, the provision was released just after VinFast's share price reached its peak, a substantial opportunity for the company. In part because

the sale of shares was reinvested in the business, the only plausible inference on the record before the court is that VinFast, to the benefit of its shareholders, seized the opportunity to sell shares when the price was high enough to warrant doing so. (*See* Oral Argument Tr. at 36:9-16.) Plaintiffs' theory does not cross the line from possible to plausible.

*Erickson*, the main case on which Plaintiffs rely for this argument, is distinguishable for two reasons. First, here, unlike in *Erickson*, the lock-up provision at issue explicitly disclosed the possibility that it could be released. Therefore, the disclosures did not "portray[] a transaction that was materially different from the one [actually] carried out." *Erickson*, 2022 WL 3028627, at *3 (S.D.N.Y. Aug. 1, 2022). Rather, the transaction here was expressly contemplated and portrayed as a possibility at the time of the offering. Second, *Erickson* involved a significant $300 million transaction related to Defendant's acquisition of another company, including the negation of terms across different companies. That transaction included the provision of a board seat and "management and first offer rights concerning the Company's real estate assets." *Id.* The court there found that it was implausible that this transaction could have arisen in under two weeks. Evidently, that type of transaction—involving multiple different entities vying for more favorable terms—would be more complex and time-consuming than a simple board approval of the lock-up release and preparation of SEC documents. *Altimeo* likewise involved a more complex transaction, and included specific allegations from confidential sources that a defendant "directed attendees [of a department meeting] that they needed to keep a low profile concerning the relisting plan." *Altimeo*, 19 F. 4th at 148. Further, unlike here, the complaint in *Altimeo* alleged that the type of transaction at issue "typically takes companies at least a full year on the quickest possible timeline" *Id.* The instant complaint is devoid of comparable allegations.

While *Erickson* does certainly stand for the proposition that a short intervening time period *can* raise the inference that a transaction was "already in place," *Erickson*, 2022 WL 3028627, at *4, evaluating questions like these is a "context-specific task," and the context here differs substantially, failing to support Plaintiffs' requested inference, *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 497 (E.D.N.Y. 2025).

Ultimately, Plaintiffs' conclusory and speculative allegations fail to raise a plausible inference of a nefarious, illusory lock-up provision, and thus fail to state a claim under Section 11.

### D. Control Person Liability

Plaintiffs allege violations of Section 15 and Section 20(a) of the Securities Act and the Exchange Act corresponding to their Section 10 and Section 11 Claims, respectively. These corresponding claims assert "control person liability" against the individual defendants. *See In re Lehman Bros. Mortgage-Backed Secs. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011). In order to state a claim for control person liability under both statutes, a Plaintiff must show (1) a primary violation and (2) control of the primary violator by the individual defendants. *Id*. For the reasons stated above, Plaintiffs have failed to state a claim for a primary violation of either Section 10 or Section 11. Consequently, their control person claims also fail. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 252 (S.D.N.Y. 2020) ("In light of the dismissal of the Section 11 and Section 10(b) claims against all Defendants, Plaintiffs' Sections 15 and 20(a) claims, which rely on the same underlying factual allegations, are also dismissed.").

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Rule 12(b)(6) motion to dismiss the Complaint with prejudice. The Clerk of Court is respectfully DIRECTED to close the case.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2026

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge